# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN, CONSTANCE
HANSEN and RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

        Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

*FILED*
*2003 JUN 30 P 3:40*
*U.S. DIST. COURT CLERK*
*EAST. DIST. MICHIGAN*
*DETROIT*

---

| | |
|---|---|
| Robert J. Muise (P62849) | Seth M. Lloyd (P16742) |
| Edward L. White, III (P62485) | Jill M. Wheaton (P49921) |
| THOMAS MORE LAW CENTER | Laura Sagolla (P63951) |
| Attorneys for Plaintiffs | DYKEMA GOSSETT PLLC |
| 3475 Plymouth Road, Suite 100 | Attorneys for Defendants |
| Ann Arbor, MI 48105-2550 | 400 Renaissance Center |
| (734) 827-2001 | Detroit, MI 48243-1668 |
| | (313) 568-6837/(734) 214-7612 |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through their attorneys, Dykema Gossett PLLC, hereby move for

summary judgment of all claims against them pursuant to Fed. R. Civ. P. 56. In support of their

motion, Defendants rely upon the accompanying brief.

1

There was a conference between attorneys in which the movant explained the nature of the motion and its legal basis and requested but did not obtain concurrence in the relief sought.

Respectfully submitted,

DYKEMA GOSSETT PLLC

Seth M. Lloyd (P16742)
Jill M. Wheaton (P49921)
Laura A. Sagolla (P63951)
400 Renaissance Center
Detroit, MI 48243

Dated: June 30, 2003

AA01\105401.1
ID\LSC

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

2

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN, CONSTANCE
HANSEN and RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

        Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

FILED
U.S. DIST COURT CLERK
EAST DIST. MICHIGAN
DETROIT
2003 JUN 30 P 3 40

---

Robert J. Muise (P62849)
Edward L. White, III (P62485)
THOMAS MORE LAW CENTER
Attorneys for Plaintiffs
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001

Seth M. Lloyd (P16742)
Jill M. Wheaton (P49921)
Laura Sagolla (P63951)
DYKEMA GOSSETT PLLC
Attorneys for Defendants
400 Renaissance Center
Detroit, MI 48243-1668
(313) 568-6837/(734) 214-7612

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iv

STATEMENT OF FACTS .........................................................................................................1

ARGUMENT ..............................................................................................................................7

A.    Defendants Did Not Violate Plaintiff's Right to Freedom of Speech. ................................8

    1.    The assemblies and panel discussion were school-sponsored activities.................9

    2.    Defendants' actions were reasonably related to legitimate pedagogical
        concerns. ...............................................................................................................11

B.    Defendants Did Not Violate Plaintiff's Right to Exercise Her Religion. ..........................13

    1.    Stating that homosexuality is wrong is not the "exercise of religion"..................13

    2.    Even assuming that stating the view that homosexuality is wrong is an
        "exercise of religion," defendants did not prohibit such an "exercise." ...............13

    3.    Exposure to material at odds with one's faith does not violate Free Exercise. .....14

    4.    The panel involved no government coercion or compulsion..................................15

C.    Defendants Did Not Violate the Establishment Clause. ....................................................16

    1.    The homosexuality and religion panel had a secular purpose. .............................16

    2.    The panel's "primary effect" neither advanced nor inhibited religion. ................17

    3.    A reasonable observer would not believe that the panel constituted an
        endorsement of religion by PHS. ........................................................................18

D.    Defendants Did Not Violate Plaintiffs' Parental Rights. ..................................................19

CONCLUSION.........................................................................................................................20

DYKEMA GOSSETT A PROFESSIONAL LIMITED LIABILITY COMPANY 400 RENAISSANCE CENTER DETROIT, MICHIGAN 48243

i

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.  Whether summary judgment should be granted to defendant school district and its employees, where the plaintiff high school student claims defendants violated her First Amendment right to freedom of speech by:

    A.  asking her to change certain portions of her speech, to be made during an all school "Diversity Week" assembly, the theme of which was "Celebrating Diversity", and plaintiff's proposed speech was condemning of homosexuality; and

    B.  precluding her from sitting on a Diversity Week panel, organized by another student group, consisting of adult clergy, to answer student's questions on the topic of homosexuality and religion, and not permitting her to choose her own representative for the panel;

where the proposed speech did not address the week's topic; the plaintiff did not follow the procedures set by the school in making her demands regarding the panel; and the position plaintiff sought to convey would not foster tolerance or acceptance of diverse points of view and could actually exacerbate the problem of gay and lesbian harassment in the school?

> Defendants answer "Yes."
> Plaintiffs would answer "No."
> This Court should answer "Yes."

II.  Whether defendants should be granted summary judgment where the plaintiff student claims a violation of her First Amendment right to Free Exercise of Religion by the above actions of the defendants, where the plaintiff voluntarily chose to attend the panel and was merely exposed to a position at odds with her faith; she expressed her views on homosexuality through the written question she posed to the panel (and she elected not to participate in a different panel herself, or to speak at an "open microphone" event, where she also could have expressed her view), and she was not required to accept the position expressed by the panelists?

> Defendants answer "Yes."
> Plaintiffs would answer "No."
> This Court should answer "Yes."

III.  Whether summary judgment should be granted to defendants where the plaintiff student and two plaintiff parents claim a violation of the First Amendment Establishment of Religion clause where the panel which is the subject of their claim consisted of leaders of various religious faiths and denominations, and was designed to present the minority viewpoint that their congregations were open and welcoming of homosexuals, and students were not require to attend?

> Defendants answer "Yes."

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

> Plaintiffs would answer "No."
> This Court should answer "Yes."

IV.    Whether summary judgment should be granted in favor of defendants where the plaintiff parents claim a violation of their parental rights based on their daughters' high school holding an optional, one-time, fifty-minute panel discussion—which both of their daughters chose to attend—in which panel members of various religious faiths and denominations stated that their congregations were open and welcoming of homosexual congregants?

> Defendants answer "Yes."
> Plaintiffs would answer "No."
> This Court should answer "Yes."

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289
(6th Cir. 2001)................................................................................................... 18

*Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002).......................................... 16, 17, 18

*Brown v. Hot, Sexy, & Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995),
cert denied, 516 U.S. 1159 (1996) ................................................................... 19

*Bull v. Dardanelle Pub. Sch. Dist.*, 745 F. Supp. 1455 (E.D. Ark. 1990) ............... 12

*Edwards v. Aguillard*, 482 U.S. 578 (1987) ................................................. 16, 17

*Employment Div., Dep't. of Human Resources of Oregon v. Smith*,
494 U.S. 872 (1990).......................................................................................... 14

*Grutter v. Bollinger*, ___ U.S. ___ (2003) 2003 WL 21433492 (June 23, 2003)........................... 12

*Harris v. McRae*, 448 U.S. 297 (1980) ............................................................. 18

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988).................... 9, 10, 11, 12, 13

*Lawrence v. Texas*, __U.S. ___ , 2003 WL 21467086 (June 26, 2003) ............ 12, 17

*Lee v. Weisman*, 505 U.S. 577 (1992)............................................................... 16

*Leebaert v. Harrington*, ___ F.3d ___, 2003 WL 21363389
(2nd Cir. June 13, 2003)................................................................................ 19, 20

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................................................... 16, 17

*Littlefield v. Forney Independent School Dist.*, 268 F.3d 275 (5th Cir. 2001) ............. 19

*Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987),
cert. denied, 484 U.S. 1066 (1988).................................................................... 15

*Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996) ................... 12

*Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989) ......................................... 10, 12

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, (1995) ............... 11

*Runyon v. McCrary*, 427 U.S. 160 (1976) ........................................................ 19

*Settle v. Dickson County School Board*, 53 F.3d 152 (6th Cir.),
cert. denied, 516 U.S. 989 (1995) .................................................................... 11

*Stone v. Graham*, 449 U.S. 39 (1980)............................................................... 16

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ............................... 8

*Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969) ................... 8, 9, 10

*Thomas v. Review Bd. of Ind.* 450 U.S. 707 (1981).......................................... 15

*Troxel v. Granville*, 530 U.S. 57, 65 (2000) ...................................................... 19

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ......................................... 19

DYKEMA GOSSETT • A PROFESSIONAL LIMITED LIABILITY COMPANY • 400 RENAISSANCE CENTER • DETROIT, MICHIGAN 48243

**<u>Rules</u>**

Fed. R. Civ. P. 56................................................................................................................ 8

## STATEMENT OF FACTS

This lawsuit concerns the events of Diversity Week 2002 at Ann Arbor Pioneer High School ("PHS").[1] The theme of Diversity Week, held March 18-22, was "Change From Within: Celebrating Diversity at PHS." (Ex. 16 to Dep. of Ass't Principal Lara Erickson.) The week's events were organized by the Student Council, headed by student Tom Jensen, with the assistance of its advisor, Sunnie Korzdorfer. (Dep. of Korzdorfer Ex. A, Tab 3, p. 33; Dep. of Tom Jensen, former Student Council Pres., Ex. A, Tab 4, pp. 44-45.)

Diversity Week traditionally includes panel discussions on race, religion, and sexual orientation. The panel discussions are held during class time in the PHS "Little Theater," and teachers sign up to bring their classes. Attendance is not mandatory -- students may choose to go to the library if their teacher is taking their class to the panel and they do not wish to attend; a student who wants to attend the panel but whose teacher has not signed up the class may ask for permission to attend. (Dep. of Erickson, Ex. A, Tab 5, p. 34; Caudle, Ex. A, Tab 2, pp. 45-46.) On February 19, 2002, signs were posted in the school and an announcement was made informing students of a mandatory meeting on February 22 for persons interested in being on a panel. (Ex. 2 to Jensen Dep.) Plaintiff Elizabeth ("Betsy") Hansen,[2] then a senior at PHS and a

---

[1] Diversity Week has been held for many years, and is a vehicle to reinforce, explain and discuss various school district policies, including the non-discrimination policy (which prohibits discrimination on the basis of, among other things, race, religion, and sexual orientation), the bullying policy, and the harassment policy. It also helps foster the Ann Arbor Public Schools' ("AAPS") general emphasis on diversity, pluralism, and multicultural awareness, and helps teach students tolerance, and how to live and work in a diverse society. (Dep. of George Fornero, Superintendent of Schools, attached as Ex. A, Tab 1, pp. 29-33, 80-81, 91-92; Dep. of Henry Caudle, PHS Principal, Ex. A, Tab 2, pp. 17-18.) The AAPS Statement of Rights and Responsibilities states that students have a right to "learn and study in a positive atmosphere for learning – one that is unbiased, nonjudgmental and free from prejudice, discrimination, verbal or physical threats and abuse." (Ex. 1 to Erickson Dep., pp. 3-4.) (Copies of the Non-Discrimination Policy and portions of the Student Rights and Responsibilities Booklet are attached as Ex. B.)

[2] Because both Betsy Hansen and her mother, Constance Hansen, are plaintiffs, defendants will refer to them as "Betsy" and "Mrs. Hansen" respectively to avoid any confusion.

leader of the student group Pioneers for Christ ("PFC") did not attend this meeting, as she was home sick. She asked her friend, Kirsten Raab, also in PFC, to sign her up to be on the sexual orientation panel. Raab reported back to her that there were no sign-up sheets at the meeting. (E. Hansen Dep., Ex. A, Tab 6, pp. 91-93.)

Tom Jensen and Ms. Korzdorfer were unhappy with the small number of students who attended the planning meetings, and realized they would need help. They sent a memo to all student group advisors asking if their groups would organize a panel. The only group to respond was the Gay/Straight Alliance ("GSA"), advised by teachers Rodney Mancini and Parker Pennington, which volunteered to organize the sexual orientation panel around the topic of sexual orientation and religion. (Jensen, Ex. A, Tab 4, p. 46.) The reason student members of GSA chose this topic was that in past years, many of the questions directed to the homosexuality panels had to do with religion. The students also believed that trained, educated adults—namely, clergy—were best-suited to speak to the topic. Their goal for the panel, to show that gay students could also be religious and that homosexuality and religion are not necessarily incompatible, also comported with the week's celebratory theme and the mandate to promote tolerance. (Dep. of Pennington, Ex. A, Tab 7, pp. 87-92, 98-101; Dep. of Mancini, Ex. A, Tab 8, pp. 19-20, 56-57.) The panel discussion was not meant to be a debate, or to convey the message that many religions are condemning of homosexuality. Rather, GSA wanted to present the less-frequently heard view that some places of worship embrace and accept gays and lesbians. (Pennington, Ex. A, Tab 7, pp. 98, 101; Mancini, Ex. A, Tab 8, pp. 19-20.)[3]

---

[3] It should also be noted that gay students at PHS had been subjected to verbal harassment and physical violence, and many felt that the school climate was hostile. (Fornero, Ex. A, Tab 1, pp. 54-55; Dep. of former AAPS Equity Ombudsman Denise Eaddy-Richardson, Ex. A, Tab 9, pp. 22-25; Dep. of Jeannette Maddock, GSA member, Ex. A, Tab 10, pp. 16-19; Mancini, Ex. A, Tab 8, p. 60.) One student had even worn a sandwich board outside of Mr. Pennington's classroom expressing a message of intolerance. (Pennington, Ex. A, Tab 7, pp. 26-

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

Another meeting was held on March 8 for persons interested in being on the panels. Betsy attended this meeting. Although Tom told all those who attended that meeting, held in Korzdorfer's room, that if they wanted to be on the sexual orientation and religion panel, they had to go to another meeting being held in Pennington's room, Betsy did not leave for Pennington's room. (E. Hansen, Ex. A, Tab 6, pp. 95-98; Jensen, Ex. A, Tab 4, pp. 70-72.) Rather, according to Betsy, Jeremy O'Brien, one of the GSA co-chairpersons, later came to Korzdorfer's room and, in response to Betsy's request to be on the panel, told her that the panel would be composed of adult clergy and was not going to be a debate. Betsy states that, at this time, she was under the impression that she could find her own representative to be on the panel.[4]  (Ex. A, Tab 6, pp. 95-98.)

After the March 8 meeting, Betsy continued to express her desire (to Ms. Korzdorfer, not to the GSA) to be on the panel or to have a representative of her choice on the panel. (E. Hansen, Ex. A, Tab 5, pp. 106-07.) Korzdorfer asked Betsy to give her the names of persons she wanted on the panel and she would "see what she could do." However, Betsy never provided any names to Korzdorfer.[5]  (Korzdorfer, Ex. A, Tab 3, pp. 152-53; E. Hansen, Ex. A, Tab 6, p. 100.) Because of Betsy's repeated requests, a meeting was held on March 12 between Korzdorfer, Caudle, Erickson, Eaddy-Richardson, and PFC advisor Bill Johnson. At that time, a decision

27.)

[4] Betsy wrote in her journal that evening that the panel as planned by GSA was "wrong and unfair and misleading" and she "was going to try and find some priests and ministers who actually believe in the God of the Bible rather than an idolatrous god they made up in their heads...!" (Ex. 3 to Hansen Dep., attached at Ex. C.)

[5] Betsy testified that she wanted her representative to convey the message that the Bible teaches that homosexuality is a sin. (Ex. A, Tab 6, p. 124.)

3

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

was made to cancel the panel. (Johnson, Ex. A, Tab 11, pp. 65-71; Caudle, Ex. A, Tab 2, pp. 70-73.)[6]

Another meeting was held on March 15 to discuss the issue, this time with the participation of the GSA advisors. Present at that meeting were Caudle, Korzdorfer, Erickson, Eaddy-Richardson, Mancini, Pennington, Johnson, and the other PFC advisor, James Brink. At that meeting, Pennington and Mancini explained that GSA had organized the panel; that Betsy did not attend the mandatory planning meeting; that the panel consisted entirely of adults; and that participation by a PFC member or representative would be inconsistent with the purpose of the panel. (Erickson, Ex. A, Tab 5, pp. 70-71.) The decision was made to keep the sexual orientation panel as originally planned by GSA, and to give the PFC the opportunity to plan a panel of its own. However, PFC declined because its advisors did not believe they had enough planning time. (Pennington, Ex. A, Tab 7, pp. 112-21; Johnson Dep., Ex. A, Tab 11, pp. 88-97.) Or, as Betsy put it, "it was a weird idea that didn't seem worth doing." (Ex. A, Tab 6, pp. 123.)

In the meantime, Korzdorfer had asked Betsy if she would like to be one of the speakers at the two identical all-school assemblies that kicked off Diversity Week, to be held during the school day in the PHS gym, and Betsy agreed. (There were approximately 2700 students at PHS last year; two assemblies were held because not all of the students could fit into the gym at once.) (Korzdorfer, Ex. A, Tab 3, pp. 128-31.) Under PHS policy, all student speeches must be

---

[6] Eaddy-Richardson, an attorney, testified that at the time of the meeting, she knew that PFC had an attorney and that they were not adverse to suing the school. (Eaddy-Richardson, Ex. A, Tab 9, p. 39.) She was familiar with a legal dispute between PHS and PFC over whether PFC had to sign the AAPS non-discrimination policy, which, as stated above, prohibited discrimination on the basis of sexual orientation. Although all student groups were required to sign the policy, PFC had refused. PHS ultimately allowed PFC to sign the policy with the sexual orientation clause removed, resulting in many complaints to Eaddy-Richardson by students, staff and parents. (Id., pp. 120-21.)

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

reviewed by a faculty member in advance. (Caudle, Ex A, Tab 2, p. 53.) The speech Betsy gave

Korzdorfer for review stated, in part:

> One thing I don't like about Diversity Week is the way that racial diversity, religious diversity, and sexual diversity are all lumped together and compared as if they are the same things. Race is not strictly an idea. It is something you are born with, something that doesn't change throughout your life (unless you are Michael Jackson, but that's a special case). It involves no choice or action. On the other hand, your religion is your choice. Sexuality implies an action, and there are people who have been straight, then gay, then straight again. I completely and wholeheartedly support racial diversity, but I can't accept religious and sexual ideas or actions that are wrong.

(Ex. 13 to E. Hansen Dep., attached as Ex. D.) Korzdorfer was concerned. She had advised the

speakers not to direct their comments to one group, yet Betsy's speech focused primarily on

homosexuals. (Korzdorfer, Ex. A, Tab 3, pp. 133-34.) She showed the speech to Erickson, who

discussed it with Caudle. They also found the speech to be negative and inconsistent with the

week's theme. (Erickson, Ex. A, Tab 5, pp. 86-88.) Korzdorfer called Betsy and asked her not

to target any specific group, to remove the Michael Jackson reference, and to create a celebratory

message. (Korzdorfer, Ex. A, Tab 3, pp. 140-41; E. Hansen, Ex. A, Tab 6, pp. 140-42.)[7] Betsy

revised her speech, which she made on Monday, March 18 at the assemblies. (A copy of the

speech as given is attached as Ex. E.)

Shortly thereafter, following a phone call from an emotional Mrs. Hansen, Eaddy-

Richardson consulted an attorney from the ACLU, who informed her that the school had the

right to deny Betsy's request regarding the panel. (Eaddy-Richardson, Ex. A, Tab 9, pp. 101-03;

---

[7] According to Korzdorfer, she asked Betsy to "rethink some of her comments." (Ex. A, Tab 3, p. 140.) According to Betsy, Korzdorfer "asked me to change parts of it." Betsy did not ask what would happen if she didn't change her speech. (Ex. A, Tab 6, pp. 140-42.) Even taking the testimony in the light most favorable to Betsy, it is clear that she was never "told" to change the speech. That evening, Betsy wrote in her journal, "we are not allowed to be represented on [the panel] and we are going to talk to the lawyers about that. Daddy in heaven, will you please work things out?"(Ex. 5 to Hansen Dep., attached as Ex. C.)

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY CO·39 PARK·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

Ex. 5 to Eaddy-Richardson Dep.)  Pennington then sent an e-mail to the PHS faculty advising

them of the panel's subject matter and purpose.  (Ex. 10 to Erickson Dep., attached as Ex. F.)[8]

The homosexuality and religion panel was held on March 20.  The panelists consisted of

a rabbi, two Episcopal rectors, a Presbyterian minister and an elder, and a pastor from the United

Church of Christ.  (Ex. 2 to Mancini Dep.)  Questions for the panel had been pre-submitted by

students in a "fishbowl" in the PHS office.  Pennington acted as the facilitator and read the

questions to the panelists.  Betsy submitted three questions, each of which was read aloud to the

panel.[9]  The panelists stated that their faith or congregation was accepting of homosexuals or, in

one case, that although his church was not supportive of homosexuals, he himself was.  (Dep. of

Kirsten Raab, Ex. A, Tab 12, pp. 98-100; Maddock, Ex. A, Tab 10, p. 61.)

The religion panel, comprised of students, immediately followed.[10]  Although Betsy was

invited to be on the religion panel, she chose not to participate.  (E. Hansen, Ex. A, Tab 6, pp.

---

[8] Specifically, Mr. Pennington's memo stated, in part, "the panel members selected represent institutions where one would not need to choose between sexual orientation and their faith.  Messages of religious disapproval are common on the radio, television and in print.  This panel is specifically designed to offer a more welcoming message."  (Ex. F.)

[9] The three questions written by Betsy were: (1) "For the panel members who say they are Christian: the Bible clearly states in numerous places that homosexual actions are wrong.  Since you don't define God through the Bible, how do you define Him?  Have you made Him up in your head?"; (2) "Many Christian denominations as well as Judaism and Islam officially teach that homosexual actions are sins.  If you don't believe in the official teaching of your religion, why don't you join one that teaches the things you believe?"; and (3) "I have read many stories about homosexuals who have become straight after they became Christian.  How do you explain this?  How do you reconcile this with the idea that people are born homosexual and remain that way throughout their whole lives?"  (E. Hansen, Ex. A, Tab 6, pp. 105-11; Ex. 1 to Mancini Dep., attached hereto as Ex. G.)  Betsy wrote in her journal that the panel was "heresy.  People who preached like that used to be stoned. . . . They did ask all of my questions to the panelists, but their answers were demonic BS. . . . Don't let Satan deceive the kids at Pioneer.  Jesus, make yourself known!"  (Ex. 8 to Hansen Dep., attached as Ex. C.)

[10] Korzdorfer had earlier distributed guidelines she had drafted for the panelists, which stated, among other things, that the goal was to "promote understanding and tolerance" and that, therefore, the panelists could not tell or imply that another person or group was going to hell; comments could not target another group's beliefs, values, culture, or sexual orientation; and that speakers could express their beliefs but not try to convert anyone.  (Ex. 3 to Erickson Dep., attached hereto as Ex. H.)  Betsy appears to claim that these guidelines violated her right to free

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

168-69; Korzdorfer, Ex, A, Tab 3, p. 177.)  Two of the panelists who were members of PFC discussed their religious opposition to homosexuality.  (Jensen Dep., Ex. A, Tab 4, p. 120.)[11]

The next day an "open mic" session was held during lunch hour at which any student could speak.  The session ended up being a group discussion focused on homosexuality and religion, with many PFC members expressing their belief that homosexual activity is sinful.  (Korzdorfer, Ex. A, Tab 3, pp. 167-73; Jensen, Ex. A, Tab 4, pp. 122-25.)  Betsy did not attend most of the open mic, nor did she speak.  (E. Hansen, Ex. A, Tab 6, pp. 203-06.)

On July 2, 2002, a Complaint was filed by Betsy and Mrs. Hansen naming as defendants the Ann Arbor Public Schools, Caudle, Erickson, Korzdorfer, Pennington, Mancini, and Eaddy-Richardson, alleging violations of Betsy's First Amendment rights of freedom of speech (1st Claim); her First Amendment rights to free exercise of religion (2d Claim); her rights to equal protection under the laws (3d Claim); and violations of the First Amendment establishment clause (4th Claim).  The complaint also alleges violations of Mrs. Hansen's parental rights under the First and Fourteenth Amendments (5th Claim) and "freedom of speech conspiracy," "free exercise conspiracy," and "equal protection conspiracy" (6th, 7th, and 8th Claims).  A First Amended Complaint ("Am. Cplt.") was filed on February 20, 2003, adding Ralph Martin as a

---

speech (the guidelines are the only exhibit attached to the Complaint).  Because Betsy was not on the religion panel, however, she lacks standing to make such a claim.

[11] Betsy testified that the consensus of PFC members regarding homosexuality was that homosexual behavior was sinful and that persons who engage in such acts may go to hell.  (Ex. A, Tab 6, pp. 63-65.)  Betsy also testified that nothing that occurred during Diversity Week caused her to change her position.  (Id., pp. 66-67.)  In addition, the school has long allowed PFC members to preach outside the school building standing on milk crates, at which time they have expressed the view that homosexuality is a sin.  (Raab, Ex. A, Tab 12, p. 122; Dep. of Laura Tew, Ex. A, Tab 13, pp. 23, 28.)

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

plaintiff. Mr. Martin's daughter, Maureen, also a senior at PHS, attended a part of the sexual orientation and religion panel. Mr. Martin claims a violation of his parental rights.[12]

Defendants filed a Motion to Dismiss or in the Alternative for Summary Judgment on October 25, 2002, upon which the Court has yet not ruled. Discovery has concluded, including depositions of fact and expert witnesses.[13] Defendants now renew their Motion.[14]

## ARGUMENT

Summary judgment is warranted under Fed. R. Civ. P. 56 where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A moving party may show the absence of a genuine issue of material fact by pointing out that the opposing party, having had the opportunity for discovery, has no evidence to support an essential element of its case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

### A.    Defendants Did Not Violate Plaintiff's Right to Freedom of Speech.

There is a long and important history of protecting student speech in American schools. Indeed, the oft-quoted admonition from *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969), that students do not "shed their constitutional rights to freedom of speech or

---

[12] It should be noted that Maureen left the auditorium halfway through the panel, and testified that the panelists did not express any viewpoint she had not already heard; did not change her beliefs; and she did not feel as though the panel was trying to "convert" her. (M. Martin Dep., Ex. A, Tab 14, pp. 15, 20-22, 26.)

[13] Defendants offered the testimony of experts Prof. Laura Szalacha, an expert in education, theology, and the educational experiences of sexual minority youths, and Dr. Stephen Russell, an expert sociologist specializing in the health and well-being of sexual minority youths. They testified, among other things, about extensive research showing that gay and lesbian students experience harassment which can lead to devastating consequences; that programs like the panel can help mitigate these problems; and that the expression at the panel of the position Betsy advocated may have had harmful consequences. (Szalacha Dep., Ex. A, Tab 15, pp. 21-22, 38, 75, 87-89, 98-102, 140-42; Russell Dep., Ex. A, Tab 16, pp. 33-37, 58-63, 75-77, 89-90, 111-121, 148.)

[14] Defendants incorporate by reference all arguments made in their Motion of October 25, 2002 and Brief in Support. (A copy of the Brief in Support is attached as Exhibit I.)

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

expression at the schoolhouse gate," reflects the value that students retain important expressive rights even within a government-sponsored educational system. One can accept and even revere this principle from *Tinker* without retreating to plaintiffs' extreme position that students must be allowed to say precisely whatever they wish, whenever they wish, in whatever manner they wish. Plaintiffs claim a violation of Betsy's free speech rights by defendants' "censoring" of her assembly speech, and by declining her request to be on the panel, or to have a representative on the panel, who would express the view that homosexual acts are "depraved and sinful".[15] (Am. Cplt. ¶38.) However, defendants' actions were entirely proper. The Court made clear in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), that schools have the right to "exercise editorial control over the style and content of student speech in school-sponsored activities" where the schools' actions are "reasonably related to legitimate pedagogical concerns."[16] Under this standard, the free speech claim must be dismissed.

1.    The assemblies and panel discussion were school-sponsored activities.

In *Hazelwood,* the Court drew the important distinction between personal student expression that happens to take place at school, and student speech that takes place at a school-sponsored activity:

> The question whether the First Amendment requires a school to tolerate particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school affirmatively to promote

---

[15] Indeed, given the testimony in this matter, as set forth in n. 7, *supra.*, it does not appear that Betsy was "censored" at all. Rather, she voluntarily chose to take the suggestions of school administrators regarding changes to her speech. However, even if Betsy had been required by defendants to change her speech, such actions would be constitutional for the reasons set forth below.

[16] Curiously, plaintiffs characterize the phrase "legitimate pedagogical concerns" as a "talismanic phrase" behind which defendants hide their "political agenda." Brief in Opposition to Defendants' Motion to Dismiss at 1. Inflammatory accusations aside, these three words are the law set forth by the United States Supreme Court, and the law that governs this case.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on the school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be described as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Id.* at 271. The Court made it clear that "[e]ducators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach . . .and that the views of the individual speaker are not erroneously attributed to the school." *Id.*[17]

This is not a case involving what a student may wear (as in *Tinker*), or what a student may say in the hallways, cafeteria, or even during classroom discussions. Rather, here, Betsy wished to engage in speech that one might "reasonably perceive to bear the imprimatur of the school." *Hazelwood*, 484 U.S. at 271. In such a case, schools have the right—indeed, the responsibility—to shape that speech to comport with the lesson or lessons being taught. *See Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990)(proper for teacher to edit student's campaign speech to excise discourteous remarks about school officials where, as here, school wide election assembly was held during school hours, on school property, and faculty reviewed all speeches in advance). The all school assemblies at which Betsy gave her speech were during the school day, in the gym, for the entire student body; the panel, organized by a student group, with the guidance of faculty, was also held in school during school hours. Both programs were part of the Diversity Week curriculum, designed to foster

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

---

[17] Indeed, even plaintiffs' purported educational "expert" agreed that educators generally have the right to censor student speeches. (Dep. of Dick Carpenter, Ex. A, Tab 17, pp. 135, 152.) Defendants reserve the right to challenge the qualifications of plaintiffs' purported "experts".

numerous AAPS policies. Clearly, both are "school-sponsored activity" within the meaning of *Hazelwood*.[18]

    2.    <u>Defendants' actions were reasonably related to legitimate pedagogical concerns.</u>

At least four pedagogical concerns animated defendants' actions regarding Betsy's speech and her requests regarding the panel, each of which is "legitimate" by accepted standards of educational theory and practice. First, defendants expected Betsy to stay on topic—a pedagogical concern which is basic and uncontroversial. (Szalacha, Ex. A, Tab 15, pp. 107-08.) The theme of Diversity Week, including the all-school assemblies, was "*Celebrating* Diversity at PHS." The topic of the panel, as explained above, was that homosexuality and religion were not incompatible. Quite simply, Betsy's speech, which targeted homosexuals for a negative message, and her proposal to have a panelist stating that homosexuality was sinful, did not adhere to the theme, topic, or format of these events.

Second, as regards the panel, defendants expected Betsy to follow proper procedures— another uncontroversial legitimate educational goal. (Szalacha, Ex. A, Tab 15, pp. 107-08; agreed to by Carpenter, Ex. A, Tab 17, p.150). Betsy did not attend all mandatory meetings, and when Korzdorfer asked Betsy to give her the names of persons she wanted on the panel, promising to "see what she could do," *Betsy never provided any names.* For a student to demand to speak when she wants, where she wants, and in what manner she wants *without even following the procedures in place to do so* is bold indeed. *See Settle v. Dickson County School Board*, 53

---

[18]  Arguably, the panel can be characterized as "school speech," which enjoys even greater deference from the courts. Where the school is the speaker attempting to convey a message of its own, as opposed to where students speak at a school-sponsored event, the school may promote virtually any viewpoint it chooses. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995) ("When the [school] determines the content of the education it provides, it is the [school] speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.").

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

F.3d 152 (6th Cir.), *cert. denied*, 516 U.S. 989 (1995)(proper to forbid a ninth-grade student to write a research paper on "The Life of Jesus Christ" where teacher believed student would not adhere to requirement that four research sources be used, and that students should learn to write research papers by starting with a topic other than their own theology).

The third pedagogical concern—to promote student tolerance and acceptance of minority points of view—is also clearly legitimate and worthwhile. (Szalacha, Ex. A, Tab 15, pp. 126-28; Fornero, Ex. A, Tab 1, pp. 28-29 (testifying that state education mandates require that schools teach tolerance); also generally agreed to by Carpenter, Ex. A, Tab 17, p. 150.)[19] This goal is at least as compelling, if not more so, than the goals sanctioned in *Hazelwood* and its progeny. *See Hazelwood*, 484 U.S. at 276 (teaching proper standards of journalism is legitimate pedagogical concern); *Poling*, 872 F.2d at 758 (teaching "civility"); *Muller v. Jefferson Lighthouse School*, 98 F.3d 1530, 1542-43 (7th Cir. 1996)(teaching "civility and manners"); *Bull v. Dardanelle Pub. Sch. Dist.*, 745 F. Supp. 1455, 1460 (E.D. Ark. 1990)(ensuring that candidates for student government are good role models). Not surprisingly, faculty in this case believed that Betsy's speech as originally written, and her desire to have a panel member state her view that homosexuality was immoral and depraved, were inconsistent with this goal.

Finally, defendants were motivated by a commitment to provide a safe and supportive environment for gay and lesbian students. That this concern is "legitimate" is evidenced not only by incidents of gay-bashing in the halls of PHS, but by the numerous studies demonstrating that gay students across the country experience harmful harassment.[20] To allow Betsy's speech as

---

[19] The Supreme Court recently emphasized the benefits of a diverse student body and the importance of preparing students "for an increasingly diverse workforce and society", in *Grutter v. Bollinger*, ___ U.S. ___ (2003) 2003 WL 21433492 (slip op. at 7) (June 23, 2003).

[20] The Supreme Court also acknowledged recently in *Lawrence v. Texas*, ___U.S. ___, 2003 WL 21467086 (June 26, 2003), in striking down a Texas statute prohibiting same-sex

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

originally written, and to force the GSA to put a representative on its panel to communicate

Betsy's message, would only exacerbate these problems. Because defendants' activities were

reasonably related to legitimate pedagogical concerns, plaintiff's free speech claim fails.

**B.    Defendants Did Not Violate Plaintiff's Right to Exercise Her Religion.**

    1.    Stating that homosexuality is wrong is not the "exercise of religion."

By couching her claim as one involving free exercise as well as free speech, plaintiff

hopes to dodge the bullet of *Hazelwood* and get two bites at the apple.[21]  At the outset, however,

Betsy fails to meet her burden of showing that there is, in fact, an "exercise of religion" here.

Rather, Betsy's claim is about curtailment of speech – here, the view that homosexual activity is

wrong – a position which many people hold, not always for religious reasons.  For this reason

alone, Betsy's free exercise claim fails.

    2.    Even assuming that stating the view that homosexuality is wrong is an "exercise
      of religion," defendants did not prohibit such an "exercise."

Even assuming that expressing one's viewpoint regarding homosexuality constitutes an

"exercise of religion" (a dubious assumption), defendants were not required to let Betsy exercise

her religion in *every single* place, time, and manner she desires.  Betsy had many opportunities to

"exercise her religion" by making her views on homosexuality known at PHS, including:

- through the questions she submitted to the panel, all of which were asked and
  answered;

- by refusing, as part of PFC, to sign the non-discrimination clause because it
  included sexual orientation as a protected category;

- the PFC milkcrate "preaching" sessions;

---

sexual contact as unconstitutional, "for centuries there have been powerful voices to condemn
homosexual conduct as immoral."  Id. at * 7.

    [21] Betsy claims that defendants prevented her "from engaging in religious
expression...and expressing her religious view."  (Am. Cplt. ¶41.)

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

- the opportunity to sit on the religion panel, which she declined;

- the opportunity to speak at the "open mic" session, which she declined; and

- the opportunity given to PFC to *have their own panel and invite whomever they wished*, which Betsy deemed "not worth doing."

Given the above, it is obvious that any burdens on plaintiff's free exercise rights as a result of defendants' suggested changes to her speech and her inability to sit on the panel were incidental, and therefore, not unconstitutional. *See, e.g., Employment Div., Dep't. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)(generally applicable prohibition against illegal substances did not violate Free Exercise merely because it prohibited use of peyote in a Native American religious ceremony).

> 3.     <u>Exposure to material at odds with one's faith does not violate Free Exercise.</u>

Plaintiffs also challenge the panel because it "subjected Plaintiff…to compulsion to affirm or deny a particular religious belief regarding homosexual activity." (Am. Cplt. ¶ 41.) However, the Sixth Circuit has made it clear that merely exposing a student to material at odds with his or her faith does not run afoul of free exercise. In *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987), *cert. denied*, 484 U.S. 1066 (1988) fundamentalist Christian students challenged the use of a basic reader in the public schools because it included stories dealing with mental telepathy and supernaturalism which they claimed contravened their religious beliefs. The court held that, "absent any showing that students were required to affirm or deny a belief or engage or refrain from engaging in a practice prohibited by their religion, this was not an impermissible burden on their free exercise rights." 827 F.2d at 1065.

Here, there is no evidence that Betsy was required to "affirm or deny a belief" or that she was forced to "engage in a practice" prohibited by her religion. Even where attendance is mandatory, as in the *Mozert* classroom, exposure to ideas counter to one's faith is not

14

unconstitutional. Where, as here, attendance is completely optional, and where the students are permitted to voice their opinion through the submission of questions, the right to free exercise is even more clearly preserved.

  4. <u>The panel involved no government coercion or compulsion.</u>

  Plaintiff's free exercise claim also dies on the vine for lack of government coercion or compulsion. The gravamen of a free exercise claim is that the government forces one to do something contrary to one's religion, or presents one with a Hobson's choice between forsaking one's religion or suffering serious negative consequences. *See, e.g., Thomas v. Review Bd. Of Ind. Employment Sec. Div.*, 450 U.S. 707 (1981) (requiring Jehovah's Witness to build tanks for the military or forego unemployment benefits after quitting). Betsy has not shown that she was compelled to accept the panelists' viewpoint. To the contrary, she was allowed to, and did, submit questions to the panelists, and these questions showed in no uncertain terms her disagreement with their viewpoint. Moreover, Betsy and Maureen Martin both testified that their views regarding homosexuality did not change as a result of the panel (and Maureen testified that she did not feel as though the panelists were trying to "convert" her).

  Nor was Betsy compelled to attend the panel—in fact, she attended the panel of her own volition, even though the rest of her class did not, with full knowledge of the topic and the viewpoint of the speakers. (Ex. A, Tab 6, p. 129.) The most that Betsy can claim is that for one fifty-minute period, during one school day, she affirmatively chose to opt-out of her class and sit in the audience with other students, where clergy persons answered questions and indicated that they were welcoming of homosexuals. That plaintiff should characterize this incident as "coercion" when she actively sought to attend the panel borders on the ridiculous. By no stretch of the imagination is there a violation of the free exercise clause in this case.

## C.   Defendants Did Not Violate the Establishment Clause.

Plaintiffs claim that defendants "impermissibly promoted and endorsed the religious belief that homosexual activity is compatible with religion". (Am. Cplt. ¶48.) In other words, plaintiffs' claim is that a high school may not permit a student group to plan and present an optional program, involving clergy, to discuss their beliefs that religion and homosexuality are not incompatible.[22] Clearly, plaintiffs' claim is based not in federal law, but in their personal dislike of the GSA, the panel's theme, and anyone or anything that can be interpreted as being tolerant of homosexuality.

In the Sixth Circuit, the test for a violation of the Establishment Clause is:

(1) whether the government activity in question has a secular purpose; and

(2) whether the activity's primary effect advances or inhibits religion; and whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government.

*Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002)(citing *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)). There is no genuine issue of material fact with respect to the panel's secular purpose or its primary effect, and plaintiffs' establishment clause claim should be dismissed.

1.   The homosexuality and religion panel had a secular purpose.

As stated above, the purpose of the panel was to inform those students who chose to attend that some religious congregations are open to and affirming of gays, in order to promote and endorse tolerance of a minority viewpoint. As long as a government actor's statement of

---

[22] Plaintiffs' Establishment Clause claim is nothing like the claims usually brought in the educational context which involve (1) prayer or worship in schools, *see, e.g., Lee v. Weisman*, 505 U.S. 577 (1992)(school-initiated prayer by rabbi at graduation violates Establishment Clause), (2) religiously-motivated curriculum choices, *see, e.g., Edwards v. Aguillard*, 482 U.S. 578 (1987)(law requiring teaching of evolutionism to be accompanied by teaching of creationism violates Establishment Clause), or (3) public display of religious symbols, *see, e.g., Stone v. Graham*, 449 U.S. 39 (1980)(posting Ten Commandments in public school violates Establishment Clause). That plaintiffs' claim is essentially without precedent is telling.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

secular purpose is "sincere and not a sham," courts must defer to that statement. *Edwards*, 482 U.S. at 585; *Adland*, 307 F.3d at 483 ("[i]t is particularly appropriate to accord a measure of deference to a state or local government's avowed secular purpose and to refrain from hastily imputing unconstitutional motives"). There is no credible evidence contradicting defendants' secular purpose.

2.  The panel's "primary effect" neither advanced nor inhibited religion.

Plaintiffs can hardly argue that the panel was improper because it had a religious component—after all, if that were the case, this problem could hardly be cured by adding Betsy or a clergy person of her own choosing to the mix. Rather, they argue that the panel improperly advanced a particular "religious belief." (Am. Cplt. ¶ 48.) However, there is a reason that the *Lemon* test, as adopted and expanded by *Adland*, focuses on the advancement of "religion," rather than on "religious beliefs" – namely, as this case so aptly illustrates, the notion of "religious beliefs" is vague to the point of meaninglessness.

Plaintiffs claim that the idea that homosexual activity is not immoral or sinful is a "religious belief." But given the fact that all religions contain intellectual, social, political, and/or moral content, almost any idea under the sun can be characterized as a "religious belief."[23] To call the belief that homosexuality is not immoral a "religious belief" for

---

[23] For example, a belief in the value of forgiveness would be deemed a "religious belief," because it resonates in Christianity. But so too would be the belief in the value of righteous punishment, as it resonates in Judaism. A belief in marriage would be, per plaintiffs, a "religious belief,"as virtually all denominations recognize some form of union. But so too would be the belief in celibacy, espoused by Roman Catholics and Buddhists. What is more, an atheist or agnostic may believe in forgiveness or marriage, and likely has beliefs regarding abortion, homosexuality, and a host of other issues with moral overtones. But no one would consider these to be "religious beliefs." Under plaintiffs' theory, a sex education teacher discussing birth control or condom use to prevent sexually transmitted diseases would be improperly establishing a "religious belief" that birth control or premarital sex are appropriate. Under plaintiffs' argument, a civics or government teacher could not even describe the holding of the recent *Lawrence v. Texas* case, because this would be "establishing a religious belief."

Establishment Clause purposes simply makes no sense. It is not associated with any one religion, as the diversity of representation on the panel indicates. (Indeed, according to plaintiffs, the rabbi and the pastor from the United Church of Christ have the same "religious belief"—a conclusion which would no doubt come as a surprise to them!) Nor is this belief even associated with religion in general, such as a belief in God. And the fact that the panel's viewpoint is or is not consistent with the beliefs generally held by persons of a particular religion is clearly not dispositive. *See Harris v. McRae*, 448 U.S. 297 (1980) (denying government funding of abortion does not establish a religion merely because it coincides with the view of Catholicism). Accordingly, the panel cannot be said to advance religion.

3.  A reasonable observer would not believe that the panel constituted an endorsement of religion by PHS.

The court must also consider whether a reasonable observer would believe that the activity constituted an endorsement of religion. *Adland*, 307 F.3d at 479. The test is an objective one. *ACLU of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 302 (6th Cir. 2001). Importantly, the reasonable observer is "deemed aware of the history and the context of the community and forum in which the religious display appears." *Id.*

To understand the history and context of the panel discussion would be to know that members of PFC can be regularly spotted preaching in front of the school, on topics including the sin of homosexuality; to know the prevalence of harassment of gays and lesbians in the hallways of PHS; and to know that PFC was felt by many in the school to focus almost exclusively on the ills of homosexuality. The observer would also know that the panel was organized by the GSA to present a positive message and to foster tolerance. For a reasonable observer with this information to believe that one fifty-minute panel—one star in a constellation of statements, ideas, and incidents regarding homosexuality and religion at PHS—somehow

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

constituted an overriding "religion" endorsed by the school would be odd indeed. Plaintiffs'

Establishment Clause claim fails.

**D.    Defendants Did Not Violate Plaintiffs' Parental Rights.**

Defendants agree that the Fourteenth Amendment Due Process Clause includes the right

to direct the education of one's children. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

However, parental rights are far from absolute in the public school context, and are subject to

reasonable regulation. *Runyon v. McCrary*, 427 U.S. 160 (1976).[24]  In *Leebaert v. Harrington*,

the parents of a seventh-grade student objected to a mandatory health-education curriculum

which consisted of forty-five days of instruction on "health and safety, alcohol, tobacco and

drugs, and family life." *Leebaert* at *2. The parents objected on the grounds that they preferred

their child to be "home schooled regarding health, morals, ethical and personal behavior." *Id.*

Rejecting the parents' claim, the court explained: "[the parental rights jurisprudence] do[es] not

begin to suggest the existence of a fundamental right of every parent to tell a public school what

his or her child will and will not be taught." *Id.* at 7.  To put it simply:

> If all parents had a fundamental constitutional right to dictate individually what
> the schools teach their children, the schools would be forced to cater a curriculum
> for each student whose parents had genuine moral disagreements with the school's
> choice of subject matter. We cannot see that the Constitution imposes such a
> burden on state educational systems....

*Id.* (citing *Brown v. Hot, Sexy, & Safer Productions, Inc.*, 68 F.3d 525, 534 (1st Cir. 1995), *cert*

*denied*, 516 U.S. 1159 (1996)(finding no parental rights claim where children were not allowed

---

[24]  While the Supreme Court recently recognized that the right of a parent to control a
child's education is "fundamental," *Troxel v. Granville*, 530 U.S. 57, 65 (2000), the Court has
declined to set forth a standard of judicial scrutiny where schools make decisions that arguably
impinge upon a parent's right to control the education of his or her child.  At least two Circuits
have adopted a rational-basis inquiry. *See Littlefield v. Forney Independent School Dist.*, 268
F.3d 275 (5th Cir. 2001); *Leebaert v. Harrington*, ___ F.3d ___, 2003 WL 21363389 (2nd Cir.
June 13, 2003).

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

to opt out of mandatory AIDS awareness assembly featuring a speaker who "advocated and approved" of oral sex, masturbation, homosexual activity, and premarital sex.))

Under *Leebaert*, the parental rights claim in this case has no merit. While the program in *Leebaert* was mandatory, the panel at issue here was not—individual students were free to opt out and Betsy went out of her way to attend, while Maureen Martin was permitted to leave halfway through. While the program in *Leebaert* was forty-five days of instruction, and the claim was brought by parents of a seventh-grader, the panel at issue here was a little more than forty-five *minutes* and has drawn the objections of parents of high school seniors—in fact, Betsy Hansen was eighteen at the time of the panel. And yet even the schools actions in *Leebaert* pass constitutional muster. Plaintiffs' parental rights claim should be dismissed.[25]

## CONCLUSION

WHEREFORE, for the above stated reasons and those stated in their earlier Motion to Dismiss, Defendants request that this Court grant summary judgment for Defendants on all counts of the Amended Complaint.

Respectfully submitted,

DYKEMA GOSSETT PLLC

Seth M. Lloyd (P16742)
Jill M. Wheaton (P49921)
Laura A. Sagolla (P63951)
400 Renaissance Center
Detroit, MI 48243

Dated: June 30, 2003

---

[25] Plaintiffs have also brought claims for violations of the equal protection clause of the Fourteenth Amendment and for conspiracy. Defendants refer the Court to their Brief in Support of their Motion to Dismiss, attached as Exhibit 11, pp. 11-16, which fully briefed these issues, and focused on the argument that these claims fail because plaintiffs have not shown any violations of the law or Constitution. Additionally, defendants believe that the individual defendants are entitled to be dismissed on the grounds of qualified immunity. Defendants refer the Court to Ex. 11, pp. 16-17 for argument on the issue of qualified immunity

## INDEX TO EXHIBITS

A.  Excerpts from deposition testimony

    1.    Dr. George Fornero
    2.    Henry Caudle
    3.    Sunnie Korzdorfer
    4.    Thomas Jensen
    5.    Lara Erickson
    6.    Elizabeth Hansen
    7.    Parker Pennington
    8.    Rodney Mancini
    9.    Denise Eaddy-Richardson
    10.    Jeannette Maddock
    11.    William Johnson
    12.    Kirsten Raab
    13.    Laura Tew
    14.    Maureen Martin
    15.    Dr. Laura Szalacha
    16.    Dr. Stephen Russell
    17.    Dr. Dick Carpenter

B.  AAPS Discrimination Against Students Policy and Rights and Responsibilities Booklet (Erickson Dep. Exs. 1, 2).

C.  Excerpts from plaintiff Elizabeth Hansen's Journal (E. Hansen Dep. Exs. 3, 5, 8).

D.  Handwritten draft of speech (E. Hansen Dep. Ex. 13).

E.  Typed final version of speech (Erickson Dep. Ex. 5).

F.  March 19, 2003 e-mail from Parker Pennington to PHS staff (Erickson Dep. Ex. 10).

G.  Student questions submitted for panel (Mancini Dep. Ex. 1).

H.  Memo from Korzdorfer to panelists (Erickson Dep. Ex. 3.)

I.  Brief in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint or in the Alternative for Summary Judgment or in the Alternative For More Definite Statement.

DET01\363961.1
IDJMW

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN, CONSTANCE
HANSEN and RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

        Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

FILED

2003 JUN 30 P 3: 40

U.S. DIST COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

---

| | |
|---|---|
| Robert J. Muise (P62849) | Seth M. Lloyd (P16742) |
| Edward L. White, III (P62485) | Jill M. Wheaton (P49921) |
| THOMAS MORE LAW CENTER | Laura Sagolla (P63951) |
| Attorneys for Plaintiffs | DYKEMA GOSSETT PLLC |
| 3475 Plymouth Road, Suite 100 | Attorneys for Defendants |
| Ann Arbor, MI 48105-2550 | 400 Renaissance Center |
| (734) 827-2001 | Detroit, MI 48243-1668 |
| | (313) 568-6837/(734) 214-7612 |

---

## NOTICE OF HEARING

To: Robert J. Muise
    3475 Plymouth Road, Suite 100
    Ann Arbor, MI 48105-2550

1

PLEASE TAKE NOTICE that Defendants' Motion for Summary Judgment will be heard at a date and time to be set by the Court.

Respectfully submitted,

DYKEMA GOSSETT PLLC

Seth M. Lloyd (P16742)
Jill M. Wheaton (P49921)
Laura A. Sagolla (P63951)
400 Renaissance Center
Detroit, MI 48243

Dated: June 30, 2003

AA01\105402.1
ID\LSC

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN,
CONSTANCE HANSEN, and
RALPH MARTIN,

           Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

           Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

FILED
2003 JUN 30 P 3 40
U.S. DIST. COURT CLERK
EASTERN MICHIGAN
DETROIT

DYKEMA GOSSETT, A PROFESSIONAL LIMITED LIABILITY COMPANY 315 E. EISENHOWER PARKWAY, SUITE 100 • ANN ARBOR, MICHIGAN 48108-3306

| | |
|---|---|
| Robert J. Muise (P62849)<br>Edward L. White, III (P62485)<br>THOMAS MORE LAW CENTER<br>Attorneys for Plaintiffs<br>3475 Plymouth Road, Suite 100<br>Ann Arbor, MI 48105-2550<br>(734) 827-2001 | Seth M. Lloyd (P16742)<br>Laura Sagolla (P63951)<br>Jill M. Wheaton (P49921)<br>DYKEMA GOSSETT PLLC<br>Attorneys for Defendants<br>400 Renaissance Center<br>Detroit, MI 48243-1668<br>(313) 568-6837/(734) 214-7612 |

## PROOF OF SERVICE

STATE OF MICHIGAN     )
                              ) SS.
COUNTY OF WAYNE      )

    Cynthia Hammond, an employee of Dykema Gossett PLLC, being first duly sworn,

deposes and says that on the 30th day of June, 2003, she caused to be served a copy of *Notice Of*

*Hearing, Defendants' Motion For Summary Judgment, Brief In Support Of Motion For Summary Judgment, Exhibits to Brief In Support Of Defendants' Motion For Summary Judgment and this Proof of Service* upon Robert J. Muise at 3475 Plymouth Road, Suite 100, Ann Arbor, Michigan 48105-2550, by enclosing copies of the same in an envelope properly addressed, and by depositing said envelope in the United States Mail with postage thereon having been fully prepaid.

*Cynthia Hammond*

Cynthia Hammond

Subscribed and sworn before me this 30th day of June, 2003.

Notary Public
My Commission Expires:

IRENE H. McCOOL
Notary Public, Macomb County
Acting in Wayne County, Mich.
My Commission Expires Sept. 14,

DET01\352906.3
IDUMW

2