UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ELIZABETH HANSEN,
CONSTANCE HANSEN, and RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his official
capacity as Principal, Pioneer High School,
LARA ERICKSON, individually and in her official
capacity as Assistant Principal, Pioneer High School,
SUNNIE KORZDORFER, individually and in her
official capacity as teacher, Pioneer High School,
PARKER PENNINGTON, IV, individually and in his
official capacity as teacher, Pioneer High School,
RODNEY MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON, individually and in
her official capacity as Equity Ombudsman, Ann Arbor
Public Schools,

        Defendants.

CIVIL ACTION
NO. 02-CV-72802-DT

HON. GERALD E. ROSEN

MAGISTRATE JUDGE CARLSON

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

---

THOMAS MORE LAW CENTER
By:   Robert J. Muise (P62849)
      Edward L. White III (P62485)
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001
Attorneys for Plaintiffs

DYKEMA GOSSETT PLLC
By:   Seth M. Lloyd (P16742)
      Laura A. Sagolla (P63951)
      Jill Wheaton (P49921)
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6837/(734) 214-7612
Attorneys for Defendants

---

     Pursuant to Fed. R. Civ. P. 56, Plaintiffs Elizabeth Hansen, Constance Hansen, and Ralph

Martin ("Plaintiffs"), by and through their undersigned attorneys, hereby move this Court for

summary judgment on all of their claims because there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law.

In support of their motion, Plaintiffs rely upon the pleadings and papers of record, as well as Plaintiffs' Brief in Support of Motion for Summary Judgment filed with this motion, and the declarations and exhibits attached thereto.

WHEREFORE, Plaintiffs respectfully request that this Court grant their motion for summary judgment and declare that Defendants violated Plaintiffs' clearly established constitutional rights as set forth in the pleadings, this motion, and Plaintiffs' brief in support of this motion; permanently enjoin future actions of Defendants that will deprive Plaintiffs of their clearly established constitutional rights; and award Plaintiffs nominal damages for the past loss of their constitutional rights. Plaintiffs also request that this Court award them their reasonable costs, including attorneys' fees, pursuant to 42 U.S.C. § 1988 and other applicable law.

Respectfully submitted this _27th_ day of June, 2003.


Robert J. Muise (P62849)
Edward L. White III (P62485)
Thomas More Law Center
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-4778
(734) 827-2001

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ELIZABETH HANSEN,
CONSTANCE HANSEN, and RALPH MARTIN,

       Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his official
capacity as Principal, Pioneer High School,
LARA ERICKSON, individually and in her official
capacity as Assistant Principal, Pioneer High School,
SUNNIE KORZDORFER, individually and in her
official capacity as teacher, Pioneer High School,
PARKER PENNINGTON, IV, individually and in his
official capacity as teacher, Pioneer High School,
RODNEY MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON, individually and in
her official capacity as Equity Ombudsman, Ann Arbor
Public Schools,

       Defendants.

CIVIL ACTION
NO. 02-CV-72802-DT

HON. GERALD E. ROSEN

MAGISTRATE JUDGE CARLSON

PLAINTIFFS' BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

---

THOMAS MORE LAW CENTER
By:   Robert J. Muise (P62849)
       Edward L. White III (P62485)
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001
Attorneys for Plaintiffs

DYKEMA GOSSETT PLLC
By:   Seth M. Lloyd (P16742)
       Laura A. Sagolla (P63951)
       Jill Wheaton (P49921)
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6837/(734) 214-7612
Attorneys for Defendants

# ISSUES PRESENTED

**I.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants violated the Establishment Clause by endorsing and promoting a particular religious belief, demonstrating an impermissible hostility toward a particular religious belief, and coercing students to accept a particular religious belief by selecting and inviting clergy members to preach to students during instructional time at Pioneer High School.

**II.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants violated Plaintiffs' First Amendment right to the free exercise of religion by preventing Plaintiff Elizabeth Hansen from exercising her paramount moral obligation to publicly defend her faith as required by her religious convictions, censoring her speech because of her religious beliefs, excluding her from participating on the "homosexuality and religion" panel because of her religious beliefs, conveying disapproval of her Roman Catholic beliefs, coercing her and Plaintiff Martin's daughter, Maureen Martin, by exposing them to material that is hostile to their faith and indoctrinating them in religious beliefs hostile to their faith.

**III.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants violated Plaintiff Elizabeth Hansen's First Amendment right to freedom of speech by censoring her speech and denying her access to a forum based on the content and viewpoint of her speech.

**IV.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants violated Plaintiffs Constance Hansen's and Ralph Martin's constitutional right to raise their children according to the religious system, system of values, and moral norms they deem appropriate and their constitutional right to the care, custody, education, and association with their children by promoting and endorsing a particular religious belief that conflicts with their and their children's religious beliefs, conveying a message of disapproval of their and their children's religious beliefs, and coercing their children to accept and support a religious belief that conflicts with their and their children's religious beliefs.

**V.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants violated Plaintiff Elizabeth Hansen's rights under the Equal Protection Clause by denying her access to a forum because Defendants found her Roman Catholic viewpoint on homosexuality to be unacceptable.

**VI.**     Whether there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law because Defendants shared in a conspiratorial objective and engaged in overt acts to deprive Plaintiff Elizabeth Hansen of her constitutional rights.

# CONTROLLING AUTHORITY

**Issue I:**

> *Lemon v. Kurtzman*, 403 U.S. 602 (1971)
> *County of Allegheny v. ACLU*, 492 U.S. 573 (1989)
> *Lee v. Weisman*, 505 U.S. 577 (1992)
> *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)
> *Edwards v. Aguillard*, 482 U.S. 578 (1987)
> *Engel v. Vitale*, 370 U.S. 421 (1962)
> *Epperson v. Arkansas*, 393 U.S. 97 (1968)

**Issue II:**

> *Employment Div. v. Smith*, 494 U.S. 872 (1990)
> *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)
> *Wisconsin v. Yoder*, 406 U.S. 205 (1971)
> *McDaniel v. Paty*, 435 U.S. 618 (1978)
> *Lee v. Weisman*, 505 U.S. 577 (1992)

**Issue III:**

> *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)
> *Board of Educ. v. Pico*, 457 U.S. 853 (1982)

**Issue IV:**

> *Wisconsin v. Yoder*, 406 U.S. 205 (1972)
> *Prince v. Massachusetts*, 321 U.S. 158 (1944)
> *Troxel v. Granville*, 530 U.S. 57 (2000)
> *Meyer v. Nebraska*, 262 U.S. 390 (1923)
> *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)

**Issue V:**

> *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92 (1972)
> *Carey v. Brown*, 447 U.S. 455 (1980)

**Issue VI:**

> *Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000)

# TABLE OF CONTENTS

                                                                        **PAGE**

ISSUES PRESENTED............................................................................................ i

CONTROLLING AUTHORITY ............................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ..................................................................................................1

FACTS ...................................................................................................................2

ARGUMENT ........................................................................................................14

    I.    Constitutional Rights of Students.........................................................14

    II.   Establishment Clause ...........................................................................16

    III.  Free Exercise of Religion.....................................................................20

    IV.  Freedom of Speech...............................................................................23

    V.   Parental Rights .....................................................................................26

    VI.  Equal Protection ...................................................................................27

    VII. Civil Conspiracy..................................................................................28

CONCLUSION.....................................................................................................29

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963).................................................................................................25

*Bethel v. Fraser,*
478 U.S. 675 (1986)..............................................................................................24

*Board of Educ. v. Pico,*
457 U.S. 853 (1982)..............................................................................................15

*Boroff v. Van Wert City Bd. of Educ.,*
220 F.3d 465 (6th Cir. 2000)................................................................................24

*Canter v. Hardy,*
188 F.Supp.2d 773 (E.D. Mich. 2002)..................................................................28

*Cantwell v. State of Connecticut,*
310 U.S. 296 (1940)..............................................................................................21

*Carey v. Brown,*
447 U.S. 455 (1980)..............................................................................................28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993).........................................................................................20, 21

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989).........................................................................................17, 18

*Edwards v. Aguillard,*
482 U.S. 578 (1987)..............................................................................15, 16, 22, 27

*Employment Div. v. Smith,*
494 U.S. 872 (1990)..............................................................................20, 22, 26, 27

*Engle v. Vitale,*
370 U.S. 421 (1962)....................................................................................16, 19, 21

*Epperson v. Arkansas,*
393 U.S. 97 (1968)......................................................................................15, 16, 24

*Freischfresser v. Directors of Sch. Dist.*
200, 15 F.3d 680 (7th Cir. 1994) ........................................................20

*Keyishian v. Board of Regents,*
385 U.S. 589 (1967).............................................................................25

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
508 U.S. 384 (1993).............................................................................17

*Lee v. Weisman,*
505 U.S. 577 (1992)..........................................15, 17, 19, 21, 22, 23

*Lemon v. Kurtzman,*
403 U.S. 602 (1971)...............................................................16, 17, 18

McDaniel v. Paty,
435 U.S. 618 (1978).............................................................................21

Meyer v. Nebraska,
262 U.S. 390 (1923).............................................................................26

*Nebraska Press Ass'n v. Stuart,*
427 U.S. 539 (1976).............................................................................25

*Oxford v. Beaumont Indep. Sch. Dist.*
224 F.Supp.2d 1099 (E.D. Tex. 2002)...............................................16

*Pierce v. Society of Sisters,*
268 U.S. 510 (1925).............................................................................26

*Police Dept. of the City of Chicago v. Mosley,*
408 U.S. 92 (1972)........................................................................27, 28

*Prince v. Massachusetts,*
312 U.S. 158 (1944).............................................................................26

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992).............................................................................25

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995).............................................................................25

*Santa Fe Indep. Sch. Dist. v. Doe,*
530 U.S. 290 (2000).......................................................15, 19, 22

*Santosky v. Kramer,*
455 U.S. 745 (1982)...............................................................................................26

*School Dist. of Abington Township v. Schempp,*
374 U.S. 203 (1963)..........................................................................................15, 21

*Shelton v. Tucker,*
364 U.S. 479 (1960)...............................................................................................24

*Sherbert v. Verner,*
374 U.S. 398 (1963)...............................................................................................20

*Southeastern Promotions, Ltd. v. Conrad,*
420 U.S. 546 (1975)...............................................................................................25

*Stone v. Graham,*
449 U.S. 39 (1980).................................................................................................15

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969).................................................................................1, 14, 23, 24

*Troxel v. Granville,*
530 U.S. 57 (2000).................................................................................................26

*Vance v. Universal Amusement Co., Inc.,*
445 U.S. 308 (1980)...............................................................................................25

*Weberg v. Franks,*
229 F.3d 514 (6th Cir. 2000) ...............................................................................28

*West Virginia State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943)...............................................................................................15

*Wisconsin v. Yoder,*
406 U.S. 205 (1972)......................................................................................20, 26, 27

*Yick Wo v. Hopkins,*
118 U.S. 356 (1886)...............................................................................................28

## INTRODUCTION

This case concerns whether public school students are truly "closed-circuit recipients of only that which the State chooses to communicate [and therefore may] be confined to the expression of those sentiments that are officially approved." *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). More specifically, it concerns whether public school officials can prescribe what shall be the orthodox, and therefore officially approved, religious belief regarding homosexuality and discriminate against and silence students who hold contrary religious beliefs.

Our Constitution forbids such actions on the part of government officials. Yet, during the deceptively named "Diversity Week" at Pioneer High School ("PHS"), Defendants established, during instructional time, a panel of adult clergy and religious leaders, whom they held out as experts, to preach their pro-homosexual religious beliefs, and at the same time, excluded anyone from participating on this panel who did not share these same religious beliefs, including Plaintiff Elizabeth Hansen ("Betsy"). Defendants believed that religious beliefs opposing homosexuality were "negative," "heterosexist," "homophobic," and akin to a white supremacists' views regarding race. Determined to secure a captive audience for their "closed-circuit" presentation, Defendants did not inform parents of the content and makeup of this panel nor seek the approval and consent of parents before exposing their children to this religious indoctrination. And for similar reasons, Defendants censored Betsy's "Diversity Week" assembly speech on the topic "What Diversity Means to Me" because her view of "diversity," particularly with regard to homosexuality, differed with Defendants' pro-homosexual view.

1

Finally, Defendants prevented Betsy from fulfilling her moral obligation to publicly defend her faith as required by her religious convictions.

The undisputed and material facts plainly show that Defendants violated the clearly established constitutional rights of Plaintiffs.

## FACTS

During the 2001-2002 school year, Betsy, the daughter of Plaintiff Constance Hansen ("Connie Hansen"), was a senior at PHS[1] and a National Merit finalist. She graduated from PHS with honors in June 2002, and is presently a full-time student at the University of Florida. (B. Hansen Decl. at ¶ 1 at Ex. 22). Betsy is a kind and gentle person who was respectful in her dealings with faculty and students (O'Brien Dep. at 42-44 at Ex. 2; Korzdorfer Dep. at 32 at Ex. 6; Jensen Dep. at 129-130 at Ex. 16); she was not a student who would make derogatory comments about a person because of the person's sexual orientation. (Pennington Dep. at 37-38 at Ex. 3; Mancini Dep. at 51 at Ex. 4; Jensen Dep. at 129-130 at Ex. 16). During the 2001-2002 school year, Betsy, Kirsten Raab, and Sebastian Seromik were leaders of the Christian student club "Pioneers for Christ" ("PFC"). (B. Hansen Dep. at 48 at Ex. 1).

In addition to Betsy, Connie Hansen has two younger children: Luke, who just completed his junior year at PHS, and Theresa, who just completed her freshman year at PHS. Betsy and Connie Hansen are Roman Catholic, and Connie Hansen raises all of her children in the Roman Catholic faith. (C. Hansen Dep. at 9, 10 at Ex. 9; *see also* Answer at ¶ 10).

Plaintiff Ralph Martin ("Ralph Martin") is a Roman Catholic, and his youngest child, Maureen, graduated from PHS in June 2002. Ralph Martin is a Roman Catholic, and he raises

---

[1] PHS is part of Defendant Ann Arbor Public Schools ("AAPS"). (Fornero Dep. at 27 at Ex. 15; Answer at ¶ 12).

2

his children, including Maureen, in the Roman Catholic faith. (R. Martin Dep. at 18, 19, 21, 28, 29, 49, 50 at Ex. 10; M. Martin Dep. at 7, 12 at Ex. 11; M. Martin Decl. at ¶¶ 1, 3 at Ex. 12).

The Catechism of the Catholic Church, which is authoritative teaching and binding on the conscience of a Roman Catholic, teaches the following:

> Basing itself on Sacred Scripture, which presents homosexual acts as acts of grave depravity, tradition has always declared that "homosexual acts are intrinsically disordered." They are contrary to the natural law. They close the sexual act to the gift of life. They do not proceed from a genuine affective and sexual complementarity. Under no circumstances can they be approved.

Therefore, affirming homosexuality is contrary to the teaching of the Roman Catholic faith. Furthermore, as a Roman Catholic, Betsy Hansen has a moral obligation to defend her faith, including publicly opposing teachings at her high school that are contrary to her faith. And it is foremost important and incumbent upon her to confront and address the error and defend her faith when the error and the challenge to her faith occur. This is a basic tenet and practice of Betsy's religion. (Fr. Orsi Dep. at 51-57 at Ex. 13; Fr. Orsi Decl. at ¶¶ 2-8 at Ex. 14).

For at least four or more years, PHS has been holding a "Diversity Week," (Pennington Dep. at 72-73 at Ex. 3; Mancini Dep. at 71-72 at Ex. 4; Eaddy-Richardson Dep. at 58-59 at Ex. 8), which is part of the PHS curriculum. (Caudle Dep. at 17-22, 36-37 at Ex. 5; Fornero Dep. at 23-27 at Ex. 15). "Diversity Week" is also held pursuant to several AAPS policies, including the Rights and Responsibilities policy, the non-discrimination policy, and the policy against bullying. (Fornero Dep. at 30-33 at Ex. 15). Defendant Caudle, who is the principal at PHS and chief administrator at the building level, has final decision-making authority regarding the "Diversity Week" events to be held at his school. (Caudle Dep. at 33-34, 94-95 at Ex. 5; Fornero Dep. at 26-27, 30-36 at Ex. 15).

Student council, under the direction of a faculty advisor, helped to organize and plan the 2002 "Diversity Week." The student council faculty advisor was Defendant Sunnie Korzdorfer. Thomas Jensen, a member of the student council, had an active role in organizing the "Diversity Week." (Jensen Dep. at 39, 42, 44-48 at Ex. 16).

The 2002 "Diversity Week" events included, among others, an all school assembly, called the 2002 "Diversity Week Assembly"; a race panel composed of all students; a religion panel composed of all students; a "homosexuality and religion" panel composed of all adult clergy or religious leaders; and an "open mic" session.[2]  (See Answer at ¶¶ 19, 20, 26).  The assembly and all of the panels occurred during instructional time. (Caudle Dep. at 35-37 at Ex. 5). The "open mic" session occurred during lunch period, which is not considered instructional time. (Caudle Dep. at 36 at Ex. 5).

Approximately 200 students attended the "homosexuality and religion" panel, and similar numbers attended the religion panel. Only about 15 students attended the lunchtime "open mic" session. (Jensen Dep. at 102, 103, 122 at Ex. 16; Korzdorfer Dep. at 163 at Ex. 6).

There were three "Diversity Week" planning meetings in which students from the general student body, such as Betsy Hansen, were invited to attend. The first meeting was an initial planning meeting that occurred in January, 2002, in the Little Theater during the lunch period. (Jensen Dep. at 55-56 at Ex. 16).  Betsy Hansen attended this meeting and made known her

---

[2] The assembly was held on Monday, March 18, 2002, and the "homosexuality and religion" and the "religion" panels were held on Thursday, March 21, 2002. The "homosexuality and religion" panel was held during the 4th class hour, and the religion panel was held immediately following during the 5th class hour. The "open mic" session was held on Friday, March 22, 2002, during lunch. (Korzdorfer Dep. at 127 at Ex. 6; Erickson Dep. at 109, 142-143, Exs. 11, 33 at Ex. 7).

interest in being a part of a panel that would combine religion and sexual orientation.  (B. Hansen Dep. at 87-89 at Ex. 1; Jensen Dep. at 56-58 at Ex. 16).

The second planning meeting was held on Friday, February 22, 2002, in Defendant Korzdorfer's classroom.[3]  Betsy had an excused absence from school on February 22, 2002; she was visiting a college (B. Hansen Decl. at ¶ 2, Ex. A at Ex. 27), so she asked Kirsten Raab to attend the meeting and sign her up for the sexual orientation panel.  (B. Hansen Dep. at 92 at Ex. 1).  It was the custom or practice at PHS that if a student missed a so-called "mandatory" meeting for "Diversity Week," the student would be allowed to be on a panel if the student sent a friend to the meeting who told either the student council advisor or student council president that the missing student wanted to be on a particular panel.  (Jensen Dep. at 19-20 at Ex. 16).

Kirsten Raab attended the February 22, 2002, meeting (Raab Decl. at ¶ 2 at Ex. 18), and told Defendant Korzdorfer that her friend, Betsy Hansen, wanted to be on the sexual orientation panel.[4]  (Korzdorfer Dep. at 76-77 at Ex. 6).

Although the announcements claim that certain meetings were mandatory, there were students who participated on the race and religion panels who did not attend these meetings. (Jensen Dep. at 20-23 at Ex. 16; Raab Decl. at ¶ 2 at Ex. 18).  These students were invited to

---

[3] The February 22nd meeting was advertised as follows: "Are you interested in being on the religion or sexual orientation panels for Diversity Week, which will be held March 18[th]-22[nd]?  A mandatory informational meeting will be held on Friday, February 22[nd] in room C310 at lunch for all potential participants.  We look forward to seeing you then!"  (Jensen Dep. at 17-19, Ex. 2 at Ex. 16).

[4] The name of the sexual orientation panel was later changed to "homosexuality and religion" in an e-mail from Defendant Pennington dated March 19, 2003.  (Pennington Dep. at 156, Exs. 1, 10 at Ex. 3).

participate because the school wanted to ensure that "diverse" views were presented on these panels. (Jensen Dep. at 147-148 at Ex. 16; Korzdorfer Dep. at 61 at Ex. 6).

The third meeting occurred during the lunch period on March 8, 2002, again in Defendant Korzdorfer's classroom.[5]  Announcements were made over the public address system on March 4, 2002, and March 7, 2002, stating, "If you are interested in being on the race, religion or sexual orientation panel during Diversity Week please see Ms. Korzdorfer in room C-310 by Friday, March 8th." (Jensen Dep. at 24-27, Exs. 4, 5 at Ex. 16).  Betsy attended this meeting and told Defendant Korzdorfer that she wanted to be on the sexual orientation panel.[6]  (B. Hansen Dep. at 94-97 at Ex. 1; Korzdorfer Dep. at 82-83 at Ex. 6).  Apparently, Defendants had given control of this panel to the Gay Straight Alliance ("GSA").[7]  Betsy was told that the GSA was planning to invite adult religious leaders to be on the panel, and so Betsy left the meeting with the understanding that she could find an adult religious leader to express her religious view on this panel. (B. Hansen Dep. at 95-97 at Ex. 1).

---

[5] The March 8th meeting was advertised as follows: "Do you want a chance to express yourself in front of your peers?  Sign up to be on the Race, Religion, or Sexual Orientation Panel for Diversity Week!  Check in with Ms. Korzdorfer in room C310 by Friday, March 8th and attend a lunchtime meeting on that day in her room to get the specifics about when and where the panels are going to be held." (Jensen Dep. at 23-24, Ex. 3 at Ex. 16).

[6] Prior to the March 8th meeting, Betsy had made known her interest to participate on this panel to Defendant Korzdorfer. (Korzdorfer Dep. at 86-90 at Ex. 6).  Betsy had also expressed this interest to GSA members at various times. (O'Brien Dep. at 103-104 at Ex. 2).

[7] The GSA holds itself out as a student-run club at PHS. Defendants Pennington and Mancini, both openly gay teachers, are the faculty advisors and have been so since the creation of the GSA.  A goal of the GSA is to promote acceptance of homosexuality by removing "homophobia" and "heterosexism" from the school. (Pennington Dep. at 16-18, 27-28, 58-59, 64-67, 70-71, 190 at Ex. 3; Mancini Dep. at 46, 59 at Ex. 4).  Pennington and Mancini take a "hands-on" role with the GSA. (O'Brien Dep. at 70-72 at Ex. 2).

In an e-mail dated March 7, 2002, Defendant Mancini told Jennette Maddock, a GSA leader, "I have asked my minister from St. Andrew's Episcopal Church to participate [on the "homosexuality and religion" panel] but the rest is up to our group to organize. If that doesn't happen, I am concerned about what the format will be and who else will be speaking. The Diversity Week coordinator Ms. Koerdoffer (sp?) wants to know who is coordinating this. Obviously she is not. We need to act fast if this is still a go." (Mancini Dep. at 140-141, Ex. 9 at Ex. 4).

At some point after the March 8, 2002, meeting, further concern was raised about allowing representation of Betsy's religious view on this panel. A meeting was held on March 12, 2002, in which Defendants Caudle, Erickson, Korzdorfer, Denise Eaddy-Richardson[8] and William Johnson, one of the faculty advisors for PFC, attended. (Johnson Dep. at 64-67 at Ex. 28). According to Defendant Eaddy-Richardson, the consensus of this meeting was that Betsy should be allowed representation on the panel. (Eaddy-Richardson Dep. at 32-35, 67 at Ex. 8). Following this meeting, Defendant Korzdorfer sent an e-mail to Defendant Pennington, stating, "The crux of the meeting was this: Pio's for Christ have a leagal (sic) right to be on the panel. It does not matter that the panel's intent is to show how religion and sexuality can go hand in hand. They have a leagal (sic) right to say that homosexuality is not a valid lifestyle. This is the bottom line." (Korzdorfer Dep. at 218, Ex. 25 at Ex. 6). Defendant Korzdorfer further stated that she supported the view of those who did not want "Pio's for Christ to be able to put a member on the panel saying that homosexuality isn't valid," so she thought it best to cancel the

---

[8] Defendant Eaddy-Richardson was the AAPS equity officer and reported directly to the superintendent. (Eaddy-Richardson Dep. at 28-29 at Ex. 8).

panel rather than allow Betsy to have a voice on it.[9]  (Korzdorfer Dep. at 218, Ex. 25 at Ex. 6). Others shared Korzdorfer's view.  (O'Brien Dep. at 114 at Ex. 2).  Defendant Korzdorfer concludes her e-mail by stating, "Let me know if I can help un-officially help organize a teach-in.  I am treading on shallow ground here, as I do not want to be sued.  However, I support and believe in your vision of the religion discussion.  Let me know how I can more fully show my support." (Korzdorfer Dep. at 218, Ex. 25 at Ex. 6).

After the March 8, 2002 meeting, Defendants Pennington and Mancini called Defendant Eaddy-Richardson to complain about the decision regarding the panel.  (Eaddy-Richardson at 49-51, 60-62 at Ex. 8).  Defendants Pennington and Mancini requested a subsequent meeting, which was held on Friday, March 15, 2002.  (Pennington Dep. at 112 at Ex. 3; Eaddy-Richardson Dep. at 64-65 at Ex. 8).  Among those attending the Friday meeting were Defendants Caudle, Erickson, Korzdorfer, Eaddy-Richardson, Pennington, and Mancini, along with William Johnson and James Brink, the faculty advisors for PFC.  Betsy was not present.  (*See* Johnson Dep. at 65, 85 at Ex. 28).  Prior to this meeting, Dr. Fornero, who was the acting superintendent, told Defendant Eaddy-Richardson that the "homosexuality and religion" panel would not be canceled.  (Eaddy-Richardson Dep. at 68-70 at Ex. 8).

During the March 15, 2002, meeting, it was decided that neither Betsy nor any representative who would express Betsy's religious view would be permitted to speak on this panel.[10]  (Johnson Dep. at 85-90 at Ex. 28).  There were claims that Betsy did not follow the

---

[9] According to Defendant Caudle, he cancelled the panel, although he believed he was canceling all of the panels.  (Caudle Dep. at 70-71 at Ex. 5).

[10] Following the March 15th meeting, Defendant Eaddy-Richardson sent a memorandum to several district administrators, including the superintendent, informing them that religious

proper procedures, which the facts above prove otherwise, but more importantly, Defendants claimed that Betsy's religious beliefs regarding homosexuality were "negative" and would "water down the positive message" that the school was attempting to convey. (Pennington Dep. at 119 at Ex. 3; C. Hansen Decl. at ¶ 7 at Ex. 25; Maddock Dep. at 62 at Ex. 24). This was a common sentiment expressed throughout "Diversity Week," and its aftermath.[11]

The "homosexuality and religion" panel went forward without Betsy or her representative. (Hansen Decl. at ¶ 3 at Ex. 22). According to Defendant Pennington, the purpose of this panel was to have adult religious leaders from the local area who have been trained extensively in matters of religion to "answer complex questions that may arise when [homosexuality and religion] are combined" because "[b]eliefs are not facts and so it will be up to each individual to find their own truth in the end though." (Pennington Dep. at 156-157, Exs. 1, 10 at Ex. 3) (emphasis added).

---

leaders would be empanelled to discuss religion and "alternate lifestyles" and that she supported the decision to hold this panel without Betsy Hansen or her representative. (Eaddy Richardson Dep. at 129-131, Ex. 9 at Ex. 8).

[11] In the PHS student newspaper, Defendant Pennington claimed that allowing adults who opposed homosexuality on the panel would be like inviting white supremacists on a race panel. Defendant Mancini agreed. (Pennington Dep. at 186-187, Ex. 3 at Ex. 3; Mancini Dep. at 140 at Ex. 4). This message was also conveyed at GSA meetings. (O'Brien Dep. at 166-167 at Ex. 2). In various e-mails, Defendants Pennington and Mancini claimed that "[t]o all outward appearances the PioneerUs (sic) for Christ club seems to have a singular goal to be against the message of tolerance and diversity the GSA stands for," and "PFC tried to have the GSA sponsored 'Religion & Homosexuality' panel cancelled for Diversity Week (recently held) because they were refused representation and a platform to spout their message of sin and religious intolerance, " and that "[t]he main purpose of the PFC seems to be a 'crusade againt (sic) queers.'" Defendant Pennington claims that Catholic beliefs regarding homosexuality are "homophobic" and "heterosexist." (Pennington Dep. at 167-171, 71-72, Exs. 19, 21 at Ex. 3).

Defendant Pennington was the "moving force" behind the "homosexuality and religion" panel, and Defendants Pennington and Mancini were very much involved with ensuring that the panel would go as planned, that is, without Betsy or her representative. (O'Brien Dep. at 59-61, 162-63 at Ex. 2; Pennington Dep. at 118 at Ex. 3). Six adult clergy and religious leaders were selected (McGarry Dep. at 61-66 at Ex. 19) and contacted by Defendant Mancini; all of the clergy and religious leaders were selected because of their pro-homosexual religious beliefs. (Mancini Dep. at 13-22 at Ex. 4; O'Brien Dep. at 59-61 at Ex. 2). None of the clergy and religious leaders were Roman Catholic (McGarry at 61-66, 73-74 at Ex. 19), nor shared the Roman Catholic beliefs regarding homosexuality. (O'Brien Dep. at 59-62, 106 at Ex. 2). Some of the clergy members wore clerical garb during the panel. (McGarry Dep. at 69-70 at Ex. 19; Nieman Dep. at 41-42 at Ex. 26). During introductions, the panelist identified their church or temple and their particular title. All of the panelists were either a priest, pastor, elder, or rabbi, religious designations of leadership and authority. Some of the panelists identified themselves as homosexual. Defendant Mancini's pastor, John Nieman, an Episcopalian priest, stated that he had a Masters of Divinity degree from Harvard. (B. Hansen Dep. at 177-181, Ex. 14 at Ex. 1; Gryniewicz Decl. at ¶ 4 at Ex. 20; McGarry Dep. at 67-68 at Ex. 19). During the course of answering questions, Susan McGarry, who identified herself as a lesbian, an Episcopalian priest, and the pastor at St. Aidan's Episcopal Church, stated that she wrote her doctoral dissertation on the wrath of God. (B. Hansen Dep. at 179, 191 at Ex. 1; Gryniewicz Decl. at ¶ 4 at Ex. 20). The adult clergy and religious leaders were held out as experts on matters of religion. (Pennington Dep. at 88-89, Exs. 1, 10 at Ex. 3; Johnson Decl. at ¶ 4 at Ex. 21; Gryniewicz Decl. at ¶ 4 at Ex. 20; *see also* Nieman Dep. at 20-21 at Ex. 26; McGarry Dep. at 18-19, 22-25, 34, 47 at Ex. 19).

The format of the panel was such that questions were pre-submitted by students and Defendant Pennington decided which ones he would ask. (Pennington Dep. at 94-95 at Ex. 3). The students attending the panel were instructed that they could not interact with the panel members. Students were not allowed to ask follow-up questions, nor were they given an opportunity to respond to or rebut any of the panelists' answers; this was not going to be a "debate." The students were left with the answers given by the panelists. (Pennington Dep. at 109-111 at Ex. 3; B. Hansen Dep. at 176-177, Ex. 14 at Ex. 1).

Panelists discussed the Bible and Sacred Scripture, explaining how passages referring to homosexuality have been misunderstood or mistranslated to mean that homosexuality was immoral or sinful or incompatible with Christianity. (B. Hansen Dep. at 187-189, Ex. 14 at Ex. 1: McGarry Dep. at 79-80 at Ex. 19; Gryniewicz Decl. at ¶ 5 at Ex. 20). There were claims that Jesus was not opposed to homosexuality because He did not talk about it in the New Testament. (Gryniewicz Decl. at ¶ 8 at Ex. 20; B. Hansen Dep. at 189, Ex. 14 at Ex. 1; *see also* McGarry Dep. at 47 at Ex. 19; Nieman Dep. at 43-44 at Ex. 26). The panelists claimed that homosexual marriages, which they called "Holy Unions," were blessed and compatible, from a religious perspective, to heterosexual marriages. (B. Hansen Dep. at 190-191, Ex. 14 at Ex.1; *see* McGarry Dep. at 37-38, 81 at Ex. 19). One of the panelists suggested that the students read a book entitled, "Rescuing the Bible from Fundamentalism," in order to get a better understanding of what Sacred Scripture meant, particularly with regard to homosexuality. (Gryniewicz Decl. at ¶ 5 at Ex. 20; Raab Dep. at 97-98 at Ex. 17; B. Hansen Dep. at 187, Ex. 14 at Ex. 1; McGarry Dep. at 95-96 at Ex. 19). The panelists used apologetic arguments and personal witness testimony to promote the religious belief that homosexuality was not immoral or sinful.

11

(Johnson Decl. at ¶ 3 at Ex. 21; *see also* McGarry Dep. at 20-21, 34, 35, 76-77, 81-84, 86-87, 90, 99 at Ex. 19; B. Hansen Dep. at 177-193, Ex. 14 at Ex. 1; Gryniewicz Decl. at ¶¶ 4-8 at Ex. 20; Jensen Dep. at 114-115 at Ex. 16).

These clergy and religious leaders impressed upon the students that their religious belief regarding homosexuality was based on reason, it was mainstream, and it was the enlightened one; therefore, any belief to the contrary was wrong. (*See* Johnson Decl. at ¶4 at Ex. 21; Gryniewicz Decl. at ¶¶ 9-10 at Ex. 20; M. Martin Decl. at ¶ 3 at Ex. 12). What these adult clergy and religious leaders were teaching was contrary to the religious beliefs and teachings of Plaintiffs. (B. Hansen Dep. at 64-65, 198-200 at Ex. 1; R. Martin Dep. at 24-29, 34, 40-41, 48-52, 75, 82-83, Ex. 1 at Ex. 10; M. Martin Dep. at 7, 12-13, 22, 29 at Ex. 11; M. Martin Decl. at ¶ 3 at Ex. 12; C. Hansen Dep. at 106-107 at Ex. 9). Students were offended and upset by what was being taught at this panel. (Gryniewicz Decl. at ¶ 10 at Ex. 20). Maureen Martin left the panel early, risking discipline from the school, because she was so offended by the panel (M. Martin Decl. at ¶ 3 at 12), and Betsy left the auditorium in tears after the panel concluded (B. Hansen Decl. at ¶ 4 at Ex. 22).

Defendants did not seek parental advice or consent prior to holding the "homosexuality and religion" panel, nor did Defendants provide information to parents about the form and content of this event prior to holding it (C. Hansen Decl. at ¶ 10 at Ex. 25; R. Martin Decl. at ¶ 3 at Ex. 29; Korzdorfer Dep. at 121-123 at Ex. 6; Caudle Dep. at 42-46 at Ex. 5); it is not their practice to do so. (Caudle Dep. at 45 at Ex. 5). Defendants also did not address parental complaints about the panel. (R. Martin Dep. at 37-38, 61, 72 at Ex. 10).

Defendants have not ruled out holding future "Diversity Week" panels similar to the "homosexuality and religion" panel held during the 2002 "Diversity Week." (Caudle Dep. at 89-90 at Ex. 5; Fornero Dep. at 42, 46, 58 at Ex. 15).

The religion panel, which immediately followed the "homosexuality and religion" panel, was comprised of only students. There was little discussion, if any, at this panel regarding homosexuality, and there was no discussion of this issue like that which occurred at the "homosexuality and religion" panel. (Gryniewicz Decl. at ¶ 11 at Ex. 20; B. Hansen Dep. at 174 at Ex. 1; Seromik Dep. at 35-36 at Ex. 23). Guidelines were drafted by Defendant Korzdorfer and given to the student panel members. (Raab Decl. at ¶ 3, Ex. A at Ex. 18). A copy was also given to Betsy, although she was not a panel member. (B. Hansen Dep. at 168-169 at Ex. 1). These guidelines prohibited students from "specifically tell[ing], or imply[ing], that another group is going to hell" or making "comments [that] directly target another group's beliefs, values, culture or sexual orientation." Students were warned, "Any staff member has the right to ask/demand that you rethink or redirect your comments. You must abide by the staff member's decision." (Korzdorfer Dep. at 183-184, 187-188, Ex. 3 at Ex. 6; Raab Decl. at ¶ 3, Ex. A at Ex. 18).

During the all school assembly, which was the opening event for "Diversity Week," Betsy was asked to give a speech on the topic, "What Diversity Means to Me." (Answer at ¶ 21). Prior to delivering her speech, Betsy was required to submit it to Defendants for review of its content. (Answer at ¶ 22). Defendants Caudle, Erickson, and Korzdorfer reviewed Betsy's speech, and they did not approve it. (Korzdorfer Dep. at 142-145, 150 at Ex. 6; Erickson Dep. at 87-89 at Ex. 7). The offending language from the speech was as follows:

13

> One thing I don't like about Diversity Week is the way that racial diversity, religious diversity, and sexual diversity are all lumped together and compared as if they are the same things. Race is not strictly an idea. It is something you are born with; something that doesn't change throughout your life, unless your Michael Jackson, but that's a special case. It involves no choice or action. On the other hand, your religion is your choice. Sexuality implies an action, and there are people who have been straight, then gay, then straight again. I completely and whole-heartedly support racial diversity, but I can't accept religious and sexual ideas or actions that are wrong. (B. Hansen Dep. at 131, 140-141, Ex. 13 at Ex. 1).

According to these Defendants, this speech was objectionable because it targeted an individual and groups, specifically homosexuals. (Korzdorfer Dep. at 140, 147-148 at Ex. 6; Erickson Dep. at 88 at Ex. 7; B. Hansen Decl. at ¶ 2 at Ex. 22). Defendant Korzdorfer called Betsy at her home on the Sunday prior to the assembly to instruct her to make the changes, knowing that calling Betsy at home would make her uncomfortable. (Korzdorfer Dep. at 139-140 at Ex. 6). Betsy did not want to make the changes (Korzdorfer Dep. at 140 at Ex. 6), but believed she had no choice. (B. Hansen Decl. at ¶ 2 at Ex. 22). AAPS policy, which students are expected to follow, states that it is "inappropriate behavior" for a student to "[r]efus[e] to comply, either verbally or non-verbally, with a direction or instruction of a staff member." (Caudle Dep. at 27-28, Ex. 1 at Ex. 5). Defendants censored Betsy's speech even though none of her comments were vulgar, offensively lewd, or contained profanity. (Korzdorfer Dep. at 134-135 at Ex. 6; Caudle Dep. at 60-61 at Ex. 5; Erickson Dep. at 95 at Ex. 7). In contrast, Defendants permitted a GSA member to give a pro-homosexual speech, without revisions. (Maddock Dep. at 68-70 at Ex. 24).

## ARGUMENT

### I.     Constitutional Rights of Students

It is a well-established principle of constitutional law that students do not shed their constitutional rights at the schoolhouse gate. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393

14

U.S. 503, 506 (1969).  Indeed, the case at bar presents significant concerns the Supreme Court

had in mind when it stated:

> In our system, state-operated schools may <u>not be enclaves of totalitarianism</u>.
> School officials do not possess absolute authority over their students.  Students in
> school as well as out of school are "persons" under our Constitution.  They are
> possessed of fundamental rights which the State must respect, just as they
> themselves must respect their obligations to the State.  In our system, students
> may not be regarded as <u>closed-circuit recipients</u> of only that which the State
> chooses to communicate.  <u>They may not be confined to the expression of those</u>
> <u>sentiments that are officially approved.</u>

*Id.* at 511 (emphasis added).  *See also Board of Educ. v. Pico*, 457 U.S. 853, 872 (1982) (holding

that "school boards may not remove books from school library shelves simply because they

dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be

orthodox in politics, nationalism, religion, or other matters of opinion'"); *West Virginia State Bd.*

*of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional

constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics,

nationalism, religion, or other matters of opinion . . . .").

Courts have been quick to strike down curriculum decisions that sought to promote or

endorse particular religious views or beliefs.  *See, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530

U.S. 290 (2000) (holding unconstitutional public school policy of permitting student-led,

student-initiated prayer before football games); *Lee v. Weisman*, 505 U.S. 577 (1992) (holding

prayer at public school graduation unconstitutional); *Stone v. Graham*, 449 U.S. 39 (1980)

(holding unconstitutional the posting of the Ten Commandments in public schools); *Edwards v.*

*Aguillard*, 482 U.S. 578 (1987) (holding unconstitutional law requiring the teaching of evolution

with creationism or not at all); *Epperson v. Arkansas*, 393 U.S. 97 (1968) (holding

unconstitutional a law forbidding the teaching of evolution in public schools); *School Dist. of*

*Abington Township v. Schempp*, 374 U.S. 203 (1963) (holding unconstitutional public school practices of reading the Bible or reciting the Lord's prayer); *Oxford v. Beaumont Indep. Sch. Dist.*, 224 F.Supp.2d 1099 (E.D. Tex. 2002) (holding unconstitutional public school's "Clergy in Schools" program).

The reason for this principle is simple and compelling: "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Edwards*, 482 U.S. at 584

## II.     Establishment Clause

The "homosexuality and religion" panel violates every Establishment Clause test articulated by the Supreme Court.

"When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).

According to the Supreme Court:

> Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.

*Epperson*, 393 U.S. at 103-04.

The Supreme Court has struggled with creating a singular test for determining when the government has violated the Establishment Clause. As a result, three tests have emerged. The *Lemon* test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), while still used, has been

widely criticized and often modified.  *See, e.g., Lambs Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring).   Under the *Lemon* test, a governmental practice is unconstitutional if <u>any</u> one of the following apply: (1) it does not have a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion.  *Id.* at 612-13.  The other Establishment Clause tests include the "endorsement" test, which seeks to determine whether the government action endorses a particular religion or religious belief or conveys a message of hostility toward a particular religion or religious belief (*see County of Allegheny v. ACLU*, 492 U.S. 573 (1989)), and the "coercion" test, under which a school-sponsored activity is analyzed to determine whether it has a coercive effect on students (*see Lee v. Weisman*, 505 U.S. 577 (1992)).

The "homosexuality and religion" panel fails all three tests.  Under the *Lemon* test, the stated purpose for this panel fails the first prong.  The purpose of this panel was to have certain clergy and religious leaders who were hand-selected by Defendants because of their pro-homosexual religious beliefs to answer "complex questions that may arise when [homosexuality and religion] are combined" because these "complex questions" are "best . . . answered by adults who have been trained extensively in their fields."  All of these adult clergy and religious leaders were from local religious "institutions where one would not have to choose between sexual orientation and their faith."  The "extensive training" of these adult clergy and religious leaders was their religious training and education.  And the adult clergy and religious leaders were expected to discuss homosexuality in the context of the Bible and other religious documents.  Moreover, the stated purpose was to show that religious "beliefs are not facts and so it would be up to each [student] to find their own truth in the end."

17

Clearly, the purpose of this panel was not secular—its purpose was to promote a singular religious belief regarding homosexuality and to confront religious beliefs that oppose homosexuality. Indeed, Defendants Pennington and Mancini boldly claim that the purpose of this panel was to challenge certain religious beliefs, because "beliefs are not facts," and leave it to the students to "find their own truth" after they have heard from Defendants' "experts." This not only violates the Establishment Clause, but it is also a transparent effort to undermine parental authority regarding core religious beliefs.

Turning to the second prong of the *Lemon* test, the "effect" of the panel was to endorse a particular religious belief and disapprove another. Defendants were quite candid in admitting that the panel was created to convey only one religious belief regarding the issue of homosexuality. Any contrary or differing religious view was deemed "negative," and summarily excluded from this panel.

Finally, Defendants' level of involvement in selecting the clergy, vetting the religious beliefs of the chosen clergy, recruiting the clergy, and providing school facilities, a forum, and a captive audience of students for the clergy demonstrate an excessive entanglement with religion.

Under the "endorsement" test, the government violates the Establishment Clause by "conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred*." *County of Allegheny,* 492 U.S. at 593. Moreover, the Establishment Clause "prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* at 594 (citation omitted). Defendants in this case conveyed the message that a particular religious belief was favored and made adherence to this religious belief

18

relevant in the way they mistreated Betsy Hansen. In order to have a favored voice during "Diversity Week," students were required to express the "preferred" and "positive" religious belief regarding homosexuality.

Under the "coercion" test, the government may not directly or indirectly apply coercive pressure to proscribe or prescribe a particular religious belief. In *Lee v. Weisman*, 505 U.S. 577 (1992), a public school ran afoul of the Establishment Clause by merely inviting one clergy member to give a nonsectarian invocation and benediction at a school graduation. In holding the practice unconstitutional, the Court noted that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Id.* at 592.

In the present case, there was direct coercion applied to proscribe Plaintiffs' Roman Catholic beliefs and to prescribe a contrary religious belief. Indeed, Defendants selected several clergy to preach a particular religious belief to students during instructional time at a school-sponsored event. This is far more egregious than permitting student-led, student-initiated prayer before a high school football game or permitting a momentary, nonsectarian invocation or benediction at a graduation, which a public school cannot do. *See Santa Fe Indep. Sch. Dist.*, 530 U.S. at 290. And it is a well-established point of law that a public school program that promotes a particular religious belief, such as the one at bar, is <u>not</u> saved from the proscriptions of the Establishment Clause because student attendance or participation is purely voluntary. *See, e.g., Engel*, 370 U.S. at 430; *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 290.

In the final analysis, Defendants violated the Establishment Clause regardless of the test employed. The "homosexuality and religion" panel violated the clear mandate of the First

Amendment, and Defendants' exclusion of Betsy and any person who shared Betsy's religious beliefs is conclusive evidence of Defendants' improper endorsement of a particular religious belief and hostility toward Betsy's Roman Catholic beliefs.

### III.   Free Exercise of Religion

Defendants violated the free exercise rights of Plaintiffs by censoring Betsy's speech and excluding her from participating in the "homosexuality and religion" panel because of her religious beliefs, conveying disapproval of Plaintiffs' Roman Catholic beliefs, unlawfully coercing Betsy and other students, including Maureen Martin,[12] by indoctrinating them with beliefs hostile to their faith, and preventing Betsy from fulfilling her moral obligation to publicly defend her faith as required by her religious convictions.  Indeed, Defendants used the coercive power of government to suppress Betsy's religious beliefs in order to promote a contrary religious doctrine.  This is prohibited by our constitution.  *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (striking down law on Free Exercise grounds because it targeted a particular religious group).

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990). The First Amendment excludes all "governmental regulation of religious beliefs." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963).  As such, "[t]he government may not compel affirmation of religious beliefs, punish the expression of religious doctrines it believes to be false . . . or lend its power to one or the other side in controversies over religious authority or dogma." *Employment*

---

[12] Plaintiff Ralph Martin is advancing a free exercise claim on behalf of his daughter because his personal religious freedom to direct the religious training of his children was violated.  *See Wisconsin v. Yoder*, 406 U.S. 205 (1972); *see also Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994).

20

*Div.*, 494 U.S. at 877 (internal citations omitted). Likewise, the government may not impose special restrictions or disabilities on the basis of religious beliefs. *See generally McDaniel v. Paty*, 435 U.S. 618 (1978). "The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." *Id.* at 626; *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (stating that the Free Exercise Clause embraces two concepts, the freedom to believe and the freedom to act, and that "freedom of conscience . . . cannot be restricted by law"). Indeed, the Free Exercise clause even forbids "subtle departures from neutrality, and covert suppression of particular religious beliefs." *City of Hialeah*, 508 U.S. at 534 (internal quotations and citations omitted). And the "Free Exercise Clause . . . recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of <u>any</u> compulsion from the state." *School Dist. of Abington Township*, 374 U.S. at 222 (emphasis added).

Under the Supreme Court's definition of "coercion" in its Establishment Clause cases, particularly *Lee v. Weisman*, 505 U.S. 577 (1992), students, such as Betsy Hansen and Maureen Martin, who are exposed to concepts and actions hostile to their religious faith indeed experience coercion to renounce their faith in the same way that students who are exposed to Bible reading or prayer are "coerced" to accept a religious faith. *See, e.g., Engel*, 370 U.S. at 431 (holding that when the government places its support "behind a particular religious belief, the indirect coercive pressure . . . to conform to the prevailing officially approved religion is plain").

The offense in the present case is far worse than the offense in *Weisman*, where plaintiffs were merely expected to maintain respectful silence during the offending school prayer. In this case, Defendants took overt action to suppress Betsy's religious beliefs and to prevent her from

defending her faith, while inviting adult clergy and religious leaders to promote an offending religious belief that students, such as Betsy and Maureen Martin, were expected to absorb. As the Supreme Court readily acknowledges, public schools create an inherently coercive atmosphere due to mandatory attendance laws, the young age of the students, students' emulation of teachers as role models, and peer pressure in group settings. *See, e.g., Santa Fe Indep. Sch. Dist.,* 530 U.S. at 290; *Edwards,* 482 U.S. at 584.

Clearly, the government may not directly or indirectly apply coercive pressure to proscribe or prescribe a particular religious belief, *Employment Div.,* 494 U.S. at 877, and "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee,* 505 U.S. at 592. Moreover, the Supreme Court readily acknowledges that "[r]esearch in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." *Lee,* 505 U.S. at 593 (recognizing that the "choice [not to participate] imposed by the State constitutes an unacceptable constraint [and] acknowledg[ing] that the government may no more use social pressure to enforce orthodoxy than it may use more direct means"). Thus, placing a student between the Scylla of violating her core religious beliefs and convictions and the Charybdis of social pressure, stigma, and possible punishment for violating the instructions of school officials, is hardly a situation void of "coercion."

As the Supreme Court acknowledged:

The First Amendment's Religion Clauses mean that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State. The design of the Constitution is that preservation and transmission of religious beliefs

22

and worship is a responsibility and a choice committed to the private sphere, which itself is promised freedom to pursue that mission.

*Lee*, 505 U.S. at 589.

Furthermore, as Justice Blackmun noted in his concurring opinion in *Lee*, "Even subtle pressure diminishes the right of each individual to choose voluntarily what to believe. . . . The rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand." *Id.* at 605-06 (internal quotations and citations omitted).

In the present case, Defendants violated Betsy Hansen's constitutional right to the free exercise of religion, as well as the free exercise right of Ralph Martin.

## IV. Freedom of Speech

Students, such as Betsy Hansen, do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. Moreover, "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. Indeed, Defendants must show that allowing Betsy to express her religious beliefs and opinions regarding homosexuality would have "materially and substantially interefere[d] with the requirements of appropriate discipline in the operation of the school," otherwise Defendants' actions "cannot be sustained." *Id.*

During the "Diversity Week" assembly, Betsy was speaking on the topic "What Diversity Means to <u>Me</u>." This was an opportunity for personal, public expression of "diverse" views, including Betsy's views. The topic was <u>not</u> "What Diversity Means to <u>PHS</u>." Thus, it was <u>not</u> a

23

situation where the speaker's views would be erroneously attributed to the school. Indeed, Defendants invited a student from the GSA to give a speech that was pro-homosexual.

Most importantly, a simple review of the language that was disapproved in Betsy's speech shows that this was not "offensively lewd and indecent speech . . . unrelated to any political viewpoint." *Compare Bethel v. Fraser*, 478 U.S. 675, 685 (1986) (permitting school to censor speech of student at school-sponsored assembly because speech was lewd and indecent); *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465 (6th Cir. 2000) (permitting school to suppress student speech by forbidding student from wearing t-shirt that was deemed vulgar and offensive). Indeed, Defendants' stated reason for disapproving and censoring Betsy's speech was that it allegedly targeted homosexuality, which is an improper basis for their content and viewpoint restriction. Moreover, there is no basis for claiming that Betsy's speech would have "materially and substantially interfered" with the operation of the school. As the Supreme Court unequivocally stated:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk.

*Tinker*, 393 U.S. at 508.

And while a students' right to expression must be "applied in light of the special characteristics of the school environment" (*Tinker*, 393 U.S. at 506), the Supreme Court has also noted that "'[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Epperson*, 393 U.S. at 104 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). In fact, "[t]he classroom is peculiarly the 'marketplace of ideas.' The

24

Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967). Thus, certain bedrock principles of free speech should also inform this Court's decision in this case.

The Supreme Court is clear on this: content- and viewpoint-based restrictions of speech are unconstitutional. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995). The government may not "impose special prohibitions on those speakers who express views on disfavored subjects" or on the basis of "hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386-91 (1992); *see also Rosenberger*, 515 U.S. at 828 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").

Additionally, Defendants' actions were a prior restraint of Betsy's speech, and "[a]ny system of prior restraints of expression [bears] a heavy presumption against its constitutional validity." *Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 317 (1980) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)). This "heavy presumption" is justified because "prior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Indeed, society "prefers to punish the few who abuse rights of speech <u>after</u> they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (emphasis added).

In the final analysis, Defendants censored Betsy's speech because of its content, and in particular, because of her viewpoint on the issue of homosexuality; and not because her speech

was lewd, vulgar, or contained profanity.  As such, Defendants did not have a "legitimate pedagogical concern" to censor her speech, and therefore Defendants violated Betsy's constitutional rights.  Likewise, Defendants violated Betsy's constitutional rights by excluding her religious viewpoint from the "homosexuality and religion" panel because they disagreed with it.

## V.     Parental Rights

The Supreme Court has long recognized the fundamental principle that parents possess the right to control the upbringing of their children: "[t]he custody, care and nurture of the child resides first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).  As Justice O'Connor recently acknowledged in *Troxel v. Granville*, "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (accord); *Meyer v. Nebraska*, 262 U.S. 390, 401-02 (1923) (holding that parents had a broad liberty interest in the rearing of their children and commenting unfavorably on the notion that children were mere creatures of the State); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (striking down law that prohibited home and private schooling, noting that a child is not the mere creature of the State, and recognizing the constitutional liberty right of parents to direct the upbringing and education of their children).

This right is most protected with regard to religious education. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Employment Div.*, 494 U.S. at 881.  In *Wisconsin v. Yoder*, the Supreme Court unequivocally established the fundamental right of parents to direct the religious

upbringing and education of their children.  *Yoder*, 406 U.S. at 205.  The Free Exercise Clause further secures this right.[13]  *Id.* at 214; *see also Employment Div.* 494 U.S. at 881.  The Supreme Court recognizes that parents, such as Connie Hansen and Ralph Martin, have a right to be free from improper governmental intrusion in the rearing of their children, particularly with regard to matters of religion.  *See Yoder,* 406 U.S. at 232.

As the facts show, Defendants did not seek parental advice or consent nor inform parents of their intent to invite adult clergy and religious leaders to preach about homosexuality to their children.  Indeed, what Defendants failed to comprehend, and their failure is an unfortunate product of the hubris of school officials who believe they know better than the parents, is that the decision to expose children to such a program is for the <u>parents</u>, not the teenage student who is subject to pressure to conform.  *See generally Edwards*, 482 U.S. at 584.

In the final analysis, Defendants violated Connie Hansen's and Ralph Martin's constitutional right to raise their children according to the religion, system of values, and moral norms they deem appropriate, and Defendants intend to continue to do so in the future.

## VI.    Equal Protection

Unquestionably, the rights protected by the guarantees of the First Amendment are fundamental.  And when the government burdens a fundamental right, as Defendants have done in this case, the government's actions are subject to the most exacting scrutiny.  *See Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (striking down city picketing ordinance and holding that under the Equal Protection Clause, government may not grant the use of a

---

[13] It should be noted that Plaintiffs alleged a violation of their parental rights pursuant to the First and Fourteenth Amendments.  (First Am. Compl. at ¶ 51).

forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views); *see also Carey v. Brown*, 447 U.S. 455, 461-62 (1980) (recognizing that the Equal Protection Clause prohibits government regulation that discriminates among speech-related activities).

Moreover, the equal protection clause demands that the government treat individuals in a manner similar to others as an independent constitutional guarantee. *See generally Yick Wo v. Hopkins*, 118 U.S. 356 (1886). This guarantee governs all governmental actions that classify individuals for different benefits or burdens, and it prohibits disparate treatment that burdens fundamental rights. *See, e.g., Mosley*, 408 U.S. at 92.

In the present case, Defendants denied Betsy participation in the "homosexuality and religion" panel, an educational program, because they found her Roman Catholic viewpoint on the issue of homosexuality to be "negative" and unacceptable thereby depriving Betsy of the guarantee of equal protection of the law.

## VII. Civil Conspiracy

According to the Sixth Circuit:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000) (finding sufficient evidence to support plaintiff's conspiracy claim under § 1983); *see generally Canter v. Hardy*, 188 F.Supp.2d 773,

792-93 (E.D. Mich. 2002) (finding that fact issue precluded summary judgment on § 1983 civil conspiracy claims).

In the present case, the numerous conversations, e-mails, meetings, and ultimate actions of Defendants show that Defendants shared in a conspiratorial objective to silence Betsy's speech, to deny Betsy access to the "homosexuality and religion" panel because of her religious beliefs and viewpoint, and to prevent her from defending her faith as required by her religious convictions. All of this resulted in the deprivation of Betsy's clearly established constitutional rights.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for summary judgment.

Respectfully submitted this _27th_ day of June, 2003.

Robert J. Muise (P62849)
Edward L. White III (P62485)
Thomas More Law Center
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-4778
(734) 827-2001

29

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**ELIZABETH HANSEN,**
**CONSTANCE HANSEN,** and **RALPH MARTIN,**

        Plaintiffs,

v.

**ANN ARBOR PUBLIC SCHOOLS,**
**HENRY CAUDLE,** individually and in his official
capacity as Principal, Pioneer High School,
**LARA ERICKSON,** individually and in her official
capacity as Assistant Principal, Pioneer High School,
**SUNNIE KORZDORFER,** individually and in her
official capacity as teacher, Pioneer High School,
**PARKER PENNINGTON, IV,** individually and in his
official capacity as teacher, Pioneer High School,
**RODNEY MANCINI,** individually and in his
official capacity as teacher, Pioneer High School,
**DENISE EADDY-RICHARDSON,** individually and in
her official capacity as Equity Ombudsman, Ann Arbor
Public Schools,

        Defendants.

CIVIL ACTION
NO. 02-CV-72802-DT

HON. GERALD E. ROSEN

MAGISTRATE JUDGE CARLSON

**PROOF OF SERVICE
OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND
PLAINTIFFS' BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

---

THOMAS MORE LAW CENTER
By:   Robert J. Muise (P62849)
       Edward L. White III (P62485)
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001
Attorneys for Plaintiffs

DYKEMA GOSSETT PLLC
By:   Seth M. Lloyd (P16742)
       Laura A. Sagolla (P63951)
       Jill Wheaton (P49921)
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6837/(734) 214-7612
Attorneys for Defendants

---

## PROOF OF SERVICE

    I hereby declare and certify that on the 27th day of June, 2003, a true and correct copy of

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** and **PLAINTIFFS' BRIEF IN**

**SUPPORT OF MOTION FOR SUMMARY JUDGMENT** were served upon the following

counsel of record by placing said document in an envelope and depositing same in a United

States Postal Service mailbox located in Ann Arbor, Michigan, with postage prepaid:

> Seth M. Lloyd, Esq.
> Laura A. Sagolla, Esq.
> Jill Wheaton, Esq.
> Dykema Gossett PLLC
> 400 Renaissance Center
> Detroit, Michigan 48243-1668

I declare under penalty of perjury that the foregoing is true and correct. Executed on this

27th day of June, 2003, in Ann Arbor, Michigan.

Sharon Peper