UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

**ELIZABETH HANSEN,**
**CONSTANCE HANSEN,** and **RALPH MARTIN,**

      Plaintiffs,

v.

**ANN ARBOR PUBLIC SCHOOLS,**
**HENRY CAUDLE,** individually and in his official
capacity as Principal, Pioneer High School,
**LARA ERICKSON,** individually and in her official
capacity as Assistant Principal, Pioneer High School,
**SUNNIE KORZDORFER,** individually and in her
official capacity as teacher, Pioneer High School,
**PARKER PENNINGTON, IV,** individually and in his
official capacity as teacher, Pioneer High School,
**RODNEY MANCINI,** individually and in his official
capacity as teacher, Pioneer High School,
**DENISE EADDY-RICHARDSON,** individually and in
her official capacity as Equity Ombudsman, Ann Arbor
Public Schools,

      Defendants.

CIVIL ACTION
NO. 02-CV-72802-DT

HON. GERALD E. ROSEN

MAGISTRATE JUDGE CARLSON

**PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

---

THOMAS MORE LAW CENTER
By:    Robert J. Muise (P62849)
        Edward L. White III (P62485)
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001
Attorneys for Plaintiffs

DYKEMA GOSSETT PLLC
By:    Seth M. Lloyd (P16742)
        Laura A. Sagolla (P63951)
        Jill Wheaton (P49921)
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6837/(734) 214-7612
Attorneys for Defendants

---

2ʳ

## ISSUES PRESENTED

I.     Whether Defendants violated Plaintiff Elizabeth Hansen's First Amendment right to freedom of speech by censoring her speech and denying her access to a forum based on the content and viewpoint of her speech.

II.     Whether Defendants violated Plaintiffs' First Amendment right to the free exercise of religion by preventing Plaintiff Elizabeth Hansen from exercising her paramount moral obligation to publicly defend her faith as required by her religious convictions, censoring her speech because of her religious beliefs, excluding her from participating on the "homosexuality and religion" panel because of her religious beliefs, conveying disapproval of her Roman Catholic beliefs, coercing her and Plaintiff Martin's daughter, Maureen Martin, by exposing them to material that is hostile to their faith and indoctrinating them in religious beliefs hostile to their faith.

III.     Whether Defendants violated the Establishment Clause by endorsing and promoting a particular religious belief, demonstrating an impermissible hostility toward a particular religious belief, and coercing students to accept a particular religious belief by selecting and inviting clergy members to preach to students during instructional time at Pioneer High School.

IV.     Whether Defendants violated Plaintiffs Constance Hansen's and Ralph Martin's constitutional right to raise their children according to the religious system, system of values, and moral norms they deem appropriate and their constitutional right to the care, custody, education, and association with their children by promoting and endorsing a particular religious belief that conflicts with their and their children's religious beliefs, conveying a message of disapproval of their and their children's religious beliefs, and coercing their children to accept and support a religious belief that conflicts with their and their children's religious beliefs.

V.     Whether Defendants violated Plaintiff Elizabeth Hansen's rights under the Equal Protection Clause by denying her access to a forum because Defendants found her Roman Catholic viewpoint on homosexuality to be unacceptable.

VI.     Whether Defendants shared in a conspiratorial objective and engaged in overt acts to deprive Plaintiff Elizabeth Hansen of her constitutional rights.

VII.     Whether Defendants are protected from personal liability when they violated the clearly established constitutional rights of Plaintiffs, rights of which a reasonable person would have known.

i

# CONTROLLING AUTHORITY

**Issue I:**

> *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)
> *Board of Educ. v. Pico*, 457 U.S. 853 (1982)

**Issue II:**

> *Employment Div. v. Smith*, 494 U.S. 872 (1990)
> *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)
> *Wisconsin v. Yoder*, 406 U.S. 205 (1972)
> *McDaniel v. Paty*, 435 U.S. 618 (1978)
> *Lee v. Weisman*, 505 U.S. 577 (1992)

**Issue III:**

> *Lemon v. Kurtzman*, 403 U.S. 602 (1971)
> *County of Allegheny v. ACLU*, 492 U.S. 573 (1989)
> *Lee v. Weisman*, 505 U.S. 577 (1992)
> *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)
> *Edwards v. Aguillard*, 482 U.S. 578 (1987)
> *Epperson v. Arkansas*, 393 U.S. 97 (1968)

**Issue IV:**

> *Wisconsin v. Yoder*, 406 U.S. 205 (1972)
> *Prince v. Massachusetts*, 321 U.S. 158 (1944)
> *Troxel v. Granville*, 530 U.S. 57 (2000)
> *Meyer v. Nebraska*, 262 U.S. 390 (1923)
> *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)

**Issue V:**

> *Police Dept. of the City of Chicago v. Mosley*, 408 U.S. 92 (1972)

**Issue VI:**

> *Weberg v. Franks*, 229 F.3d 514 (6th Cir. 2000)

**Issue VII:**

> *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)
> *Anderson v. Creighton*, 483 U.S. 635 (1987)

# TABLE OF CONTENTS

**PAGE**

ISSUES PRESENTED............................................................................................. i

CONTROLLING AUTHORITY .......................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION .................................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS .............................2

ARGUMENT.......................................................................................................11

     I.     Defendants Violated Betsy's Right To Freedom Of Speech .................11

     II.    Defendants Violated Plaintiffs' Right To Free Exercise of Religion ...................14

     III.   The Homosexuality And Religion Panel Violated The Establishment Clause......16

     IV.   Defendants Violated Plaintiffs' Parental Rights .....................................19

     V.    Defendants Do Not Have Qualified Immunity .....................................19

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Adland v. Russ,*
307 F.3d 471 (6th Cir. 2002) ..............................................................................17

*Anderson v. Creighton,*
483 U.S. 635 (1987) ............................................................................................20

*Bartel v. Lohiser,*
215 F.3d 550, (6th Cir. 2000) ............................................................................19

*Bethel v. Fraser,*
478 U.S. 675 (1986) ....................................................................................12, 13

*Board of Educ. v. Pico,*
457 U.S. 853 (1982) ....................................................................................11, 13

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ....................................................................................14, 15

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989) ............................................................................................18

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ....................................................................................16, 19

*Employment Div. v. Smith,*
494 U.S. 872 (1990) ....................................................................................14, 15

*Epperson v. Arkansas,*
393 U.S. 97 (1968) ..............................................................................................16

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ............................................................................................19

*Hazelwood Sch. Dist. v. Kuhlmeier,*
484 U.S. 260 (1988) ....................................................................................11, 12

*Lawrence v. Texas,*
____ U.S. ____, 2003 WL 21467086 (June 26, 2003) ..............................1, 18

*Lee v. Weisman,*
505 U.S. 577 (1992) ..................................................................................16

*Lemon v. Kurtzman,*
403 U.S. 602 (1971) ..............................................................................16, 17

*McDaniel v. Paty,*
435 U.S. 618 (1978) ..................................................................................14

*Mozert v. Hawkins Cty. Bd. Of Educ.,*
827 F.2d 1058 (6th 1987) ........................................................................15

*Oxford v. Beaumont Indep. Sch. Dist.*
224 F.Supp.2d 1099 (E.D. Tex. 2002) ......................................................16

*Poling v. Murphy,*
872 F.2d 757 (6th Cir. 1989) ...................................................................13

*Risbridger v. Connelly,*
275 F.3d 565 (6th Cir. 2002) ..................................................................20

*Santa Fe Indep. Sch. Dist. v. Doe,*
530 U.S. 290 (2000) ..................................................................................16

*School Dist. of Abington Township v. Schempp,*
374 U.S. 203 (1963) ..............................................................................14, 16

*Stone v. Graham,*
449 U.S. 39 (1980) ....................................................................................16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
393 U.S. 503 (1969) ......................................................................11, 12, 13

*Washegesic v. Bloomingdale Public Schs.,*
33 F.3d 679 (1994) ....................................................................................16

*West Virginia State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ..................................................................................11

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ..............................................................................14, 19

# INTRODUCTION

Defendants offer this Court an incomplete, and in many ways inaccurate, statement of the facts, as well as a tendentious view of the law. Defendants' futile effort to achieve an absurd result in this case finds no basis in the constitutional jurisprudence that is binding on this Court. Indeed, upon close examination of the facts applied in light of the well-established law governing this case, it is plain that Defendants have violated the clearly established constitutional rights of Plaintiffs.

In a desperate effort to avoid liability, Defendants attempt to disguise their unconstitutional actions by couching them as "legitimate pedagogical concerns." (Defs.' Br. at 9-11). According to Defendants, the phrase "legitimate pedagogical concern" is a universal remedy that school officials can conveniently apply to heal any constitutional injury. However, behind their thinly veiled "pedagogical concerns" is Defendants' true political aim: the promotion of the homosexual agenda[1] and the marginalization of Christian opposition. As Mr. Martin fittingly noted in his comments to the Ann Arbor School Board, "How ironic for diversity week to be used to eliminate diversity! George Orwell would love it!" (Martin Dep. at 54-56, 62-63, Ex.1 at Ex.1).

---

[1] *See, e.g., Lawrence v. Texas*, ___ U.S. ___, 2003 WL 21467086 (June 26, 2003) (describing the "homosexual agenda" as "the agenda promoted by some homosexual activists directed at eliminating the moral opprobrium that has traditionally attached to homosexual conduct") (Scalia, J. dissenting). In fact, Pennington and Mancini, homosexual activists who promote the homosexual agenda within PHS and the local community (*see* Pennington Dep. at 64, 66-67, 71, 128-33, 144-46, 167-69, 176-78, Exs.7,9,11,12,19,21,27 at Ex.3; Mancini Dep. at 107-08; 29-30, Ex.7 at Ex.4; *see also* Carpenter Dep. at 173-74 at Ex.5) were the "moving force" behind the "homosexuality and religion" panel (O'Brien Dep. at 70-72, 162-63 at Ex.6). Additionally, Representative Chris Kolb, a homosexual activist, was the "keynote" speaker for the kick-off "Diversity Week" assembly. (*See* Jensen Dep. at 96-97 at Ex.7; C. Hansen Decl. at ¶¶ 3-4 at Ex.8).

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS[2]

Defendants allege that "Diversity Week" is a "vehicle" to promote various school district policies, "including the non-discrimination policy (which prohibits discrimination on the basis of, among other things, . . . religion)," and that it "helps teach students tolerance." (Defs.' Br. at 1, n.1). According to AAPS policy, students have a right to "learn and study in a positive atmosphere for learning—one that is unbiased, nonjudgmental and free from prejudice, [and] discrimination." (Defs.' Br. at 1, n.1).

AAPS has a policy regarding "Controversial Issues," which states that when presenting a controversial issue, "[t]eachers have an obligation to preserve an attitude of impartiality coupled with intellectual honesty." (Fornero Dep. at 92-93, Ex.17 at Ex.2). AAPS also has a policy on "Student Freedom of Expression." This policy claims that it is "[a]n important educational aim of [AAPS]" to ensure "the vigorous competition of ideas" and to preserve "the free expression of ideas." According to this policy, AAPS "is firmly committed to the belief that in the long run, free play of ideas is less damaging to our society and productive of maturity and responsibility in its future citizens than narrow restraints artificially imposed." (Fornero Dep. Ex.18 at Ex.2).

"Diversity Week" is an annual event at PHS and students and staff are encouraged to participate and attend the events. (*See* Korzdorfer Dep. at 191, 215, Exs.6,22 at Ex.9; Jensen Dep. at 17-18, 23-27, Exs.2,3,4,5 at Ex.7; R. Martin Dep. at 71 at Ex.1). "Diversity Week" traditionally includes panel discussions on race, religion, and sexual orientation.[3] (*See* Defs.' Br.

---

[2] Plaintiffs direct this Court's attention to and hereby incorporate the "Facts" section of their brief in support of summary judgment. (Pls.' Br. in Supp. of Summ. J. at 2-14, with Exhibits). In this response, Plaintiffs will highlight as well as dispute certain facts advanced by Defendants.

[3] "Sexual orientation" in the context of "Diversity Week" means homosexuality.

at 1). The typical way in which students attend the panel discussions is by their teacher taking the class to the panel. (*See* Defs.' Br. at 1; Erickson Dep. at 35, Ex. 13 at Ex.10). And while the panel discussions are not "mandatory," a student would have to single herself out and ask for permission to be dismissed from attending with her class if she did not want to go. (*See* Defs.' Br. at 1). Students may also seek permission to attend on their own. (*See* Defs.' Br. at 1). For example, if a student preferred to sit in the "Little Theater" for an entire class period listening to a panel rather than sit in her class doing math, she could do so. (*See* M. Martin Dep. at 15-16 at Ex.11). It should come as no surprise that the events held during instructional time (*see* Caudle Dep. at 35-37 at Ex.12), such as the "homosexuality and religion" panel, were well attended. In fact, there was standing room only for these events, with about 200 students and teachers in attendance. (Jensen Dep. at 103 at Ex.7). Meanwhile, the "open mic" session, which was held during lunch (*see* Caudle Dep. at 36 at Ex.12), was poorly attended, with only approximately 15 students in attendance. (*See* Jensen Dep. at 122 at Ex.7; Korzdorfer Dep. at 163 at Ex.9).

There were several "planning meetings" for "Diversity Week." One such meeting was held on February 22, 2002.[4] (Defs.' Br. at 1). Betsy had an excused absence from school on this day, so she asked Kirsten Raab to attend this meeting and sign her up for the sexual orientation panel. (Defs.' Br. at 2). During this meeting, Ms. Raab told Korzdorfer that Betsy wanted to be on the sexual orientation panel. (Korzdorfer Dep. at 76-77 at Ex.9).

---

[4] Two other planning meetings were held, one in mid-January and the other on March 8th. (Jensen Dep. at 23-27, 55-56, Exs.3,4,5 at Ex.7). Betsy attended both of these meetings and during them and on other occasions she made known to Korzdorfer and the GSA her interest in being a part of the sexual orientation panel. (B. Hansen Dep. at 87-89 at Ex.13; Jensen Dep. at 56-58 at Ex.7; Korzdorfer Dep. at 86-90 at Ex.9; O'Brien Dep. at 103-04 at Ex.6).

Defendants claim that Betsy did not follow "procedures"; therefore, they could deny her the benefit of participating in an educational program, namely the "homosexuality and religion" panel. (*See* Defs.' Br. at 11). Allegedly, Betsy failed to follow procedure by not attending this February 22nd meeting. (*See* Korzdorfer Dep. at 104-105 at Ex.9).[5] However, Betsy had an excused absence from school on February 22nd. (B. Hansen Decl. at ¶ 2, Ex. A at Ex.14). And Betsy sent her friend Kirsten Raab to attend this meeting and sign her up for the panel (Defs.' Br. at 2); it is a practice at PHS to permit students to miss such meetings and still participate so long as they send a friend to the meeting in their place (*see* Jensen Dep. at 19-20 at Ex.7). In fact, it was Defendants who did not follow "procedures."

Moreover, although Defendants claim that certain meetings were "mandatory," there were students who participated on panels who did not attend these meetings. (Jensen Dep. at 20-23 at Ex.7; Raab Decl. at ¶ 2 at Ex.15; Korzdorfer Dep. at 61 at Ex.9). These students were invited to participate because Defendants wanted to ensure that "diverse" views were presented on these panels. (Jensen Dep. at 147-48 at Ex.7; Korzdorfer Dep. at 61 at Ex.9).

Defendants claim that an e-mail was sent on March 4, 2002, to the faculty advisors for the student groups asking if their group wanted to organize a panel. (Defs.' Br. at 2; Jensen Dep. at 46-47 at Ex.7). According to Defendants, the only group to respond was the GSA. (Defs.' Br.

---

[5] Defendants complain that Betsy did not provide names of persons she wanted to represent her views on this panel (Defs.' Br. at 11), but fail to mention that Korzdorfer made this suggestion to Betsy at the Friday, March 8th meeting; that Betsy was gathering names (B. Hansen Dep. at 100, 124-25 at Ex.13); that this panel was scheduled for March 21st, still two weeks away; and that the panel was actually canceled on Tuesday, March 12th (Korzdorfer Dep. at 218, Ex.25 at Ex.9), negating the need to look further or provide names. Nevertheless, this was a futile effort given Defendants' hostility towards Betsy's religious views and Korzdorfer's admission that she did not want Betsy on the panel and would rather cancel it than have Betsy's views represented (*see* Korzdorfer Dep. at 218, Ex.25 at Ex.9).

4

at 2). So based on a phantom e-mail,[6] Defendants gave the GSA the authority to exclude anyone and any viewpoint they disliked from this so-called "Diversity Week" panel.[7]

The facts clearly show that Defendants Korzdorfer, Mancini, and Pennington had been working together, on the side, throughout "Diversity Week" to ensure that pro-homosexual clergy would be empanelled to discuss "homosexuality and religion."[8] However, Betsy Hansen's determined quest to have her religious viewpoint represented on this year's "sexual orientation" panel was ruining Defendants' plan.

On March 12, 2002, a meeting was held to discuss whether Betsy should have a voice on the "homosexuality and religion" panel. Present at this meeting were Defendants Caudel, Korzdorfer, and Eaddy-Richardson, as well as Mr. Johnson, the faculty advisor for PFC.[9]

---

[6] Despite all of the e-mail that was produced during discovery in this case, this March 4th e-mail and any response to it have never been produced.

[7] Curiously, though, announcements were made over the public address system on March 4th and March 7th inviting students to come to a March 8th meeting if they were interested in being on the sexual orientation panel during "Diversity Week." (Jensen Dep. at 24-27, Exs.4,5 at Ex.7). And in an e-mail dated March 7, 2002, Mancini told Jennette Maddock, a GSA co-leader, that he had asked his minister from St. Andrew's Episcopal Church to participate on the panel, "but the rest is up to our group to organize. If that doesn't happen, I am concerned about what the format will be and who else will be speaking. The Diversity Week coordinator Ms. Koerdoffer (sp?) wants to know who is coordinating this. Obviously she is not. We need to act fast if this is still a go." (Mancini Dep. at 140-141, Ex.9 at Ex.4) (emphasis added).

[8] In January 2002, Mancini, Pennington, and Korzdorfer exchanged e-mails that plainly show they were planning to have "gay friendly" clergy on a "religion and homosexuality panel during diversity week." (Mancini described it to Pennington as "our religion and homosexuality panel.") (See Korzdorfer Dep. at 251-52, Ex.46 at Ex.9; Mancini Dep. at 136-39, 142-43 at Exs.10,46 at Ex.4) (emphasis added).

[9] Throughout, Defendants have improperly tried to color this case as a controversy between PFC and the GSA, which it is not. Betsy wanted to participate on the panel representing herself and her views, not PFC. (See B. Hansen Dep. at 121 at Ex.13). Moreover, Betsy never wanted to run a panel; she just wanted to participate in the "homosexuality and religion" panel. Defendants

According to Eaddy-Richardson, the consensus of this meeting was that Betsy should be allowed to have a voice on this panel. (Eaddy-Richardson Dep. at 32-35, 67 at Ex.16). Shortly following this meeting, Korzdorfer wrote in an e-mail to Pennington that the "crux" of this meeting was that Betsy had a legal right to be on the panel; however, Korzdorfer supported the view of those who did not want Betsy's religious view presented, so she canceled the panel. (*See* Korzdorfer Dep. at 218, Ex. 25 at Ex.9).

On March 15, 2002, a follow-up meeting was held, and it was decided that the panel would run without Betsy or a person representing Betsy's religious view.[10] (Johnson Dep. at 85-90 at Ex.17). The basis for this decision was essentially two-fold: (1) Defendants falsely claimed that Betsy did not follow "procedures," and (2) Defendants did not like Betsy's religious view on homosexuality, labeling it as "negative."[11] Therefore, Betsy was denied participation in the panel based on her religious beliefs and viewpoint about homosexuality.[12]

---

did not require students to run or organize a panel as a precondition to participating in a panel. (*See generally* Jensen Dep. at 20-23, 147-48 at Ex.7; Korzdorfer Dep. at 61 at Ex.9).

[10] Between the March 12th and the March 15th meetings, Pennington and Mancini called Eaddy-Richardson to complain about the panel decision. (Eaddy-Richardson Dep. at 60-63, 91 at Ex.16). During a subsequent phone conversation, either Pennington or Mancini identified an ACLU attorney to Eaddy-Richardson. (Eaddy-Richardson Dep. at 91-94 at Ex.16). The ACLU attorney encouraged Defendants to exclude Betsy from this panel. (Defs.' Br. at 5).

[11] Defendants demonstrate throughout "Diversity Week" their ignorance regarding the Catholic Church's teaching on homosexuality. (*See* Fr. Orsi Decl. at ¶¶ 3-6 at Ex.18; B. Hansen Dep. at 62-65, 123-124 at Ex.13). Although, it is not uncommon for homosexual activists to challenge opposing views by labeling them as hate speech. (*See* Pennington Dep. at 71-72, 167-171, 186-187, Exs.3,19,21 at Ex.3; Mancini Dep. at 140 at Ex.4; O'Brien Dep. at 166-167 at Ex.6).

[12] Defendants exaggerate the claim that there was "gay bashing in the halls of PHS," or even that the PHS school climate was hostile toward homosexuals. (*See* Defs.' Br. at 2, n.3, 12). Both Dr. Fornero, the superintendent of AAPS, and Eaddy-Richardson, the former AAPS equity officer, both recognized that it was not. (*See* Fornero Dep. at 54-55 at Ex.2; Eaddy-Richardson Dep. at

As Defendants acknowledge, the "homosexuality and religion" panel was comprised of clergy and adult religious leaders (Defs.' Br. at 6), who were selected by Mancini because of their pro-homosexual religious beliefs (*see* Defs. Br. at 6, n.8; Mancini Dep. at 13-22 at Ex.4; O'Brien Dep. at 59-61 at Ex.6). Defendants would like this Court to believe that all that these clergy and religious leaders said was that "their faith or congregation was accepting of homosexuals." (Defs.' Br. at 6). This was hardly the case. (*See* Pls.' Br. in Supp. of Summ. J. at 10-12). Indeed, the clergy panelists were engaging in apologetic arguments and using personal witness testimony to preach to the students. (*See* Johnson Decl. at ¶ 3 at Ex.22; *see also* McGarry Dep. at 20-21, 34, 35, 76-77, 81-84, 86-87, 90, 99 at Ex.23; B. Hansen Dep. at 177-193, Ex.14 at Ex.13; Gryniewicz Decl. at ¶¶ 4-8 at Ex.24; Jensen Dep. at 114-115 at Ex.7). And Defendants admit that these adult clergy and religious leaders were held out to the students as

---

19-20 at Ex.16). Indeed, in light of Defendants' gross claim, this Court should consider the following: Pennington and Mancini are "openly gay" teachers at PHS (Pls.' Br. in Supp. of Summ. J. at 6, n.7); PHS has included "sexual orientation" as part of its "Diversity Week" for years (*see* Defs.' Br. at 1, n.1); AAPS offers domestic partnership benefits (Fornero Dep. at 57 at Ex.2); AAPS has strict policies against harassing or bullying (Defs.' Br. at 1, n.1); and AAPS policy prohibits discrimination on the basis of "sexual orientation" (Defs.' Br. at 1, n.1). Indeed, AAPS is a pro-homosexual school district. (Fornero Dep. at 57 at Ex.2). Remarkably, Defendants seem to care little about the "Christian-bashing" that occurs at PHS (*see* O'Brien Dep. at 78-79 at Ex.6), and indeed have continued to fuel such discrimination in the way they handled the 2002 "Diversity Week." Nevertheless, it does not follow that the school will be "safer" for homosexuals by undermining the Christian beliefs of certain students. In fact, it is likely that programs such as the "homosexuality and religion" panel, which usher students into the homosexual lifestyle, are damaging to the students psychologically. (*See* Dep. of Fitzgibbons at 92 at Ex.19). None of the "extensive research" cited by Defendants' so-called "experts" consists of longitudinal studies, i.e., studies to determine whether these types of pro-homosexual programs will have any negative long-term effects. (*See* Dep. of Szalacha at 44-45 at Ex.20; Russell Dep. at 59-60 at Ex.21). (Plaintiffs reserve the right to challenge the qualifications and testimony of Defendants' purported "experts.") Indeed, it is the considered medical opinion of Dr. Richard Fitzgibbons, M.D., a clinical psychiatrist who has treated between 200 to 300 patients with same sex attraction, that such programs are psychologically harmful, particularly to teenagers. (Fitzgibbons Dep. at 53, 62, 70, 76-77, 92, 96 at Ex.19).

7

experts in religion. (*See* Defs.' Br. at 2 (noting that "trained, educated adults—namely, clergy—were best-suited to speak to the topic" of homosexuality and religion)).

Defendants make the ridiculous claim that Betsy's religious view was expressed because questions she submitted were presented to the panelists. (*See* Defs.' Br. at 6, n.9). In fact, these questions facilitated the illicit goal of the panel, which was to refute and undermine Betsy's religious beliefs. (*See, e.g.,* Pennington Dep. at 156-57, Exs.1,10 at Ex.3) (stating "[b]eliefs are not facts and so it will be up to each individual to find their own truth in the end though"). This panel was designed to be an effective medium for evangelizing and proselytizing. Defendants accomplished this by having the "moderator," Pennington, read questions such as Betsy's to the "expert" panelists who would then refute them. This carefully crafted method achieved a dual purpose: (1) it denied the questioner the opportunity for follow-up or any way to respond to or rebut the answer; and (2) it left the audience convinced of the "expert's" answer. (*See* Pennington Dep. at 109-11 at Ex.3; B. Hansen Dep. at 176-77, Ex.14 at Ex.13).[13] It should come as little surprise, then, that Pennington chose to ask Betsy's questions in the first place—after all, Pennington was working with a loaded panel.

Moreover, Defendants used their authority to prevent Betsy from engaging in a practice prescribed by her faith. As a Roman Catholic, Betsy has a moral obligation to defend her faith, including publicly opposing teachings at her high school that are contrary to her faith, and to do

---

[13] Indeed, one of the most influential works of theology, the *Summa Theologica* by Thomas Aquinas, was presented in a similar manner. In the *Summa*, a difficult theological question was presented and then challenged by Aquinas, leaving the reader firmly convinced of Aquinas's position. *See* Thomas Aquinas, *Summa Theologica* (Benziger Bros. ed. 1947); (*see also* Szalacha Dep. at 128-29 at Ex.20) (stating, "It reminds me of reading the Summa. I would—I would read and be firmly—translated from the Latin, of course, be firmly convinced of a position and then read Thomas Aquinas's opposite argument and then be firmly convinced of that position").

so when the error and the challenge to her faith occur. This is a basic tenet and practice of Betsy's religion. (Fr. Orsi Dep. at 51-57 at Ex.25; Fr. Orsi Decl. at ¶¶ 2-8 at Ex.18).

The "religion" panel, which immediately followed the one-sided "homosexuality and religion" panel, was not the "response" to the pro-homosexuality panel that Defendants present it to be. (*See* Defs.' Br. at 6-7). Nor was it an opportunity for Betsy to express her religious beliefs regarding homosexuality. There was little discussion, if any, at this panel regarding homosexuality, and there was no discussion of this issue like that which occurred at the "homosexuality and religion" panel. (Gryniewicz Decl. at ¶ 11 at Ex.24; B. Hansen Dep. at 174 at Ex.13; Seromik Dep. at 35-36 at Ex.26). In fact, guidelines were drafted by Korzdorfer and given to the student panel members that prohibited students from expressing a viewpoint that opposed homosexuality.[14] A copy was also given to Betsy, although she was not a panel member. (B. Hansen Dep. at 168-169 at Ex.13).

Likewise, there is no comparing the "open mic" session to the "homosexuality and religion" panel. (*Compare* Defs.' Br. at 7). The "open-mic" session was nothing more than a lunchtime discussion. In fact, teachers did not take their classes to this event; about 15 students attended; there was no attraction for a student to skip lunch and attend this event, as opposed to skipping a math class, for example, to attend one of the panels; and even at this event Korzdorfer played the "devil's advocate" [her words] to ensure that a pro-homosexual view was expressed

---

[14] These guidelines prohibited students from "specifically tell[ing], or imply[ing], that another group is going to hell" or making "comments [that] directly target another group's beliefs, values, culture or sexual orientation." Students were warned, "Any staff member has the right to ask/demand that you rethink or redirect your comments. You must abide by the staff member's decision." (Korzdorfer Dep. at 183-184, 187-188, Ex.3 at Ex.9; Raab Decl. at ¶ 3, Ex.A at Ex.15).

(Korzdorfer Dep. at 171-73 at Ex.9).   In fact, Betsy was only present for about 10 minutes because she was taking a make-up test in calculus.  (B. Hansen Dep. at 204-05 at Ex.13).

Betsy was given the opportunity to make a speech during the opening, "Diversity Week" assembly, as was Jennette Maddock, one of the leaders of the GSA.  There is no dispute over the fact that Defendants did not approve Betsy's speech.  (Korzdorfer Dep. at 142-45, 150 at Ex.9; *see also* Defs.' Br. at 4-5).  In fact, Korzdorfer threw Betsy's original speech away; she did not sign the bottom of it and return it to Betsy, as is her practice for approving student speeches. (*see* Korzdorfer Dep. at 141-42, 150 at Ex.9).  And there is no dispute that the portion of Betsy's speech that Defendants objected to was the following:

> One thing I don't like about Diversity Week is the way that racial diversity,
> religious diversity, and sexual diversity are all lumped together and compared as
> if they are the same things.  Race is not strictly an idea.  It is something you are
> born with; something that doesn't change throughout your life, unless your
> Michael Jackson, but that's a special case.  It involves no choice or action.  On
> the other hand, your religion is your choice.  Sexuality implies an action, and
> there are people who have been straight, then gay, then straight again.  I
> completely and whole-heartedly support racial diversity, but I can't accept
> religious and sexual ideas or actions that are wrong.  (B. Hansen Dep. at 131,
> 140-141, Ex.13 at Ex.13; Defs.' Br. at 5).

Defendants objected to Betsy's speech even though none of her comments were vulgar, offensively lewd, or contained profanity (Korzdorfer Dep. at 134-135 at Ex.9; Caudle Dep. at 60-61 at Ex.12; Erickson Dep. at 95 at Ex.10), and her speech did not single out any student or staff member.  In contrast, Defendants permitted a GSA member to give a pro-homosexual speech, without revisions.  (Maddock Dep. at 68-70 at Ex.27).  Moreover, Defendants conveniently leave out the <u>fact</u> that the <u>assigned</u> topic for Betsy's speech was "What Diversity Means to <u>Me</u>."  (*See* Answer at ¶ 21; B. Hansen Decl. at ¶ 2 at Ex.29).  In the final analysis, Defendants disapproved Betsy's "Diversity Week" speech because of its content and Betsy's viewpoint regarding

10

homosexuality. This is not a "legitimate pedagogical concern." (*See* Carpenter Decl. at ¶¶ 8, 10 at Ex.28).

## ARGUMENT[15]

**I.     Defendants Violated Betsy's Right To Freedom Of Speech.**

Defendants' give a nod to *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969), the controlling legal authority in this case, then proceed to ignore it. (Defs.' Br. at 8-9).

Defendants' singular reliance on *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), is misplaced. In fact, the Court in *Hazelwood* reaffirmed the right of a student to engage in personal expression that occurs on school premises (*see id.* at 271), and it did not overrule *Tinker*,[16] nor did it affect the holdings in *Board of Educ. v. Pico*, 457 U.S. 853, 872 (1982) (holding that "school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion'") or *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that First Amendment right of students prevented school officials from prescribing "what shall be orthodox in . . . religion, or other matters of opinion"). Moreover, *Hazelwood* does <u>not</u> permit school officials to proscribe student speech based on the students' viewpoint. *See Tinker*, 393 U.S. at 511 (stating that

---

[15] Plaintiffs incorporate herein their legal arguments contained in their brief in support of their motion for summary judgment. (Pls.' Br. in Supp. of Summ. J. at 14-29).

[16] *See Tinker*, 393 U.S. at 508 (stating that "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, <u>in class</u>, in the lunchroom, or on the campus, <u>that deviates from the views of another person</u> may start an argument or cause a disturbance. But our Constitution says we must take this risk.") (emphasis added).

students "may not be confined to the expression of those sentiments that are officially approved" and "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views"); *Bethel v. Fraser*, 478 U.S. 675, 685 (1986) (permitting school to censor speech of student at school-sponsored assembly because speech was lewd and indecent and "unrelated to any political viewpoint").

Indeed, the *Hazelwood* case is readily distinguishable on its facts. *Hazlewood* involved a challenge to a high school principal's decision to exclude two articles from a student newspaper. *Hazelwood*, 484 U.S. at 263. One article unfairly infringed on the privacy rights of certain pregnant students and contained references to sexual activity and birth control that were inappropriate for some of the younger students, and the other article improperly discussed the impact of divorce on students at the school by identifying by name the student who complained of her father's conduct. *Id.* at 263. These articles were written as part of a journalism class offered by the school and were to be published in the school's newspaper.[17] *Id.*

In contrast, during the "Diversity Week" assembly, Betsy was speaking on the topic "What Diversity Means to <u>Me</u>." This was clearly an opportunity for personal, public expression of Betsy's views. Indeed, Defendants invited a student from the GSA to give a pro-homosexual speech during this same assembly. There is no basis for claiming that the views of the individual speakers would be erroneously attributed to the school, and there is no constitutionally valid reason for discriminating against Betsy because of her viewpoint.

"Diversity Week" was allegedly a "vehicle" for reinforcing various policies that prohibit discrimination and that promote tolerance and a learning environment that is unbiased,

---

[17] Ironically, Pennington made statements in the student newspaper comparing Betsy's religious beliefs to that of a white supremacist's view on race. (*See* Pennington at 186-87, Ex.3 at Ex.3).

12

nonjudgmental and free from prejudice and discrimination. It was an opportunity for students to express their "diverse" views on issues such as religion and sexual orientation. Therefore, based on Defendants' claimed purpose for "Diversity Week," there was no "legitimate pedagogical concern" for discriminating against Betsy because of her religious views.

Moreover, a simple review of the "offending" language in Betsy's speech clearly shows that it was <u>not</u> "offensively lewd and indecent speech . . . unrelated to any political viewpoint." *Compare Bethel*, 478 U.S. at 685 (permitting school to censor speech of student at school-sponsored assembly because speech was lewd and indecent); *compare also Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989) (permitting school to punish student campaign speech that made rude comment directed at assistant principal who was named in the speech). Indeed, Betsy's speech was well written and on topic. Defendants' improper content and viewpoint restriction of Betsy's speech did not serve any "legitimate pedagogical concern." (*See* Carpenter Decl. at ¶¶ 8, 10 at Ex.28).

Moreover, Defendants' refusal to allow Betsy to participate in the "homosexuality and religion" panel by denying her representation based on her religious viewpoint was not legitimate and violates the core principle that school officials may not prescribe what shall be orthodox in matters of religion. *See Pico*, 457 U.S. at 872; *see also Tinker*, 393 U.S. at 511 ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.").

**II.    Defendants Violated Plaintiffs' Right To Free Exercise Of Religion.**

Defendants' mischaracterize Betsy's "exercise of religion" and offer this Court a constrained and limited reading of the Free Exercise Clause that practically nullifies this fundamental constitutional right.

The Free Exercise clause protects the "right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990). It prohibits the government from compelling affirmation of religious beliefs, punishing the expression of religious beliefs it believes to be false, imposing special restrictions or disabilities on the basis of religious beliefs, or lending its power to one or the other side in controversies over religious authority or dogma. *Id.* at 877 (internal quotations and citations omitted); *see also McDaniel v. Paty*, 435 U.S. 618, 626 (1978). Indeed, the Free Exercise clause forbids "subtle departures from neutrality, and covert suppression of particular religious beliefs," (*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (internal quotations and citations omitted)), and it "recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the state," (*School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 222 (1963)), including the right of parents to direct the religious education of their children free from government interference. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972).

When applying these principles, this Court "must not presume to determine the place of a particular religious belief in a religion or the plausibility of a religious claim." *Smith*, 494 U.S. at 886-87 (recognizing that it is not appropriate for a court to "question the centrality of particular

14

beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds") (citation omitted).

Without question Defendants punished the expression of Betsy's religious beliefs because Defendants believed them to be "negative," imposed special restrictions and disabilities on Betsy by denying her access to an educational program because of her religious beliefs, and lent the government's power to one side in a religious controversy regarding homosexuality. Moreover, Defendants suppressed Betsy's religious beliefs and prevented her from defending her faith, while inviting adult clergy and religious leaders to promote an offending religious belief that students, such as Betsy and Maureen Martin, were expected to absorb.[18] As a Roman Catholic, Betsy has a moral obligation to defend her faith, including publicly opposing teachings at her high school that are contrary to her faith, and to do so when the error and the challenge to her faith occur. Defendants violated this basic tenet and practice of Betsy's religion. This was not some generally applicable prohibition, but a prohibition that applied to Betsy because of her particular religious beliefs. *See, e.g., City of Hialeah*, 508 U.S. at 520 (striking down law because it targeted a particular religious group). And because Defendants failed to achieve their ultimate unlawful objective (*see* Defs.' Br. at 15), i.e., the conversion of students such as Betsy Hansen and Maureen Martin,[19] does not make their illicit practice constitutionally acceptable.

---

[18] *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058 (6th 1987) is readily distinguishable. *Mozert* held that it does not offend the Free Exercise Clause to require students to study a religiously neutral basal reader series chosen by school authorities. This is hardly the same as subjecting students to preaching and religious proselytizing by clergy, as was done in the present case.

[19] *See* Pennington Dep. at 156-57, Ex.10 at Ex.3 (stating "[b]eliefs are not facts and so it will be up to each individual to find their own truth in the end though").

15

**III.    The "Homosexuality And Religion" Panel Violated The Establishment Clause.**

Defendants violated the fundamental principle of law articulated by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578 (1987): "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Id.* at 584.

Indeed, courts have held unconstitutional the following: a policy that permits, but does not require, nonsectarian, nonproselytizing prayer initiated and led by a student at high school football games (*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)); momentary nonsectarian invocation and benediction, lasting no more than a minute each, given at a voluntary school graduation by a clergy member invited by a school official (*Lee v. Weisman*, 505 U.S. 577 (1992)); the simple posting of the Ten Commandments (*Stone v. Graham*, 449 U.S. 39 (1980)); a law requiring the teaching of evolution with creationism or not at all (*Edwards*, 482 U.S. at 578); a law forbidding the teaching of evolution in public schools (*Epperson v. Arkansas*, 393 U.S. 97 (1968)); the practices of reading the Bible or reciting the Lord's prayer (*School Dist. of Abington Township*, 374 U.S. at 203); the display of the portrait of Jesus (*Washegesic v. Bloomingdale Public Schs.*, 33 F.3d 679 (1994) (applying *Lemon* test)); and inviting clergy to provide voluntary, nonsectarian, nonproselytizing counseling to high school students on secular topics, even though the clergy were instructed to not discuss religion, church affiliation or church services, wear clerical clothing, or discuss sensitive topics such as sex, abortion, and prayer (*Oxford v. Beaumont Indep. Sch. Dist.*, 224 F.Supp.2d 1099 (E.D. Tex. 2002) (applying *Lemon* test, endorsement test, and coercion test)).

16

Defendants apparently believe that because they were endorsing the "politically correct" religion of the "Church of the High Holy Liberal," Supreme Court precedent does not apply.

Defendants improperly rely on and indeed misapply a truncated Establishment Clause test that they erroneously claim is required by the Sixth Circuit's opinion in *Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002) (holding unconstitutional a resolution directing the display of the Ten Commandments because directive had a primary religious purpose and it impermissibly endorsed religion; therefore, not requiring court to decide whether it fosters an excessive entanglement with religion). (*See* Defs.' Br. at 16-19; *compare* Pls.' Br. in Supp. of. Summ. J. at 16-20 (applying *Lemon* test, endorsement test, and coercion test). Nevertheless, Defendants proceed to misapply their proposed version of the Establishment Clause test.

First, the "homosexuality and religion" panel did not have a constitutionally valid purpose. As the Court in *Adland* acknowledged, the government violates the "purpose" prong of the *Lemon* test by promoting "religion in general" or advancing "a particular religious belief." *Id.* at 480. And it is this Court's "task to distinguish a sham secular purpose from a sincere one."[20] *Id.* (internal quotations and citation omitted). The clear purpose of this panel was to promote a singular religious belief regarding homosexuality. (Pennington Dep. at 156-57, Ex.10 at Ex.3). And it was expected that the clergy would be using the Bible as well as other religious documents to do so. (Pennington Dep. at 88-89 at Ex.3). Therefore, its purpose was unlawful.

Second, the clear "effect" of this panel was to promote and endorse a particular religious belief. Defendants' strained attempt to distinguish the advancement of "religion" with the

---

[20] Defendants claim that the panel was designed to "promote and endorse tolerance of a minority viewpoint." (Defs.' Br. at 16). This is a tacit admission that the panel was designed to promote and endorse a particular religious belief.

advancement of "religious beliefs" finds no basis in law.[21]   *See County of Allegheny v. ACLU*, 492 U.S. 573, 593 (1989)( "[T]he prohibition against governmental endorsement of religion 'preclude[s]' government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred*.'") (citation omitted) (emphasis added).[22]

Finally, Defendants' "reasonable observer" would believe that Defendants were conveying a message that a particular religious belief was "favored or preferred."   The "reasonable observer" would know that her school invited several clergy, who were introduced and held out as "experts" in matters of religion, to answer questions and discuss homosexuality from a singular religious perspective.  This observer would see clergy and adult religious leaders, some dressed in clerical clothing, up on a stage in her high school theater preaching about homosexuality and religion.  The observer would hear apologetic arguments and personal witness testimony that promoted the religious belief that homosexuality was not immoral or sinful.  And this observer would know that none of the other "Diversity Week" panels were

---

[21] Plaintiffs' Establishment Clause claim does not depend on whether Betsy or her representative were permitted to be on this panel.  Indeed, Defendants' exclusion of Betsy and any person who shared Betsy's religious beliefs is conclusive evidence of Defendants' improper endorsement of a particular religious belief and hostility toward Betsy's Roman Catholic beliefs.

[22] Defendants claim that the term "religious beliefs" is meaningless in the context of Plaintiffs' claims because, according to Defendants, they then could not teach subjects such as "forgiveness." (*See* Defs.' Br. at 17, n. 23).  This argument is absurd.  Unquestionably, schools can and should teach students that it is wrong to steal, murder, or tell lies; however, they cannot do so by posting the Ten Commandments.  Schools can teach forgiveness, but they cannot do so by reciting the Lord's Prayer, which states in relevant part, "forgive us our trespasses as we forgive those who trespass against us."  And having a "civics" or "government teacher" explain the holding in *Lawrence v. Texas* is hardly analogous to inviting a lesbian, Episcopalian priest, trained in Aramaic and Semitic languages, to explain how Sacred Scripture has been misinterpreted to mean that homosexuality is a sin.

composed of adults or clergy.  Indeed, a "reasonable observer" would conclude that this is an unconstitutional endorsement of "religion."

**IV.    Defendants Violated Plaintiffs' Parental Rights.**

As Plaintiffs argue more fully in their brief in support of their motion for summary judgment (Pls.' Br. in Supp. of Summ. J. at 26-27), Defendants violated Mrs. Hansen's and Mr. Martin's parental right to direct the religious upbringing and education of their children.  *See Wisconsin v. Yoder*, 406 U.S. 205 (1972).  None of the cases cited by Defendants involve school officials exposing children to preaching and proselytizing during instructional time by clergy who were invited by school officials to promote a particular religious belief that was contrary to the religious beliefs of the parents or children.  Parents expect, and the U.S. Constitution protects this expectation, "that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Edwards,* 482 U.S. at 584.[23]

**V.    Defendants Do Not Have Qualified Immunity.**

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that government officials are protected from personal liability so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see also Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000) (same).

---

[23] Defendants do not raise any opposition to Plaintiffs' equal protection or conspiracy claims; they merely direct this Court to their motion that was filed in response to Plaintiffs' original complaint (*see* Defs.' Br. at 20, n.25) that was superseded by the First Amended Complaint. Plaintiffs direct this Court to Plaintiffs' response to Defendants' motion (*see* Ex.30), as well as Plaintiffs' brief filed in support of their motion for summary judgment (Pls.' Br. in Supp. of Summ. J. at 27-29), which briefed these issues.

This Circuit has established a three-part inquiry for evaluating a defendant's entitlement to qualified immunity. This inquiry asks: "(1) whether the facts taken in a light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was a 'clearly established' right of which any reasonable officer would have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right." *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002) (emphasis added).

However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted).

As argued more fully in the previous sections of this brief and in Plaintiffs' brief filed in support of their motion for summary judgment, Defendants violated Plaintiffs' "clearly established" rights. Moreover, Korzdorfer's admissions that Betsy had a legal right to be on the panel and "I am treading on shallow ground here, as I do not want to be sued" (Korzdorfer Dep. at 218, Ex.25 at Ex.9) makes clear that Defendants knew that they were violating clearly established constitutional rights. Therefore, Defendants claim of qualified immunity must fail.

## CONCLUSION

For the foregoing reasons, this Court must deny Defendants' motion.

Respectfully submitted this 17th day of July, 2003.

Robert J. Mulse (P62849)

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**ELIZABETH HANSEN,**
**CONSTANCE HANSEN,** and **RALPH MARTIN,**

        Plaintiffs,

v.

**ANN ARBOR PUBLIC SCHOOLS,**
**HENRY CAUDLE,** individually and in his official
capacity as Principal, Pioneer High School,
**LARA ERICKSON,** individually and in her official
capacity as Assistant Principal, Pioneer High School,
**SUNNIE KORZDORFER,** individually and in her
official capacity as teacher, Pioneer High School,
**PARKER PENNINGTON, IV,** individually and in his
official capacity as teacher, Pioneer High School,
**RODNEY MANCINI,** individually and in his official
capacity as teacher, Pioneer High School,
**DENISE EADDY-RICHARDSON,** individually and in
her official capacity as Equity Ombudsman, Ann Arbor
Public Schools,

        Defendants.

CIVIL ACTION
NO. 02-CV-72802-DT

HON. GERALD E. ROSEN

MAGISTRATE JUDGE CARLSON

**PROOF OF SERVICE**
**OF PLAINTIFFS' RESPONSE**
**TO DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

---

THOMAS MORE LAW CENTER
By:    Robert J. Muise (P62849)
        Edward L. White III (P62485)
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001
Attorneys for Plaintiffs

DYKEMA GOSSETT PLLC
By:    Seth M. Lloyd (P16742)
        Laura A. Sagolla (P63951)
        Jill Wheaton (P49921)
400 Renaissance Center
Detroit, Michigan 48243-1668
(313) 568-6837/(734) 214-7612
Attorneys for Defendants

---

### PROOF OF SERVICE

    I hereby declare and certify that on the 18th day of July, 2003, a true and correct copy of

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY**

**JUDGMENT** and **EXHIBITS TO PLAINTIFFS' RESPONSE TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT** were served upon the following counsel of record by placing said document in an envelope and depositing same in a United States Postal Service mailbox located in Ann Arbor, Michigan, with postage prepaid:

> Seth M. Lloyd, Esq.
> Laura A. Sagolla, Esq.
> Jill Wheaton, Esq.
> Dykema Gossett PLLC
> 400 Renaissance Center
> Detroit, Michigan 48243-1668

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of July, 2003, in Ann Arbor, Michigan.

Sharon Peper