# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN, CONSTANCE
HANSEN and RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

        Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

FILED

2003 JUL 21 D 4:42

U.S. DISTRICT COURT
EASTERN DIST. MICH.
DETROIT

---

| | |
|---|---|
| Robert J. Muise (P62849) | Seth M. Lloyd (P16742) |
| Edward L. White, III (P62485) | Jill M. Wheaton (P49921) |
| THOMAS MORE LAW CENTER | Laura Sagolla (P63951) |
| Attorneys for Plaintiffs | DYKEMA GOSSETT PLLC |
| 3475 Plymouth Road, Suite 100 | Attorneys for Defendants |
| Ann Arbor, MI 48105-2550 | 400 Renaissance Center |
| (734) 827-2001 | Detroit, MI 48243-1668 |
| | (313) 568-6837/(734) 214-7612 |

---

## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DYKEMA GOSSETT • A PROFESSIONAL LIMITED LIABILITY COMPANY • 400 RENAISSANCE CENTER • DETROIT, MICHIGAN 48243

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

STATEMENT OF ISSUES PRESENTED............................................................................ iii

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................1

ARGUMENT.........................................................................................................................6

A.    Plaintiffs Are Not Entitled to Summary Judgment on their Free Speech Claim
Because Defendants Exercised Editorial Control Based Upon Legitimate
Pedagogical Concerns...............................................................................................6

      1.    Plaintiffs completely omit *Hazelwood* from their free speech analysis. ......................7

      2.    Plaintiffs offer the red herring of "lewdness" or "indecency.".....................................9

      3.    Plaintiffs use the inapposite terms "content and viewpoint restrictions" and
"prior restraint" for their rhetorical effect. ..................................................................9

B.    Plaintiffs Are Not Entitled to Summary Judgment on their Free Exercise Claim. ...........13

      1.    Plaintiffs improperly "mix and match" Establishment Clause and Free
Exercise cases. ..........................................................................................................14

      2.    Plaintiffs ignore controlling Sixth Circuit case law....................................................14

C.    Plaintiffs Are Not Entitled to Summary Judgment on their Establishment Clause
Claim Because There Was No Endorsement of a Religious Belief by the Schools. .........15

      1.    There was no establishment of religion in this case, under any test............................16

      2.    The Establishment Clause cases plaintiffs rely upon are not relevant.........................17

D.    Plaintiffs Are Not Entitled to Summary Judgment on their Parental Rights Claim
Because The Facts of this Case Do Not Begin to Implicate the Constitutional
Right to Direct the Education of One's Children..............................................................19

CONCLUSION....................................................................................................................20

DYKEMA GOSSETT • A PROFESSIONAL LIMITED LIABILITY COMPANY• 400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

<u>**TABLE OF AUTHORITIES**</u>

*Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002), *cert denied*, 123 S.Ct. 1909 (2003) ......................16

*Arkansas Educ. Television Comm'n v Forbes*, 523 U.S. 666 (1998)............................................ 11

*Brown v. Hot, Sexy, & Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995), *cert denied*,
    516 U.S. 1159 (1996).............................................................................................................. 19

*Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369 (6th Cir. 1999)...................................................... 16

*DeNooyer v. Livonia Public Schools*, 799 F. Supp. 744, 750 (E.D. Mich. 1992) .......................... 8

*Dixon v. City of Lawton*, 898 F.2d 1443 (10th Cir. 1990) ............................................................ 20

*Doe v Beaumont Indep Sch Dst*, 240 F3d 462 (5th Cir 2001) ....................................................... 16

*Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000) *cert denied*, 532
    U.S. 994 (2001)................................................................................................................... 11, 12

*Engel v. Vitale*, 370 U.S. 421 (1962) ...................................................................................... 14, 18

*Epperson v. Arkansas*, 393 U.S. 97 (1968)................................................................................... 18

*Fleming v. Jefferson County Sch. Dist. R-1*, 298 F.3d 918 (10th Cir. 2002)................................... 9

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)....................................................*passim*

*Henery v. City of St. Charles Sch. Dist.*, 200 F.3d 1128 (8th Cir. 1999)........................................ 9

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist.*, 926 F.2d 505 (6th Cir. 1991).................... 20

*Lee v. Weisman*, 505 U.S. 577 (1992)...................................................................................... 14, 17

*Leebeart v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ................................................................. 19

*Lemon v. Kurtzman*, 403 U.S. 602(1971) ..................................................................................... 16

*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999)........................................... 13

*Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058 (6th Cir. 1987) *cert. denied*, 484 U.S.
    1066 (1988)............................................................................................................................. 15

*Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996) ..................................... 9, 12

*Oxford v. Beaumont Indep. Sch. Dist.*, 224 F. Supp. 2d 1099 (E.D. Tex. 2002) .......................... 18

*Poling v. Murphy*, 872 F.2d 757 (6th Cir. 1989) *cert denied*, 5493 U.S. 1021 (1990).......... 7, 9, 12

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................................... 10

*Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir. 1986)......................................................... 3

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ......................... 10, 11

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) ............................................................. 17

*Settle v. Dickson County School Board*, 53 F.3d 152 (6th Cir. 1995) ......................................... 7, 9

*Stubl v. T.A. Systems, Inc.*, 984 F. Supp 1075 (E.D. Mich. 1997) ................................................. 3

*Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969) ................................................... 7, 8

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

## STATEMENT OF ISSUES PRESENTED

I.    Whether plaintiffs are entitled to summary judgment on their claims that the plaintiff high school student's right to Free Speech was violated by defendants, the school district and its employees, by their (1) asking her to change certain portions of her speech, to be made during an all school "Diversity Week" assembly, and (2) precluding her from sitting on a Diversity Week panel, organized by another student group, where defendants' actions had a valid educational purpose and were reasonably related to such legitimate pedagogical goals as teaching students to stay on topic, to follow established procedures, making students aware of minority points of view, and creating a safe environment for gay and lesbian students?

> Defendants answer "No"
> Plaintiffs would answer "Yes"
> This Court should answer "No"

II.   Whether plaintiffs are entitled to summary judgment on their claim that the plaintiff student's right to Free Exercise of Religion was violated by the above actions of the defendants, where expressing the opinion that homosexuality is sinful (as plaintiff student wished) is not the "exercise of religion", and plaintiff student was not required to affirm or deny a belief by merely attending the panel?

> Defendants answer "No"
> Plaintiffs would answer "Yes"
> This Court should answer "No"

III.  Whether plaintiffs are entitled to summary judgment on their claim that defendants violated the Establishment of Religion clause where the panel which is the subject of plaintiffs' claim had the secular purpose of promoting diversity, and a reasonable observer would not believe that the panel, consisting of clergy persons from different faiths, constituted an endorsement of religion?

> Defendants answer "No"
> Plaintiffs would answer "Yes"
> This Court should answer "No"

IV.   Whether plaintiffs are entitled to summary judgment on their claim of violation of their parental rights where the general rule is that parents do not have the right to dictate the curriculum of a public school?

> Defendants answer "No"
> Plaintiffs would answer "Yes"
> This Court should answer "No"

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243


V.    Whether plaintiffs are entitled to summary judgment on their claims of violation of the Equal Protection clause and for conspiracy where plaintiffs have not shown that any of their fundamental rights were violated, that defendants acted illegally or improperly, and all of the defendants are associated with the same entity (i.e., the Ann Arbor Public Schools) and therefore cannot "conspire" with one another as a matter of law?

Defendants answer "No"
Plaintiffs would answer "Yes"
This Court should answer "No"

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

iv

# INTRODUCTION

Plaintiffs' Brief in Support of their Motion for Summary Judgment ("Pl.'s Br.") is a twenty-nine page exercise in obfuscation. When the rhetoric is stripped away, what is clear is that plaintiffs are not entitled to summary judgment. Plaintiffs completely omit any controlling precedent they find inconvenient—most importantly, *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988)—or cite cases completely out of context. And plaintiffs cloak their extreme beliefs in the noble cloth of free speech and free exercise. Defendants are not fooled, and this Court should not be either. Plaintiffs' claims fail for the reasons set forth below.

# STATEMENT OF FACTS

Defendants have previously set forth their recitation of the facts in this case in their Brief in Support of Defendants' Motion for Summary Judgment ("Def.s Br.")(at pp. 1-8) and refer the Court thereto. However, some additional points are worth mentioning.

First, it is significant that plaintiffs either agree with, or do not dispute, the following pertinent facts:

- Diversity Week is held pursuant to numerous Ann Arbor Public Schools policies, and most of the events are held during class time, on school premises. (Pl.'s Br. at pp. 3,4; Def.'s Br., p. 1, n.1.)

- The theme of Diversity Week was "Change from Within: Celebrating Diversity at PHS". (Def.'s Br., p. 1.)

- Attendance at the homosexuality and religion panel was not mandatory and plaintiff Elizabeth ("Betsy") Hansen elected to attend the panel, with full knowledge of its subject matter, even though her class did not. (Pl.'s Br., p. 19; Def.'s Br., p. 15.)

- Members of Pioneers for Christ ("PFC") frequently preach outside of the school and have made statements disapproving of homosexuality in that context; similar statements were made by students at the Diversity Week "open mic" session. (Def.'s Br., p. 7.)

- PFC was twice given the opportunity to create its own panel for Diversity Week (once when Ms. Korzdorfer was seeking student groups to coordinate panels, and then again during the March 15 meeting) but declined both times. (Def.'s Br., pp. 2, 4.)

1

- Betsy was given the opportunity to be on the panel on religion but declined. (Def.'s Br., p. 6.)

- Betsy never provided names of her proposed panel members to Ms. Korzdorfer or the GSA. (Def.'s Br., p. 3.)

- All of the questions Betsy submitted for the homosexuality and religion panel were read aloud to the panel and discussed. (Def.'s Br., p. 6.)

- There have been instances of harassment and violence towards gay students at PHS. (Def.'s Br., p. 2, n.2.)

Second, apart from the facts about which there is no dispute, plaintiff overstates certain others. For example, although plaintiff states that defendants "permitted a GSA member to give a pro-homosexual speech" (Pl's. Br., p. 14, referring to a speech given at the all-school assembly by Jeannette Maddock), the cited deposition testimony does not support plaintiffs' assertion. Jeannette testified that she merely said "the person sitting next to you could be a different race, creed, sexual orientation, religion, or he could – economic status, but that shouldn't matter", and that you "shouldn't. . . keep diversity in mind just through Diversity Week, it should be on your mind always." (Maddock Dep., attached at Exhibit A, Tab 1, p. 69.) Defendants fail to see how this is "pro-homosexual." Plaintiffs also state that there was virtually no discussion of homosexuality at the panel on religion. (Pl.'s Br., p. 13.) However, the deposition testimony contradicts this assertion, as former Student Council President and Diversity Week organizer Tom Jensen testified that two PFC member religion panelists discussed their faith's opposition to homosexuality, and a PFC member testified that she and/or another PFC member panelist may have discussed their religious beliefs regarding homosexuality. (Jensen Dep., Ex. A, Tab 2, p. 120; Raab Dep., Ex. A, Tab 3, p. 72.)

Third, and perhaps most disturbing, are the new sworn declarations submitted by plaintiffs which contradict or "explain away" prior deposition testimony. As this Court appreciates, such declarations are procedurally improper. At her May 8, 2003 deposition,

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

plaintiff Ralph Martin's daughter Maureen, who attended the homosexuality and religion panel, testified quite clearly that she did not feel as if she was "trying to be converted" at the panel; that the only thing that stood out in her mind about the panel was that she did not think the school did an "adequate job" of getting "different opinions"; and that the reason she left the panel halfway through was because she "didn't feel like it was being diverse." (M. Martin Dep., Ex. A, Tab 4, pp. 15, 26-27.) However, her declaration, executed on June 11, 2003—the eve of plaintiffs' motion—contradicts her earlier testimony by stating that she believes the panelists were "trying to convince me that my religious belief regarding homosexuality was wrong" and that she left because she would rather "face punishment than have to stay and listen to what these church leaders were saying." (Declaration of M. Martin, Ex. 12 to Pl's. Br., ¶ 3.) Similarly, at the April 9, 2003 deposition of William Johnson, PFC advisor, he produced notes he wrote immediately following Diversity Week 2002 which state "after attending the religion and sexuality panel, I woke up the next morning with some creative thoughts. It seemed like the panel was fine the way that it was. . . ." (Johnson Dep. Ex. 2, attached as Ex. B, p. 3.) Yet his June 16, 2003 declaration—again, executed on the eve of plaintiffs' motion—is highly critical of the panel, stating that he believes students were left with the impression that the panelists' belief "was based on reason, it was mainstream, and it was the enlightened one." (Declaration of William Johnson, Ex. 21 to Pl.'s Br. ¶¶ 3, 4.)[1]

Affidavits or declarations that contradict or supplement prior deposition testimony are impermissible when filed in connection with a motion for summary judgment. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Stubl v. T.A. Systems, Inc.*, 984 F. Supp 1075

---

[1] Plaintiffs have also submitted declarations from plaintiffs Ralph Martin and Elizabeth Hansen, and Father Michael Orsi (Exs. 14, 27 and 29 to Pl.'s Br.) despite the fact that all were previously deposed.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

(E.D. Mich. 1997) (affidavits that "contradict or substantially supplement" previous deposition testimony should be disallowed). Accordingly, these declarations should be stricken.

Finally, the very manner in which the case has been prosecuted reveals plaintiffs' true concerns and motivations behind this case. Put simply, plaintiffs *are not* concerned with First Amendment rights; they are concerned with silencing anyone or anything that does not explicitly condemn homosexuality. Among the best evidence of plaintiffs' position is the background and testimony of two of their three "expert" witnesses.

Richard Fitzgibbons, M.D., a psychiatrist from Pennsylvania, is a member of the Scientific Advisory Committee of the National Association for Research and Therapy of Homosexuality ("NARTH"). NARTH offers "sexual reorientation treatment" for homosexuals, also known as "reparative therapy," and attempts to persuade people that homosexuality is treatable and preventable. (Fitzgibbons Dep., Ex. A, Tab 5, p. 84; excerpts from NARTH website, attached as Ex. C.) NARTH and the position that it advocates have been roundly criticized by numerous professional groups.[2] Dr. Fitzgibbons testified that he believes homosexuality to be a treatable disorder, even though he acknowledges that the American Psychological Association, American Psychiatric Association, American Academy of Pediatrics, the Council on Child and Adolescent Health, and the World Health Organization have all either removed homosexuality from their lists of disorders or stated that they believe homosexuality cannot be changed. Dr. Fitzgibbons also testified that persons who believe homosexuality is genetic are "delusional," and that the homosexuality and religion panel was "psychologically

---

[2] See, e.g., American Psychiatric Association Position Statement on Therapies Focused on Attempts to Change Sexual Orientation (Reparative or Conversion Therapies), approved May 2000; American Academy of Pediatrics Policy Statement on Homosexuality and Adolescence, Oct. 1993; American Psychological Association, Answers to Your Questions About Sexual Orientation and Homosexuality; National Association of Social Workers Policy Statement: Lesbian, Gay and Bisexual Issues, approved Aug. 1996.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

damaging" to the students who attended because it "affirm[ed] homosexuality" and could cause the students to engage in homosexual activity, even though he knows of no studies supporting this conclusion. Dr. Fitzgibbons even testified that the mere *publication* of the American Psychological Association's position statement on homosexuality, which states that it is not a mental illness, could cause psychological harm. (Ex. A, Tab 5, pp. 54, 78-84, 91-93, 96-99.)[3]

Dick Carpenter, II, Ph.D., is offered by plaintiffs as an expert in (1) education and (2) "gay activist organizations, such as the Gay, Lesbian, and Straight Education Network (GLSEN) and . . . their efforts to influence education in the public schools." (Plaintiffs' Answers to Defendants' First Set of Interrogatories as to Dr. Dick Carpenter, attached as Ex. E, p. 2.) Until recently, Dr. Carpenter was affiliated with the conservative Christian group Focus on the Family. He currently travels the country conducting seminars entitled "Love Won Out," along with Dr. Nicolosi, the founder of NARTH. The purpose of the Love Won Out conferences is to inform people that they can change from homosexual to heterosexual. (Carpenter Dep., Ex. A, Tab 6, pp. 75-77.) Like Dr. Fitzgibbons, Dr. Carpenter believes that homosexuality is a disorder, despite the position of numerous professional organizations to the contrary. Like Dr. Fitzgibbons, Dr. Carpenter believes that "normalizing" homosexuality (that is, showing any acceptance of gays and lesbians) may encourage students to engage in homosexual activities, causing physical or psychological harm, although he too admits that he knows of no studies to support this theory. (Carpenter Dep., Ex., Tab 6, pp. 51-53, 62-63, 74, 126-29.) Dr. Carpenter also believes that the National Education Association is seeking to "indoctrinate students with

---

[3] See also, Plaintiffs' Answers to Defendants' First Set of Interrogatories and Document Requests as to Dr. Richard Fitzgibbons, attached as Ex. D, pp. 4-5, concluding that "the practice of exposing at-risk children and adolescents to groups or programs which usher them into a homosexual lifestyle can be fatal."

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

gay messages"; that the concepts that homosexuality is genetic and that gay teens have committed suicide due to harassment are "myths"; and that homosexuals cannot lead a fulfilling life. Dr. Carpenter even opined that a panelist arguably conveyed a "pro gay message" simply by identifying herself as lesbian, and that for a gay person to express that he or she was happy could be construed as a "pro gay" statement, improper in the schools. (*Id.*, pp. 57, 70, 158-59, 168, 177).[4]

Needless to say, defendants will file motions challenging the qualifications of these "experts" at the appropriate time should the case survive summary judgment, but the immediate point is that the selection of these individuals as "experts" makes clear plaintiffs' extreme and unsupported position on these issues and the real motive behind this case – to stop any and all actions or statements that are not condemning of gays.[5]

## ARGUMENT

**A.    Plaintiffs Are Not Entitled to Summary Judgment on their Free Speech Claim Because Defendants Exercised Editorial Control Based Upon Legitimate Pedagogical Concerns.**

---

[4] Dr. Carpenter also edited a pamphlet entitled "Teaching Captivity? How the Pro-Gay Agenda is Affecting Our Schools" (Carpenter Dep. Ex. 8, attached as Ex. F) which states that: (1) "the homosexual agenda is infecting our schools"; (2) the gay community "knew they didn't have a single valid point from which to argue the acceptance of homosexuality to the American public, so they had to be sneaky"; (3) refers to "tricky tactics" gay activists use to "further their agenda" (including "proclaim[ing] myths" such as that homosexual students are victimized); and (4) states that "we simply want the false glamour and lies to be stripped away from homosexuality. We are advocating the truth that it is unhealthy: mentally, emotionally, socially, spiritually and physically." (*Id.*, pp. 3, 12, 14, 16.)

[5] Plaintiffs' position is also shown by plaintiffs' counsel's repeated questioning at depositions regarding such topics as persons' sexual orientation, the activities of the Ann Arbor chapter of GLSEN, PHS's observation of the National Day of Silence, the history behind the formation of PHS' Gay/Straight Alliance ("GSA"), gay candidates for the Ann Arbor School Board, and whether AAPS offers benefits to domestic partners, none of which have anything to do with plaintiffs' claims in this case. (*See, e.g.*, Mancini Dep., Ex. A, Tab 7, pp. 34-37, 46-48, 69-70, 91, 101, 106; Pennington Dep., Ex. A, Tab 8, pp. 28-29, 58-69, 82-83, 128-144; O'Brien Dep., Ex. A, Tab 9, pp. 35-39; Fornero Dep., Ex. A, Tab 10, pp. 57-62.)

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

Defendants have established, through uncontested lay and expert testimony, four legitimate pedagogical goals motivating defendants to exercise control over student speech in this case: (1) teaching students to stay on topic, (2) teaching students to follow proper procedures, (3) making students aware of minority points of view, and (4) creating a safe environment for gay and lesbian students. (Def.'s Br., pp. 11-13.) In light of these undisputed goals, plaintiffs attempt to distract the Court from the strength of defendants' free speech defense in several ways, none of which is successful.

1.    Plaintiffs completely omit *Hazelwood* from their free speech analysis.

Plaintiffs rely heavily upon *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503 (1969) but completely ignore the case that controls this dispute, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). There are essentially three types of speech that can occur at a school – (1) speech by a student that happens to occur on school premises, such as the wearing of armbands to protest the Vietnam war at issue in *Tinker;* (2) speech by a student that is related to a school sponsored activity, such as the articles in the school newspaper at issue in *Hazelwood;* and (3) speech by the school itself or its representatives. Plaintiffs assume without analysis that the speech in this case falls into the first category. However, plaintiffs are incorrect.

Contrary to plaintiffs' assertion, it is *not* correct that "defendants must show that allowing Betsy to express her religious beliefs and opinions regarding homosexuality would have 'materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school.'" (Pl.'s Br., p. 23.) This language, taken from *Tinker*, 393 U.S. at 509, *does not* govern student speech in the context of an assembly speech or a panel discussion such as the one here. *See Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir. 1989) *cert. denied*, 493 U.S. 1021 (1990)(applying *Hazelwood* to teacher's decision to edit student's campaign speech)(not cited by plaintiffs); *Settle v. Dickson County School Board*, 53 F.3d 152 (6th Cir. 1995)(applying

*Hazelwood* to teacher's decision to forbid student to write research paper on "Life of Jesus Christ")(not cited by plaintiffs).

Plaintiffs apparently miss—or choose to ignore—*Hazelwood*'s important distinction between "a student's personal expression that happens to occur on the school premises," which is governed by *Tinker*, and student speech that is part of "school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," which is governed by *Hazelwood.* And given the facts, conceded by plaintiffs, that the Diversity Week events at issue were planned by student groups, faculty advisors, and administration to further school policies, and were held during school time, on school premises, it is all the more clear that *Hazelwood* governs.[6] Plaintiffs tip their hat to *Hazelwood* when they state in conclusory fashion that defendants did not have "legitimate pedagogical concern[s]" regarding Betsy's speech. (Pl.'s Br., p. 26.) But nowhere do plaintiffs treat *Hazelwood*—and the pedagogical concerns defendants have articulated in accordance with *Hazelwood's* teachings—head-on. Plaintiffs' silence on this point is not surprising. Dealing squarely with *Hazelwood* would prove fatal to plaintiffs' claims.[7]

---

[6] Plaintiffs are certainly aware of *Hazelwood* and, arguably, plaintiffs' counsel had an ethical obligation to bring it to the Court's attention as binding precedent. Indeed, a pamphlet authored by plaintiffs' counsel, The Thomas More Center, entitled <u>A Thumbnail Sketch of Religion and The Public School Student</u> (attached as Ex. G) refers to *Hazelwood* in its list of sources.

[7] By ignoring *Hazelwood*, plaintiffs also attempt to avoid the clear theory behind *Hazelwood*, namely, that great deference is granted to educators' decisions regarding school-sponsored events. As the Court stated in *Hazelwood*, "it is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." 484 U.S. at 607 (cites omitted). And, as this Court noted in upholding a school's decision preventing a student from showing a video in which she sang a religious song, the standard set forth in *Hazelwood* and *Poling* is consistent with the policy that education "is not a matter for federal judges". *DeNooyer v. Livonia Public Schools*, 799 F. Supp. 744, 750 (E.D. Mich. 1992).

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

2.  Plaintiffs offer the red herring of "lewdness" or "indecency."

Plaintiffs emphasize that Betsy's speech was not lewd or indecent—they label this their

"most important" point.  (Pl.'s Br., p. 24).  But of course defendants have never justified the

suggested editing of Betsy's speech on the grounds that her speech, as originally written, was

lewd or indecent.  After all, schools have the right to edit student speech for a number of reasons

that have nothing to do with lewdness or indecency.  *See, e.g., Settle,* 53 F.3d at 154, 156

(permissible to restrict student paper topic on theology); *Poling,* 872 F.2d at 759, 763

(permissible to edit student speech because of insulting references to administration); *Muller v.*

*Jefferson Lighthouse School,* 98 F.3d 1530, 1542-43 (7th Cir. 1996)(permissible to review

student-distributed flyers to teach civility and manners); *Henery v. City of St. Charles School*

*Dist.,* 200 F.3d 1128, 1134-35 (8th Cir. 1999) (permissible to review student-distributed flyers to

preserve calm and to ensure that school hours were devoted primarily to education); *Fleming v.*

*Jefferson County Sch. Dist. R-1,* 298 F.3d 918, 932-33 (10th Cir. 2002) (permissible to remove

student writing from school wall to "avoid divisiveness and disruption from unrestrained

religious debate" and to prevent the school from becoming a memorial for past tragedy).

Accordingly, plaintiff's "most important" point is not important at all.

3.  Plaintiffs use the inapposite terms "content and viewpoint restrictions" and "prior
restraint" for their rhetorical effect.

Finally, plaintiffs try to raise the specter of censorship with the labels "content and

viewpoint restrictions" and "prior restraint", despite the fact that both are inapplicable to this

case.

*a.  "Content and Viewpoint Restrictions"*

Plaintiffs allege that defendants imposed "content" and "viewpoint" restrictions on

student speech in this case which, according to plaintiffs, are always unconstitutional.  As

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

support for this proposition, plaintiffs cite two cases dealing with content and viewpoint restrictions in contexts completely different—and legally distinct—from the high school setting, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) and *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). Neither of these cases avails plaintiffs.

In *Rosenberger*, the Supreme Court held that the University of Virginia could not deny funding to a student group based on its Christian viewpoint. The ruling hinged on the fact that the University had created a "public forum" by its funding of various groups with differing views and purposes. In such a forum, viewpoint or content restrictions were improper. *Rosenberger*, 515 U.S. at 828. Here, in contrast, there can hardly be a dispute that the assembly speech and the homosexuality and religion panel were at least school-sponsored activities, if not school speech itself—after all, they took place during normal school hours and were designed to advance the missions of the school, as set forth in numerous school policies. Accordingly, there is no allegation—nor could there be—that defendants created a public forum. Plaintiffs' reliance on *Rosenberger* is therefore misplaced.

*R.A.V.* is similarly off-point. There, the Supreme Court held that a city ordinance could not place viewpoint restrictions on sub-categories of unprotected speech—namely, that the city could not ban fighting words that pertained to race, color, creed, religion, or gender, while treating all other types of "abusive invective" as fair game. *R.A.V.*, 505 U.S. at 391. *R.A.V.*, involving distinctions between certain types of unprotected speech that occur in public fora, is irrelevant to a case such as this, involving protected speech in the closed forum of a school-sponsored activity.

In fact, while the school assembly at which Betsy spoke is properly viewed as student speech that is part of a school-sponsored activity (and over which defendants can exercise

editorial control so long as it reasonably relates to a legitimate pedagogical concern), the homosexuality and religion panel is properly viewed as school or government speech, in which the school *can* make content-based decisions. "When the State is the speaker, it may make content-based choices." *Rosenberger*, 515 U.S. at 828. The GSA, a school group, with the assistance and approval of its advisors and school administration, selected the panelists for a school sponsored event to take place on school premises. As the Supreme Court noted, "much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school presenting its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others." *Arkansas Educ. Television Comm'n v Forbes*, 523 U.S. 666, 674 (1998).

*Downs v. Los Angeles Unified School Dist.*, 228 F.3d 1003 (9th Cir. 2000) *cert. denied*, 532 U.S. 994 (2001), illustrates that the homosexuality and religion panel was school speech. In that case, the Court of Appeals affirmed the grant of summary judgment to a school district that ordered a teacher to remove materials he had posted on a bulletin board in response to the school's recognition of Gay and Lesbian Awareness Month. The posted materials stated that most religions condemn homosexuality, and cited passages from the Bible the teacher believed to be condemning of homosexuality. Finding that the teacher's speech was school speech because it was posted on school property, the court found that the school principal had ultimate authority over the content and viewpoint of that speech. The court stated:

> An arm of local government – such as a school board – may decide not only to talk about gay and lesbian awareness and tolerance in general, but also to advocate such tolerance if it so decides, and restrict the contrary speech of one of its representatives.

*Downs*, 228 F.3d at 1014.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

Like the defendants in *Downs* who were permitted to make content and viewpoint determinations in ordering the removal of the plaintiff's materials, so can defendants in this case make content and viewpoint determinations regarding who could be on the panel. As the *Downs* court noted, "school teachers have no First Amendment right to influence curriculum as they so choose." *Id.* at 1016. If a school teacher has no such constitutional right, certainly Betsy, a student, has no such right either.

### b. "Prior Restraint"

Plaintiffs' use of the term "prior restraint" is also inapposite. The term "prior restraint" has never been used by the United States Supreme Court or the Sixth Circuit to describe pre-distribution or pre-delivery review of speech in a school-sponsored activity. Notably, the *Hazelwood* Court did not use this term when it approved the constitutionality of reviewing articles before publication in the school newspaper—a practice virtually identical to defendants' review of Betsy's speech. *Hazelwood*, 480 U.S. at 262-63. Nor has the Sixth Circuit characterized pre-delivery review of student speech as "prior restraint"; the *Poling* court likewise approved the policy of reviewing student candidates' speeches in advance without ever using the phrase "prior restraint." *Poling*, 872 F.2d at 758-60.

And plaintiffs must concede that even where courts have used the phrase "prior restraint" in the context of school speech, *they have approved such restraint nonetheless.* In *Muller*, the court approved the school's policy of reviewing student flyers twenty-four hours before distribution, holding that "[p]rior restraint of student speech in a nonpublic forum is constitutional if reasonable." *Muller*, 98 F.3d at 1540. The court reasoned that prior restraints in this context "can be an important tool in preserving a proper educational environment," and stated, "where public school children are involved there is no practical way to protect students from materials that can disrupt the educational environment or even severely traumatize a child

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

without some form of prior restraint." *Id. See also, Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999)("[Plaintiff] is simply wrong in arguing that all prior restraints on speech are analyzed under the same test . . . . [A] prior restraint on speech in a non-public forum at a school is constitutional if reasonably related to legitimate pedagogical goals." (citing *Hazelwood*, 484 U.S. at 274)). Thus, while plaintiffs hope to sway the court by labeling defendants' actions as "prior restraint," a look at the applicable law reveals that plaintiffs' argument is based on rhetoric, not reason.

Because defendants had a valid educational purpose in suggesting that Betsy change her speech, and in declining her request to be on the homosexuality and religion panel or to have a representative of her choosing on the panel, plaintiffs' Free Speech claims fail.

**B.   Plaintiffs Are Not Entitled to Summary Judgment on their Free Exercise Claim.**

Plaintiffs struggle mightily to state a claim for violation of plaintiffs' right to free exercise of religion. However, as indicated in defendants' earlier brief, voicing one's belief that homosexuality is sinful and depraved is *not* an exercise of religion within the meaning of Free Exercise jurisprudence.[8] Even if it were, any burdens placed on that "exercise" were incidental given the panoply of opportunities Betsy had to express her views—at the milk-crate preaching sessions, through her questions posed to the homosexuality and religion panel, at the religion

---

[8]   Plaintiffs assert that Betsy is under a moral obligation to defend her faith against opposing views, that this is a "basic tenet and practice of Betsy's religion," and that defendants violated her right to Free Exercise by "prevent[ing] her from defending her faith." (Pl.'s Br., pp. 3, 21.) Plaintiffs' "expert", Father Orsi, testified that Betsy, as a Catholic, had an obligation to confront "error", such as the "error" being presented by the panel, regardless of the setting in which the error was presented, and regardless of the rules set for the forum. For example, Fr. Orsi believes that Betsy had an obligation to speak out even if the school stated that there would be no comments from the audience. (Orsi Dep., Ex. A, Tab 11, pp. 51-61.) But plaintiffs' argument is a radical one. If a student had a valid Free Exercise claim any time he or she was not allowed to speak on some moral issue on which their faith takes a position, the Free Exercise right would be broad indeed. And under this argument, a school *would have to* allow a student to interrupt any type of proceeding, no matter what the occasion, be it graduation, classroom instruction, or the administering of the SATs, if the student believed "error" was being presented.

panel, at the open mic session, and by PFC's having its own panel and inviting whomever its members wished. Finally, the panel involved no "coercion" or "compulsion," another touchstone of a free exercise claim. Attendance at the panel was entirely optional, it was less than an hour long, and conflicting viewpoints were given a voice in the questions posed to the panel. Plaintiffs state no claim for violation of the Free Exercise clause.

      1.    <u>Plaintiffs improperly "mix and match" Establishment Clause and Free Exercise cases.</u>

Because plaintiffs cannot state a valid claim for the violation of Free Exercise, they repeatedly and indiscriminately slip into an analysis of Establishment Clause jurisprudence in their discussion of Free Exercise. For instance, plaintiffs rely heavily on *Lee v. Weisman*, 505 U.S. 577 (1992), the seminal case in which the Supreme Court held, *on Establishment Clause grounds*, that a high school graduation ceremony could not feature an invocation prayer led by a rabbi. Plaintiffs quote liberally from *Lee* in their section on Free Exercise on the subject of the "subtle coercive pressure" to conform to certain religious forces in the schools (Pl.'s Br., pp. 22-23). But their reliance on *Lee* merely underscores what is fatal to their claim—they can point to no *Free Exercise case* indicating that they should prevail.

      2.    <u>Plaintiffs ignore controlling Sixth Circuit case law on Free Exercise.</u>

Even worse, plaintiffs' confusion between Establishment Clause and Free Exercise leads them affirmatively to misstate the law of Free Exercise. Analogizing the instant case to *Lee* and to *Engel v. Vitale*, 370 U.S. 421 (1962), two Establishment Clause cases, plaintiffs imply that it is a violation of the Free Exercise clause to expose "students, such as Betsy Hansen and Maureen Martin, . . .to concepts and actions hostile to their religious faith." (Pl.'s Br., p. 21.) That this argument directly contradicts binding Sixth Circuit precedent in the Free Exercise arena, plaintiffs entirely ignore (reminiscent of their failure to acknowledge *Hazelwood*). In *Mozert v.*

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

*Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1065 (6ᵗʰ Cir. 1987) *cert. denied,* 484 U.S. 1066

(1988), the Sixth Circuit stated that "absent any showing that students were required to affirm or

deny a belief or engage or refrain from engaging in a practice prohibited by their religion," it was

not a violation of the Free Exercise clause to expose them to a compulsory reading book

containing stories on mental telepathy and supernaturalism, which contravened some students'

religious beliefs.  In this case, plaintiffs have made no showing—nor could they—that students

were required to affirm or deny any viewpoint expressed by members of the panel or its

organizers.  Nor were students forced to engage in any practice prohibited by their religion.

Even if listening to opposing views were contrary to the practice of Catholicism (which it is not,

and to which no one has testified), students were not forced to attend the panel or to engage in

this "forbidden practice"—that is, there was no governmental compulsion.  Plaintiffs' decision to

ignore *Mozert* is yet another example of their strategy to persuade through indirection.

In the end, plaintiffs' Free Exercise claim fails before it begins.  Stating that

homosexuality is sinful is not an "exercise of religion" as contemplated by the Free Exercise

clause.  Even if it were, defendants need not give Betsy a platform for this exercise wherever,

whenever, and however she desires.[9]  Plaintiffs' Free Exercise claim should be dismissed.

**C.    Plaintiffs Are Not Entitled to Summary Judgment on their Establishment Clause
Claim Because There Was No Endorsement of a Religious Belief by the Schools.**

Plaintiffs ignore binding Sixth Circuit precedent with regard to the Establishment Clause

as well.  Nowhere do plaintiffs acknowledge the most recent Sixth Circuit Establishment Clause

---

[9]  Betsy did not want to express her viewpoint through soap-box preaching, she wanted to express it at the panel.  Betsy did not want to express her viewpoint at the open mic session, she wanted to express it at the panel.  Betsy did not want to express her viewpoint at a panel she and the PFC organized, she wanted to express it at the panel organized by GSA.  And Betsy did not want to express her viewpoint by way of the questions she presented to the panel, she wanted to be on the panel herself or have someone of her own choosing on the panel.  Surely the Constitution does not require a school to cater so specifically to a student's wishes.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

case, *Adland v. Russ*, 307 F.3d 471 (6th Cir. 2002) *cert. denied*, 123 S.Ct. 1909 (2003). There the court set forth the following test: (1) whether the government activity in question has a secular purpose; and (2) whether the activity's primary effect advances or inhibits religion, that is, whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government. *Id.* at 479. Instead, plaintiffs employ three different tests – the *Lemon v. Kurtzman*, 403 U.S. 602 (1971) test, the "endorsement" test, and the "coercion" test, hoping that perhaps one will resonate with the facts of this case.[10]

    1.    <u>There was no establishment of religion in this case, under any test.</u>

Under any of these tests, plaintiffs' motion fails because the panel clearly had a secular purpose. Plaintiffs have not disputed the ample testimony that the panel was designed to promote and endorse tolerance of a minority viewpoint, and to inform those students who chose to attend (fewer than 10% of the student body) that some religious congregations are welcoming of gays and lesbians—not to promote religion or a particular religious belief. (*See* Def.'s Br., p. 2.) Indeed, it is clear that the purpose of the panel was pro-diversity, not anti-Catholic. *See Doe v Beaumont Indep Sch Dst*, 240 F3d 462 (5th Cir 2001) ("we cannot imply [sic] from the presence of a minister that the message cannot be secular.") Under plaintiffs' argument, a school could never present a viewpoint on *any* issue that was contrary to any religious group's position, for doing so would violate the Establishment Clause. Such a result is untenable.

It is also clear that no reasonable observer would believe that the panel constituted an endorsement of religion. The undisputed testimony regarding harassment of gays and lesbians in

---

[10] The Sixth Circuit has applied the "coercion" test in *Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369 (6th Cir. 1999), which predates *Adland*. However, *Coles* involved school prayer and it is therefore unclear whether the "coercion" test would apply to this case, as prayer is not involved. However, as discussed above, if this were the appropriate test, plaintiffs have not established a violation of the Establishment Clause.

the halls of PHS, and about the PFC's well-known and strong stance against homosexuality, indicate that a reasonable observer would see the panel as part of an ongoing dialogue about homosexuality and religion, not as a proclamation from on-high that a particular belief was the only acceptable one. Even plaintiffs' own witness, Maureen Martin, testified that she did not feel as though the panelists were trying to "convert" her, and PFC advisor Bill Johnson concluded, immediately following the panel, that it had turned out "fine". (Ex. A, Tab 4, p. 26; Ex. B.)[11] Based on this evidence, plaintiffs are clearly not entitled to summary judgment.[12]

2.    The Establishment Clause cases plaintiffs rely upon are not relevant.

Plaintiffs also rely upon a number of Establishment Clause cases that do not support their claim. Plaintiffs analogize to *Lee v. Weisman, supra.*, in which a public school invited a rabbi to give an invocation prayer at a school graduation, and to *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), in which a public school allowed student-led prayer before football games, both of which ran afoul of the Establishment Clause. Plaintiffs reason that inviting several clergy to a public school to "preach" a particular religious belief at the school-sponsored Diversity Week panel is "far more egregious" than the offending practices in these cases. (Pl.'s Br., p. 19.)

What plaintiffs fail to acknowledge is that both *Lee* and *Santa Fe* involved *prayer*, an action that is presumptively suspect when it is part of a school-sponsored activity. *See Engel v.*

---

[11]    Although plaintiffs submit supplemental declarations of Maureen Martin and William Johnson in an effort to neutralize this testimony, as explained above, these eleventh-hour declarations are improper and should not be considered.

[12]    Plaintiffs make much of GSA advisor Parker Pennington's memo stating that the purpose of the homosexuality and religion panel was to bring in adult religious leaders to "answer complex questions that may arise when [homosexuality and religion] are combined" because "[b]eliefs are not facts and so it will be up to each individual to find their own truth in the end...." (Pl.'s Br., p. 9.) Defendants are perplexed by plaintiffs' reliance on this statement, as it clearly demonstrates that the goal of the panel, at least according to one of the GSA advisors, was not to "preach" on the topic of homosexuality and religion, or to persuade students that any one view was correct, but to provide information that would enable students to "find their own truth." Under any Establishment Clause test, this evidence indicates that the panel was proper.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

*Vitale*, 370 U.S. at 425 (1962)(discussing historical context of Establishment Clause as specifically against establishment of certain types of prayer). . The panel in this case did not pray, or, as plaintiffs claim, "preach." The only "evidence" offered by plaintiffs that even comes close to this characterization of the panel's actions is the supplemental declarations of Maureen Martin and Bill Johnson, both of which must be struck as improper. The evidence establishes that, far from preaching, the panelists provided objective descriptions of their congregations' attitudes toward homosexual congregants. Accordingly, plaintiffs' analogies to *Lee* and *Santa Fe* do not persuade.

Nor does this case resemble *Epperson v. Arkansas*, 393 U.S. 97 (1968), upon which plaintiffs also rely. Plaintiffs pluck from *Epperson* the suggestive language that "the government may not aid, foster, or promote one religion or religious theory against another." *Id.* at 104. Assuming that the view that homosexuality and religion are not necessarily incompatible is a "religious theory"—which it is not (Def.'s Br., p. 17-18)—this language appears to support plaintiffs' view that the panel discussion was impermissible. But plaintiffs ignore the facts of *Epperson*, in which the Supreme Court declared unconstitutional an Arkansas statute banning the teaching of evolution in the public schools. Surely plaintiffs do not believe that this case, where defendants allowed clergy of many different faiths to speak to a smattering of the student body in one fifty-minute session, bears any resemblance to a case in which the state, at all times and in all schools, banned the teaching of a scientific theory precisely because it conflicted with a religious theory.[13]

---

[13] Plaintiffs also cite *Oxford v. Beaumont Indep. Sch. Dist.*, 224 F. Supp. 2d 1099 (E.D. Tex. 2002), which held that a public school's "Clergy in Schools" program violated the Establishment Clause. However, any similarity to the instant case suggested by the name of the offending program in *Oxford* is entirely superficial. In *Oxford*, the court found unconstitutional a

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

At bottom, plaintiffs Establishment Clause case fails because of the panel's secular purpose, because no reasonable observer would believe that the panel endorsed a particular religion or religious theory, and because the case law does not dictate the result plaintiffs desire.

**D.** **Plaintiffs Are Not Entitled to Summary Judgment on their Parental Rights Claim Because The Facts of this Case Do Not Begin to Implicate the Constitutional Right to Direct the Education of One's Children.**

Plaintiffs' parental rights claim fails because the facts of this case are not nearly of the magnitude necessary to implicate parents' constitutional rights to direct the upbringing of their children. While plaintiffs cite the seminal Supreme Court cases on parental rights, they nowhere acknowledge how the lower courts have applied the Supreme Court's inchoate parental rights doctrine to real disputes in the educational setting. As indicated in defendants' summary judgment brief, at least two federal circuits have adopted a rational basis level of scrutiny for school decisions that impinge upon parents' rights to control the education of their children—a level of scrutiny that allows for great discretion on the part of the school. (Def.'s Br., p. 19.)

Notably, the Second Circuit Court of Appeals has held that the doctrine of parental rights does not include "a fundamental right of every parent to tell a public school what his or her child will and will not be taught." *Leebeart v. Harrington*, 332 F.3d 134, ___(2d Cir. 2003). Moreover, where parents have objected to educational programs far more controversial, rigorous, lengthy, and mandatory than the panel discussion at issue in this case, the courts have rejected the parental rights claims. *See Leebaert* (no parental rights claim where children could not opt out of instruction on health and safety, alcohol, tobacco and drugs, and family life); *Brown v. Hot, Sexy, & Safer Productions, Inc.*, 68 F.3d 525, 534 (1st Cir. 1995), *cert. denied*, 516 U.S.

---

permanent counseling program run entirely by religious leaders. Such a program bears little resemblance to the one fifty-minute, optional panel discussion at issue here.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243

1159 (1996)(no claim where children could not opt out of AIDS awareness assembly featuring a

speaker who "advocated and approved" of homosexual activity, and premarital sex).  Like their

other claims, plaintiffs' parental rights claim suffers from their broad-brush approach to

Constitutional law and their inattention to relevant precedent.[14]

## CONCLUSION

WHEREFORE, for the above stated reasons and those stated in Defendants' Motion for

Summary Judgment and Brief in Support, Defendants request that this Court deny Plaintiff's

Motion for Summary Judgment and grant Defendants' Motion.

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: _____

Scott M. Lloyd (P16742)
Jill M. Wheaton (P49921)
Laura A. Sagolla (P63951)
400 Renaissance Center
Detroit, Michigan  48243-1668

Dated:  July 21, 2003

---

[14] As regards plaintiffs' claim for conspiracy, it is inappropriate for two reasons.  To state a claim for conspiracy, plaintiff must establish both a conspiracy and a deprivation of rights.  *See, e.g., Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990).  For all of the reasons set forth above, there was no deprivation of any of plaintiffs' rights.  Moreover, the general rule is that a corporation, including a school district, cannot conspire with its own agents or employees.  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist.*, 926 F.2d 505, 509 (6th Cir. 1991) (dismissing plaintiff's conspiracy claims against a school superintendent, district director, and school administrators, since all were members of the same collective entity and there were therefore not two separate "people" to form a conspiracy.)  For these reasons, plaintiffs' conspiracy claims should be dismissed.  Similarly, plaintiffs admit that in order to state a claim for violation of the Equal Protection Clause, they must show that government has violated plaintiffs' fundamental rights.  (Pl.'s Br., p. 27.)  Because plaintiffs have not shown a violation of their fundamental rights, the are not entitled to summary disposition on their Equal Protection claim.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

## INDEX TO EXHIBITS

Exhibit A:   Excerpts from deposition testimony

    Tab 1:    Jeannette Maddock

    Tab 2:    Thomas Jensen

    Tab 3:    Kirsten Raab

    Tab 4:    Maureen Martin

    Tab 5:    Dr. Richard Fitzgibbons

    Tab 6:    Dick Carpenter

    Tab 7:    Rodney Mancini

    Tab 8:    Parker Pennington

    Tab 9:    Jeremy O'Brien

    Tab 10:    George Fornero

    Tab 11:    Fr. Michael Orsi

Exhibit B:   Exhibit 1 to Johnson deposition

Exhibit C:   Excerpts from NARTH website

Exhibit D:   Plaintiffs' Answers to Defendants' First Set of Interrogatories as to Dr. Richard P. Fitzgibbons

Exhibit E:   Plaintiffs' Answers to Defendants' First Set of interrogatories as to Dick Carpenter, Ph.D.

Exhibit F:   Exhibit 8 to Carpenter deposition

Exhibit G:   <u>A Thumbnail Sketch of Religion and The Public School Student</u>, Thomas More Law Center

DYKEMA GOSSETT • A PROFESSIONAL LIMITED LIABILITY COMPANY • 400 RENAISSANCE CENTER • DETROIT, MICHIGAN 48243

DET01\366324.1
ID\JMW

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELIZABETH HANSEN,
CONSTANCE HANSEN, and
RALPH MARTIN,

        Plaintiffs,

v.

ANN ARBOR PUBLIC SCHOOLS,
HENRY CAUDLE, individually and in his
official capacity as Principal, Pioneer High
School, LARA ERICKSON, individually and
in her official capacity as Assistant Principal,
Pioneer High School, SUNNIE
KORZDORFER, individually and in her
official capacity as teacher, Pioneer High
School, PARKER PENNINGTON, IV,
individually and in his official capacity as
teacher, Pioneer High School, RODNEY
MANCINI, individually and in his official
capacity as teacher, Pioneer High School,
DENISE EADDY-RICHARDSON,
individually and in her official capacity as
Equity Ombudsman, Ann Arbor Public
Schools,

        Defendants.

Case No. 02-CV-72802-DT

HONORABLE GERALD E. ROSEN

FILED

U.S. DIST COURT CLERK
EASTERN DIST. MICHIGAN
DETROIT

2003 JUL 21 P 4: 51

---

Robert J. Muise (P62849)
Edward L. White, III (P62485)
THOMAS MORE LAW CENTER
Attorneys for Plaintiffs
3475 Plymouth Road, Suite 100
Ann Arbor, MI 48105-2550
(734) 827-2001

Seth M. Lloyd (P16742)
Laura Sagolla (P63951)
Jill M. Wheaton (P49921)
DYKEMA GOSSETT PLLC
Attorneys for Defendants
400 Renaissance Center
Detroit, MI 48243-1668
(313) 568-6837/(734) 214-7612

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·315 E EISENHOWER PARKWAY, SUITE 100·ANN ARBOR, MICHIGAN 48108-3306

---

## PROOF OF SERVICE

STATE OF MICHIGAN      )
                        ) SS.
COUNTY OF WAYNE      )

    Cynthia Hammond, an employee of Dykema Gossett PLLC, being first duly sworn,

deposes and says that on the 21st day of July, 2003, she caused to be served a copy of a *Brief In*

*Opposition To Plaintiff's Motion For Summary Judgment and this Proof of Service* upon Robert J. Muise at 3475 Plymouth Road, Suite 100, Ann Arbor, Michigan 48105-2550, by enclosing copies of the same in an envelope properly addressed, and by depositing said envelope in the United States Mail with postage thereon having been fully prepaid.

*Cynthia Hammond*

Cynthia Hammond

Subscribed and sworn before
me this 21st day of July, 2003.

Notary Public
My Commission Expires:

MARY PEARSON
NOTARY PUBLIC MACOMB CO., MI
MY COMMISSION EXPIRES Jan 8, 2008
ACTING IN WAYNE COUNTY, MI

DET01\352906.5
IDJMW

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•1515 EISENHOWER PARKWAY, SUITE 100•ANN ARBOR, MICHIGAN 48108-3306

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED